UNITED STATES of America

v.

Salim Ahmed HAMDAN.

CMCR 09–002.

United States Court of Military Commission Review.

June 24, 2011.

Joseph M. McMillan argued the cause for appellant. With him on the briefs were Harry H. Schneider, Jr., Charles C. Sipos, Adam Thurschwell, and Captain Michael G. Thieme, U.S. Air Force.

Francis A. Gilligan argued the cause for appellee. With him on the briefs were Captain John F. Murphy, JAGC, U.S. Navy and Captain Edward S. White, JAGC, U.S. Navy.

Briefs of amici curiae urging reversal were filed for the National Institute of Military Justice by Marc A. Goldman and Michelle M. Lindo McCluer; for Professor Dr. Terry D. Gill and Dr. Gentian Zyberi by Michael R. Doyen, Gregory D. Phillips, and David C. Lachman; for Constitutional Law Scholars by Kimball R. Anderson and John A. Sholar, Jr., with the assistance of Law Student Contributors: Kenneth Burden, Andrew Linenberg, Amy Pahlka–Sellars, and Neha Sinha (Rutgers University School of Law—Camden); for Professors Geoffrey S. Corn and Victor M. Hansen by Sylvia H. Walbolt. Brief of amici curiae urging recusal of two judges was filed for the National Institute of Military Justice by Eugene R. Fidell, Michelle M. Lindo McCluer, and Jonathan E. Tracy.

BEFORE THE COURT EN BANC
BRAND, CONN, HOFFMAN, SIMS, GALLAGHER, PERLAK, ORR,[1] Appellate Military Judges.

**PUBLISHED OPINION
OF THE COURT**

PER CURIAM.

I. STATEMENT OF FACTS ............................................1254

II. CHARGE AND SPECIFICATIONS WITH GUILTY FINDINGS.............1258

III. PROCEDURAL HISTORY ...........................................1259

IV. ISSUES .......................................................1260

V. MILITARY COMMISSION PROCEDURES ..............................1260

VI. STANDARD OF REVIEW ...........................................1263

VII. PROVIDING MATERIAL SUPPORT FOR TERRORISM AS A LAW OF
 WAR OFFENSE ..................................................1264
 A. Authority to Define Law of War Offenses ...........................1264
 1. War Powers.................................................1264
 2. Foreign Affairs.............................................1267

1. Acting Chief Judge O'TOOLE and Judges THOMPSON, PRICE, BIESTER, and Gregory recused themselves from participation in appellant's case. Judge GEISER retired from the Court. Judges GALLAGHER, HOFFMAN, PERLAK, and SIMS joined the Court on November 30, 2010. Judges ORR and GREGORY joined the Court on March 17, 2011. After the recusals and retirement, and the new judges joined the Court, the judges re-voted and again decided to consider appellant's case *en banc*. All judges not recused from the Court attended the oral argument on March 17, 2011, and were either present for or listened to the recording of the oral argument on January 26, 2010.

B. Defining Terrorism and Providing Material Support for Terrorism....1270
 1. U.S. Domestic Terrorism Offenses—Title .........................1270
 2. Congressional Finding that Providing Material Support for
 Terrorism is a Traditional Law of War Offense ..................1273
 3. The M.C.A. and Providing Material Support for Terrorism .........1274
 4. M.M.C.'s List of Elements for Appellant's Specifications...........1275
 5. Criminal Intent and Wrongfulness...............................1276
 6. Findings of the Military Commission Judge ......................1279
C. Criminalization of Analogous Global Conduct........................1279
 1. International Conventions and Declarations .....................1280
 2. International Criminal Tribunals ...............................1284
 3. Non–United States Domestic Terrorism Laws .....................1288
D. Prosecutions for Wrongfully Providing Aid or Support to the Enemy....1292
 1. Contents of Specifications.....................................1293
 2. 19th Century Irregular Warfare and Aiding the Enemy .............1294
 3. The Philippine–American War, 1899–1902.........................1303
 4. World War II Era ............................................1304
 5. Army 1914 and 1956 Manuals .................................1309
E. Ex Post Facto .................................................1310
F. Conclusion ...................................................1312

VIII. EQUAL PROTECTION ...........................................1313
 A. Jurisdiction of Article I Courts................................1314
 B. Due Process ...............................................1315
 C. Boumediene and Equal Protection under the Fifth Amendment.........1316
 D. The 2006 M.C.A. and the Equal Protection Component of the Due
 Process Clause of the Fifth and Fourteenth Amendments ............1319
 E. Legal Test.................................................1320
 F. Application of Rational Basis Review............................1322

IX. CONCLUSION..................................................1322

Appellant was convicted, contrary to his pleas, of five specifications of providing material support for terrorism, in violation of the Military Commissions Act of 2006, 10 U.S.C. § 950v(b)(25), at a military commission convened at U.S. Naval Station, Guantanamo Bay, Cuba. The military commission sentenced him to 66 months confinement, and the convening authority approved the findings and sentence. Under our review authority,[2] we have carefully considered the record and the various pleadings, briefs, and oral arguments of the parties and *amici*. We find appellant's assignments of error and pleadings, to include his filing on granted issues,[3] to be without merit, and we affirm the findings and sentence.

## I. STATEMENT OF FACTS

The record establishes and the military commission found that appellant joined and became a member of al Qaeda, a well-established terrorist organization, with the knowledge that al Qaeda has engaged in and engages in terrorism. He had the intent to join in al Qaeda's purposes, and he subsequently took actions to further al Qaeda's goals and purposes.[4]

---

**2.** We have jurisdiction under the *Military Commissions Act of 2006* §§ 950c(a) and 950f (2006 M.C.A.) and Manual for Military Commissions (M.M.C.), Rules for Military Commissions (R.M.C.) 1111 and 1201(c) (Jan. 18, 2007).

**3.** *See* n. 7, *infra*.

**4.** *See* Findings of Guilty for Specifications 2, 5, 6, 7, and 8 of Charge II, *infra* pp. 1257–59.

As early as 1989, Usama bin Laden associated with al Qaeda's Shura Counsel, especially the leader of the Egyptian Islamic Jihad Movement, Dr. Ayman al-Zawahiri, and Omar Abdel Rahman, the Blind Shaykh. Rahman was "the joint spiritual leader of the two leading terrorist organizations in Egypt, the Islamic Jihad and Al–Gama'at al-Islamiyya." [5] Al Qaeda, a military organization, has been involved in various violent activities directed against U.S. civilian and military personnel since at least 1991. "In December 1991, Islamic militants launched a failed bomb attack at a hotel in Aden, Yemen targeting 100 U.S. soldiers who were staying there en route to peacekeeping duties in nearby Somalia." The 1991 Aden bombing, which killed two tourists, was "in response to a 'fatwah,' or religious edict, issued on behalf of [al-Qaeda] in late 1991—which condemned the presence of U.S. military peacekeepers as an attempt to colonize the Muslim world."

In late 1992, bin Laden led meetings of terrorists at al Qaeda guesthouses in Khartoum, Sudan. Al Banshiri, al Qaeda's chief military commander, told al Qaeda members that al Qaeda hoped the United States would become involved in the civil war in Somalia so "that we make a big war with them." Bin Laden announced to 30–40 al Qaeda members in late 1993 that "the American army now they came to the Horn of Africa, and we have to stop the head of the snake ... the snake is America, and we have to stop them. We have to cut the head and stop them." In 1993, al Qaeda's leaders sent al Qaeda Shura Council member Mohammed Atef (a.k.a. Abu Hafs al Masri) to Somalia to organize and train for an attack upon U.S. forces. In October 1993, Somali militiamen used rocket-propelled grenades to shoot down two U.S. Blackhawk helicopters over Mogadishu. Eighteen U.S. military personnel and numerous militiamen were killed in the ensuing street battle. Shortly thereafter, Abu Hafs spoke with al Qaeda members in the Sudan and stated, "everything happening in Somalia, it's our responsibility ... the al Qaeda group, our group."

In January 1996, Rahman was convicted in U.S. federal court of conspiracy for inspiring the February 1993 bombing of the World Trade Center. *United States v. Rahman,* 189 F.3d 88, 103 (2d Cir.1999). In early 1996, Mohammed bin Attash, a close associate of bin Laden, convinced appellant that he should go from his home in Yemen to Tajikistan for Jihad. Bin Attash gave appellant a false passport and an airline ticket to fly from Yemen to Pakistan. Appellant stayed in guest houses in Pakistan, and then he went to Afghanistan. Once in Afghanistan, appellant spent 30–40 days at Al Farouq, an al Qaeda training camp. While there, appellant received training on a variety of weapons,

---

**5.** The quotations in the Statement of Facts regarding the conflict between al Qaeda and the United States are from the video "The Al–Qaida Plan," which detailed the origins and goals of al Qaeda and Usama bin Laden to the military commission to support a determination that appellant's conduct occurred during hostilities. Descriptions of al Qaeda's violent campaign against the United States in various decisions by federal courts are consistent. *See e.g., In re Terrorist Bombings of U.S. Embassies in East Africa,* 552 F.3d 93, 103–05 (2d Cir.2008); *United States v. Rahman,* 189 F.3d 88, 105–11 (2d Cir.1999) (describing conspiracy resulting in the bombing in 1993 of the World Trade Center); *United States v. Salameh,* 152 F.3d 88, 107–08 (2d Cir.1998) (same); *United States v. Yousef,* 327 F.3d 56, 79–83 (2d Cir.2003) (describing the conspiracy from August 1994 to January 1995 to bomb United States commercial airliners in Southeast Asia). *See also The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States* (2004), which describes additional linkage between al Qaeda attempted bombings and bombings of U.S. citizens in the mid–1990s.

including AK–47s, machine guns, pistols, and rockets. After training, appellant became a driver for an al Qaeda guest house where he ferried people and supplies between Al Farouq and the guest houses. Shortly thereafter, appellant was introduced to bin Laden, gained his trust, and became a primary driver for him. Appellant was trained on convoy techniques and standard operating procedures to engage in if one of bin Laden's compounds came under attack. In addition to serving as bin Laden's driver, appellant also served as his bodyguard. All bodyguards and drivers were armed.

During this period as bin Laden's personal driver and bodyguard, appellant pledged *bayat*, or "unquestioned allegiance" to bin Laden. The *bayat* extended to bin Laden's campaign to conduct jihad against Jews and crusaders and to liberate the Arabian Peninsula from infidels; however, appellant reserved the right to withdraw his *bayat* if bin Laden undertook a mission with which he did not agree. The record does not reveal any instance where appellant exercised this prerogative and refused to support an al Qaeda mission or declined to obey bin Laden's orders.

Appellant, on numerous occasions, delivered requests for logistical support, including weapons and ammunition, to al Qaeda's logistical officer and subsequently delivered the military supplies to the Panjshir Valley. Appellant also delivered bin Laden's orders for military supplies. Appellant repeatedly attended anti-Western lectures given by bin Laden. This began with his own training at an al Qaeda training camp and continued throughout his association with bin Laden, including driving him to training camps and other meetings.

In August 1996, bin Laden issued a video which included a "declaration of war" against the Americans who were occupying land in the Arabian Peninsula (1996 Jihad Declaration). Bin Laden's 1996 Jihad Declaration encouraged the killing of American soldiers in the Arabian Peninsula, and he called upon Muslims everywhere to carry out operations to expel Americans and non-Muslims from the Arabian Peninsula by use of "explosions and jihad" stating:

> My Muslim Brothers of The World: Your brothers in Palestine and in the land of the two Holy Places are calling upon your help and asking you to take part in the fighting against the enemy— your enemy and their enemy—the Americans and the Israelis. They are asking you to do whatever you can, with one['s] own means and ability, to expel the enemy, humiliated and defeated, out of the sanctities of Islam.

In February 1998, bin Laden held a press conference in Afghanistan and announced the founding of the "World Islamic Front Against Jews and Crusaders." "Bin Laden and his colleagues signed a joint fatwah requiring all Muslims able to do so to kill Americans—whether civilian or military—anywhere they can be found and to 'plunder their money.' " Bin Laden issued a declaration called "The Nuclear Bomb of Islam" which included the statement, "it is the duty of Muslims to prepare as much force as possible to terrorize the enemies of God." On August 7, 1998, al Qaeda operatives detonated truck bombs outside the American Embassies in Nairobi, Kenya and Dar es Salaam, Tanzania, killing 257 people, including 12 Americans, and wounding thousands more. Before the bombings of the U.S. Embassies in Nairobi and Tanzania in 1998, appellant knew that a terrorist attack outside of Afghanistan targeting Americans was going to take place. Bin Laden did not know how the U.S. would react, so bin Laden left his compound in Kandahar the day after the attacks and went to Kabul for 10 days. In 1998, appellant drove bin Laden

to a press conference related to the 1998 East African Embassy bombings. While there, appellant met al-Zawahiri. On August 20, 1998, the United States retaliated, sending tomahawk missiles and striking "terrorist training camps in Afghanistan and a suspected chemical weapons laboratory in Khartoum, Sudan." Shaykh Omar Abdel Rahman responded from inside his American jail cell by urging new recruits to join the cause and issuing a new fatwah, saying, "Oh, Muslims everywhere! Cut the transportation of their countries, tear it apart, destroy their economy, burn their companies, eliminate their interests, sink their ships, shoot down their planes, kill them on the sea, air, or land. Kill them when you find them, take them and encircle them. . . ."

In October 2000, al Qaeda operatives exploded a bomb alongside the USS COLE, "killing 17 American sailors, wounding 39 others, and causing nearly $250 million in damage. The COLE operation came at the direction and urging of Usama bin Laden, Abu Hafs Al Masri, and other senior [al-Qaeda] leaders." At the time of the USS COLE bombing, appellant was in Yemen. He believed that due to his close association with bin Laden, he might be apprehended, so he made arrangements to return to Afghanistan. Appellant knew that the scope of bin Laden and al Qaeda's operations included terrorist attacks targeting Americans outside of Afghanistan.

Appellant drove bin Laden in a convoy in August 2001 to a large gathering with 150–200 attendees, mostly Egyptian Islamic Jihad members and al Qaeda members. After the dinner, al-Zawahiri and bin Laden announced that the Egyptian Islamic Jihad and al Qaeda were merged. Subsequently, appellant drove bin Laden to meetings with al-Zawahiri and drove in convoys with both bin Laden and al-Zawahiri.

Al Qaeda's actions achieved worldwide infamy when, on September 11, 2001, 19 men recruited by al Qaeda hijacked four commercial airliners on the east coast of the United States and crashed one into the Pentagon in Washington D.C. and two into the World Trade Center towers in New York. The fourth aircraft crashed in Pennsylvania after the passengers attacked the hijackers.

Seven to ten days before September 11, 2001, bin Laden told appellant they were evacuating the compound because an operation was about to take place. Two days prior to the operation, appellant took bin Laden to Kabul, where they stayed until just after the 9/11 attack. The day after the attack, at dinner, bin Laden confirmed that he was responsible for the 9/11 operation. Subsequently, appellant drove bin Laden to Lahore, a military camp with numerous tunnels and structures for hiding. After a week hiding there with bin Laden, appellant continued to transport bin Laden around Afghanistan, changing locations every few days to help bin Laden escape retaliation by the United States. Shortly after 9/11, appellant drove bin Laden and al-Zawahiri to a camp outside of Kabul where bin Laden made a video talking about Jews, Americans, and jihad.

Congress passed the Authorization for Use of Military Force resolution (AUMF) one week after the September 11, 2001 terrorist attacks. Pub.L. No. 107–40, 115 Stat. 224 (2001). The AUMF authorizes the President to "use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks." *Id.* The President ordered the armed forces to Afghanistan "to subdue al Qaeda and quell the Taliban regime that was known to support it." *Hamdi v. Rumsfeld,* 542 U.S. 507, 510, 124 S.Ct. 2633, 159 L.Ed.2d 578 (2004). Sub-

sequently, United States and allied armed forces engaged in military operations in Afghanistan where appellant was seized on November 24, 2001.

## II. CHARGE AND SPECIFICATIONS WITH GUILTY FINDINGS

Appellant was convicted of two types of providing material support for terrorism. First, he provided material support for carrying out an act of terrorism. Second, he provided material support to an international terrorist organization. *See* 2007 M.M.C., Part IV, ¶¶ 6(25)bA and 6(25)bB. The five specifications of which he was convicted begin with identical language:

In that Hamdan, a person subject to trial by military commission as an alien unlawful enemy combatant, did, in Afghanistan and other countries, from in or about February 1996 to on or about November 24, 2001, in context of or associated with an armed conflict—

The specifications continue with individualized allegations as follows:

Specification 2: [Hamdan] with knowledge that al Qaeda has engaged in or engages in terrorism, did provide material support or resources, to wit: personnel, himself, to al Qaeda, an international terrorist organization engaged in hostilities against the United States, with the intent to provide such material support and resources to al Qaeda, by becoming a member of the organization and performing at least one of the following [6]:

a. Received training at an al Qaeda training camp;

b. Served as a driver for Usama bin Laden transporting him to various locations in Afghanistan;

c. Served as Usama bin Laden's armed bodyguard at various locations throughout Afghanistan;

d. Transported weapons or weapons systems or other supplies for the purpose of delivering or attempting to deliver said weapons or weapons systems to Taliban or al Qaeda members and associates.

Specification 5: [Hamdan did] provide material support and resources to wit: service or transportation by serving as a driver for Usama bin Laden by transporting him to various locations in Afghanistan knowing that by providing said service or transportation he was directly facilitating communication and planning used for an act of terrorism.

Specification 6: [Hamdan did] with knowledge that al Qaeda, an international terrorist organization engaged in hostilities against the United States, had engaged in or engages in terrorism, intentionally provide material support or resources to al Qaeda, to wit: service or transportation to Usama bin Laden by transporting him to various areas in Afghanistan knowing that by providing said service or transportation he was directly facilitating communication and planning used for acts of terrorism.

Specification 7: [Hamdan did] provide material support and resources to wit: service as an armed body guard for Usama bin Laden, knowing that by providing said service as an armed bodyguard

---

6. Although Specification 2 of Charge II alleges that appellant committed at least one of four alleged acts, the findings worksheet for this specification indicates the members found appellant guilty of all four alleged acts, including that he "[t]ransported weapons or weapons systems or other supplies for the purpose of delivering or attempting to deliver said weapons or weapons systems to Taliban or al Qaeda members and associates." AE 320 at 5–6. After review of the entire record, we are independently convinced beyond a reasonable doubt that appellant committed all four of the acts alleged in Specification 2 of Charge II. *See* 2009 M.C.A. § 950f(d).

he was protecting the leader of al Qaeda and facilitating communication and planning used for acts of terrorism.

Specification 8: [Hamdan did] with knowledge that al Qaeda, an international terrorist organization has engaged in hostilities against the United States, had engaged in or engages in terrorism, intentionally provide material support or resources, to al Qaeda, to wit: service as an armed body guard for Usama bin Laden by knowing that by providing said service as an armed body guard for Usama bin Laden he was protecting the leader of al Qaeda and facilitating communication and planning used for acts of terrorism.

## III. PROCEDURAL HISTORY

In late 2001, militia forces in Afghanistan captured appellant, and on November 24, 2001, they turned him over to the U.S. military. In 2002, the U.S. military transported him to a military detention facility in Guantanamo Bay, Cuba, where he was held until he was transferred to Yemen in November 2008.

On July 3, 2003, the President declared appellant eligible for trial by military commission on unspecified charges pursuant to the President's Military Order of November 13, 2001. *Hamdan v. Rumsfeld*, 344 F.Supp.2d 152, 155 (D.D.C.2004). On July 13, 2004, the Appointing Authority referred to trial by military commission one charge with one specification of conspiracy with bin Laden and other "members and associates of the al Qaeda organization, known and unknown, to commit" the offenses of "attacking civilians; attacking civilian objects; murder by an unprivileged belligerent; destruction of property by an unprivileged belligerent; and terrorism." Charge Sheet and Referral, Allied Papers.

On April 6, 2004, appellant filed a petition for mandamus or habeas corpus in the U.S. District Court for the Western Dis-

trict of Washington. *Hamdan*, 344 F.Supp.2d at 155. On July 8, 2004, the Ninth Circuit directed that all habeas cases from Guantanamo "should be heard in the District Court of the District of Columbia." *Id.* at 156 (citing *Gherebi v. Bush*, 374 F.3d 727 (9th Cir.2004)). On September 2, 2004, appellant's case was docketed in the District Court of the District of Columbia. *Id.* On November 8, 2004, the District Court stayed appellant's military commission trial until the Department of Defense complied with various requirements of the Court. *Id.* at 173–74. On July 15, 2005, a D.C. Circuit panel unanimously reversed the District Court. *Hamdan v. Rumsfeld*, 415 F.3d 33, 44 (D.C.Cir.2005). On November 7, 2005, the Supreme Court granted certiorari. *Hamdan v. Rumsfeld*, 546 U.S. 1002, 126 S.Ct. 622, 163 L.Ed.2d 504 (2005).

On June 29, 2006, the Supreme Court ruled in *Hamdan v. Rumsfeld*, 548 U.S. 557, 635, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006), that the military commission system then in existence violated Article 36, Uniform Code of Military Justice (UCMJ) and the Geneva Conventions, and that appellant was entitled to the protections of Common Article 3 of the Geneva Conventions (Common Article 3). *See* pp. 1261–63 *infra* (discussing Supreme Court decision and quoting Common Article 3). Subsequently, Congress passed the 2006 M.C.A., which President Bush signed into law on October 17, 2006. Remarks on Signing the Military Commissions Act of 2006, 42 *Weekly Comp. Pres. Doc.* 1831–33 (Oct. 17, 2006). The 2006 M.C.A. established a revised system of military commissions, which limited jurisdiction to alien unlawful enemy combatants (AUECs). 2006 M.C.A. § 948c. *See* n. 48, *infra.* (defining the term AUEC).

On May 10, 2007, the convening authority referred to trial by military commission

one charge each of conspiracy and providing material support for terrorism, citing violations of 10 U.S.C. §§ 950v(b)(28) and 950v(b)(25). Appellant again asked the District Court to stop his trial. On July 18, 2008, the District Court declined to stop his trial, acknowledging the new landscape of military commissions after enactment of the 2006 M.C.A. *Hamdan v. Gates,* 565 F.Supp.2d 130, 136–37 (D.D.C. 2008).

Appellant pleaded not guilty to the two charges. Although the military commission found appellant not guilty of conspiracy and three specifications of providing material support for terrorism, he was found guilty of five specifications of providing material support for terrorism.

On August 7, 2008, the military commission sentenced appellant to 66 months of confinement, and the military commission judge awarded confinement credit of 61 months, seven days. In late November 2008, appellant was transferred to his native Yemen for the remaining few weeks of confinement. Appellant's Brief at 3. In January 2009, Yemeni authorities released appellant. *Id.* On July 16, 2009, the convening authority approved appellant's conviction and sentence.

## IV. ISSUES

Appellant urges this court to vacate the findings and sentence of the military commission for three reasons. First, he contends the military commission, established pursuant to Congress's Article I power to "define and punish … Offenses against the Law of Nations," lacked subject matter jurisdiction over the offense of providing material support for terrorism, because it is not a violation of the international law of war. Second, he argues his conviction for that offense is the result of an *ex post facto* prosecution prohibited by both the U.S. Constitution and international law, because 10 U.S.C. § 950v(b)(25) was signed into law on October 17, 2006, several years after the alleged conduct in the charges occurred. Third, he claims that the 2006 M.C.A. violates the Constitution by making aliens, but not citizens, subject to trial by military commission. Our Court also granted appellant's motion to be heard on two issues relating to appellant's second argument,[7] and appellant continued to maintain that his prosecution was barred because the offenses were *ex post facto.*

## V. MILITARY COMMISSION PROCEDURES

In light of its predicate application of Common Article 3,[8] in 2006 the Supreme

---

**7.** The two granted issues are as follows:

I. Assuming that the charges allege underlying conduct that violates the law of armed conflict and that "joint criminal enterprise" is a theory of individual criminal liability under the law of armed conflict, what, if any, impact does the "joint criminal enterprise" theory of individual criminal liability have on this Court's determinations of whether the charged conduct constitutes an offense triable by military commission and whether the charges violate the Ex Post Facto Clause of the Constitution? *See, e.g. Hamdan v. Rumsfeld,* 548 U.S. 557, 611 n. 40, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006).

II. In numerous Civil War and Philippine Insurrection cases, military commissions convicted persons of aiding or providing support to the enemy. Is the offense of aiding the enemy limited to those who have betrayed an allegiance or duty to a sovereign nation? *See Hamdan v. Rumsfeld,* 548 U.S. 557, 600–01, n. 32, 607, 693–97, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006).

**8.** Article 3 of the Geneva Convention (III) Relative to the Treatment of Prisoners of War, Aug. 12, 1949, [1955] 6 U.S.T. 3316, 3318, T.I.A.S. No. 3364 states:

In the case of armed conflict not of an international character occurring in the territory of one of the High Contracting Parties, each Party to the conflict shall be bound to apply, as a minimum, the following provisions: (1) Persons taking no active part in the hostilities, including members of armed forces who have laid down their arms and those placed hors de combat by

Court determined the Presidentially-directed structure for appellant's original trial in 2004 was inconsistent with the limitations imposed by Congress pursuant to Article 36, UCMJ, 10 U.S.C. § 836,[9] and was therefore illegal. *Hamdan*, 548 U.S. at 620–25, 126 S.Ct. 2749. The Court considered the President's authority to convene appellant's military commission without specific statutory authority to prosecute the charged offense, and addressed the jurisdictional basis of military commissions stating:

> Exigency alone, of course, will not justify the establishment and use of penal tribunals not contemplated by Article I, § 8, and Article III, § 1, of the Constitution unless some other part of that document authorizes a response to the felt need. And that authority, if it exists, can derive only from the powers granted jointly to the President and Congress in time of war.[10]

The *Hamdan* Court, quoting Chief Justice Chase in *Ex parte Milligan*, emphasized the limits on the President's authority to convene military commissions without more specific statutory authorization stating:

> But neither can the President, in war more than in peace, intrude upon the proper authority of Congress, nor Congress upon the proper authority of the President.... Congress cannot direct the conduct of campaigns, nor can the President, or any commander under him, without the sanction of Congress, institute tribunals for the trial and punishment of offences, either of soldiers or civilians, unless in cases of a controlling necessity, which justifies what it compels, or at least insures acts of indemnity from the justice of the legislature.

*Id.* at 591–92, 126 S.Ct. 2749 (quoting *Ex parte Milligan*, 71 U.S. 2, 139–40, 4 Wall. 2, 18 L.Ed. 281 (1866); citation omitted).

---

sickness, wounds, detention, or any other cause, shall in all circumstances be treated humanely, without any adverse distinction founded on race, colour, religion or faith, sex, birth or wealth, or any other similar criteria. To this end, the following acts are and shall remain prohibited at any time and in any place whatsoever with respect to the above-mentioned persons: (a) violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture; (b) taking of hostages; (c) outrages upon personal dignity, in particular humiliating and degrading treatment; (d) the passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court, affording all the judicial guarantees which are recognized as indispensable by civilized peoples. (2) The wounded and sick shall be collected and cared for. An impartial humanitarian body, such as the International Committee of the Red Cross, may offer its services to the Parties to the conflict. The Parties to the conflict should further endeavour to bring into force, by means of special agreements, all or part of the other provisions of the present Convention. The

application of the preceding provisions shall not affect the legal status of the Parties to the conflict.

**9.** The Hamdan Court included the version of Article 36, UCMJ, then in effect:

> (a) The procedure, including modes of proof, in cases before courts-martial, courts of inquiry, military commissions, and other military tribunals may be prescribed by the President by regulations which shall, so far as he considers practicable, apply the principles of law and the rules of evidence generally recognized in the trial of criminal cases in the United States district courts, but which may not be contrary to or inconsistent with this chapter. (b) All rules and regulations made under this article shall be uniform insofar as practicable and shall be reported to Congress.

*Hamdan*, 548 U.S. at 620, 126 S.Ct. 2749.

**10.** *Hamdan*, 548 U.S. at 591, 126 S.Ct. 2749 (citing *Ex parte Quirin*, 317 U.S. 1, 26–29, 63 S.Ct. 1, 87 L.Ed. 3 (1942); *In re Yamashita*, 327 U.S. 1, 11, 66 S.Ct. 340, 90 L.Ed. 499 (1946); internal citations omitted).

The Court found appellant's initial military commission substantially deviated from regular court-martial practice, and the record lacked an adequate demonstration that procedures more similar to courts-martial were not practicable. *Id.* at 622 & n. 50, 624, 126 S.Ct. 2749. Article 36, UCMJ, required either uniformity or justification for variation from UCMJ procedures, rendering those military commission's variations illegal. *Id.* at 625, 126 S.Ct. 2749. Distinguishing the pre-enactment of the UCMJ precedent which supported military commissions like appellant's, the Court noted, "Prior to the enactment of Article 36(b), [UCMJ,] it may well have been the case that a deviation from the rules governing courts-martial would not have rendered the military commission illegal. Article 36(b), however, imposes a statutory command that must be heeded." *Id.* at 625 n. 54, 126 S.Ct. 2749 (internal citations, quotation marks, and emphasis omitted).

Justice Breyer suggested the President seek Congressional authorization for military commissions when those procedures are inconsistent with the UCMJ stating, "Indeed, Congress has denied the President the legislative authority [under Article 36, UCMJ] to create military commissions of the kind at issue here. Nothing prevents the President from returning to Congress to seek the authority he believes necessary." *Id.* at 636, 126 S.Ct. 2749 (Breyer, Kennedy, Souter, and Ginsburg, JJ., concurring).

In response, Congress passed the 2006 M.C.A., and President Bush signed the Act into law. On October 28, 2009, President Obama signed into law the 2009 M.C.A.[11] With the enactment of the 2009 M.C.A., two different Presidents and two different Congresses have spoken on the issue of how military commissions should be conducted. After vigorous Congressional debate, the 2009 M.C.A. did not change the jurisdiction of military commissions nor did it eliminate the offense of providing material support for terrorism. *Compare* 2006 M.C.A. §§ 948d, 950v(b)(25) *with* 2009 M.C.A. §§ 948d, 950t(25). The 2006 and 2009 M.C.A.s broadly conformed commission procedures to those under the UCMJ, with several exceptions.[12]

Current structure of military commissions is similar to trials in U.S. district courts and courts-martial. The duties of a military commission judge, who is required to have the same qualifications as a trial judge at courts-martial, include deciding pretrial motions and other issues of law and instructing the military commission about the elements of offenses. 2006 M.C.A. §§ 948j(b), 949d, and 949l; Article 26, UCMJ. The accused automatically receives assigned military counsel, who is required to have the same qualifications as military defense counsel at courts-martial, and the accused may be represented by civilian counsel. 2006 M.C.A. §§ 948k(c) and 949c(b); Article 27, UCMJ. The members detailed to a military commission act as the "jury" for findings and sentencing, and they are required to have the same qualifications as all-officer courts-martial panels, "those active duty commissioned officers, who in the opinion of the convening authority are best qualified for the duty by reason of their age, education, training, experience, length of service, and judicial temperament." 2007 M.M.C., Rule for Military Commissions 502(a)(1); MMC

---

11. *See* http://www.whitehouse.gov/the-press-office/remarks-president-signing-national-defense–authorization–act–fiscal–year–2010.

12. Section 948b(d) of the 2006 and 2009 versions of the M.C.A. explicitly excluded applicability of Articles 10, 31(a), 31(b), 31(d), and 32, UCMJ, to military commission proceedings and 2006 M.C.A. Section 4(a), Conforming Amendments, limited Articles 21, 28, 48, 50a, 104, and 106, only to the extent provided by the M.C.A.

(2008), Rule for Courts–Martial 502(a)(1). *See also* M.C.A. § 948i(b); Article 25, UCMJ.

The merits phase of a military commission trial begins with opening statements, and the Government and accused have opportunities to present their cases. Next, both sides make their closing arguments, the military commission judge instructs the commission members about the elements of the offenses, evidentiary matters, and burden of proof. Then the members decide, in closed session, whether the Government has proven the guilt of the accused beyond a reasonable doubt. If the accused is found guilty of any specification, the commission members specify the sentence in a manner similar to trials by court-martial. The accused's rights at a military commission are briefly listed at n. 171, *infra.*

After a trial resulting in a finding of guilty, the record is reviewed by the convening authority, the U.S. Court of Military Commission Review, and the U.S. Court of Appeals for the District of Columbia Circuit. 2006 and 2009 M.C.A. §§ 950b, 950f, and 950g. The Supreme

Court may review by writ of certiorari the final judgment of the United States Court of Appeals for the District of Columbia Circuit. 2006 and 2009 M.C.A. § 950g(e).

## VI. STANDARD OF REVIEW

 We review the military commission judge's decision whether the military commission had subject matter jurisdiction *de novo* because jurisdiction is a question of law.[13] We also consider appellant's challenges to the constitutionality of the 2006 M.C.A. under a *de novo* standard of review.[14] We must ensure that findings of guilty are correct in law and fact and the sentence is appropriate.[15] We review factual sufficiency *de novo* applying a proof beyond reasonable doubt standard.[16] Our Court is required to "weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact, recognizing that the military commission saw and heard the witnesses." 2009 M.C.A. § 950f(d). We also review the sentence to ensure appellant is "sentenced only for the offense or offenses of which he has been found guilty. A proper sentence is one tailored to the particular accused

---

**13.** *Defenders of Wildlife v. Gutierrez,* 532 F.3d 913, 919 (D.C.Cir.2008); *United States v. Khadr,* 717 F.Supp.2d 1215, 1220 (USCMCR 2007).

**14.** *United States v. Carta,* 592 F.3d 34, 42 (1st Cir.2010) (citing *United States v. Rene E.,* 583 F.3d 8, 11 (1st Cir.2009), *cert. denied,* —— U.S. ——, 130 S.Ct. 1109, 175 L.Ed.2d 921 (2010)); *United States v. Weatherly,* 525 F.3d 265, 273 (3d Cir.2008) (citing *United States v. Singletary,* 268 F.3d 196, 198–99 (3d Cir. 2001)); *Anderson v. Milwaukee County,* 433 F.3d 975, 978 (7th Cir.2006) (citing *Weinberg v. City of Chicago,* 310 F.3d 1029, 1035 (7th Cir.2002)) (stating "any questions of constitutional law [are reviewed] under the *de novo* standard of review").

**15.** 2009 M.C.A. § 950f(d). The 2006 M.C.A. § 950f(d) limited our review to "matters of law." We "apply the law in effect at the time

[we render our] decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." *Landgraf v. USI Film Products,* 511 U.S. 244, 249, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (citing *Bradley v. School Bd. of Richmond,* 416 U.S. 696, 711, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974)). We choose to apply the 2009 M.C.A. in lieu of the 2006 M.C.A. standard of review because it is more protective of the accused and manifests Congressional intent that we utilize the same standard of review for factual sufficiency and sentence appropriateness as the service courts of criminal appeals use under Article 66, UCMJ, 10 U.S.C. 866, to review courts-martial convictions and sentences.

**16.** *See United States v. Sills,* 56 M.J. 239, 240–41 (C.A.A.F.2002) (discussing standard of review under Article 66, UCMJ, for factual sufficiency).

member and the nature and seriousness of the offense."[17]

## VII. PROVIDING MATERIAL SUPPORT FOR TERRORISM AS A LAW OF WAR OFFENSE

### A. Authority to Define Law of War Offenses

■ Appellant contends that Congress exceeded its authority in violation of the Constitution's Define and Punish Clause, art. I, § 8, cl. 10, when Congress established providing material support for terrorism as an offense in the 2006 M.C.A.[18] We disagree. Provided their actions are taken respecting the Constitution, the President and the Congress have broad discretion when acting during an ongoing conflict in the areas of war powers, foreign relations, and aliens.[19] Nothing in the current appeal serves to challenge the outer limits of the Congress's authority under the Constitution's Define and Punish Clause.

### 1. War Powers

■ The Government has broad powers to safeguard the United States under the Constitution in time of war. In addition to the Define and Punish Clause, the Supreme Court listed nine constitutional sources relevant to authorizing military commissions to support the nation's warfighting efforts.[20] One constitutional source of authority for appellant's military commission stems from the Constitution's War Powers. In 1948, the Supreme Court

---

**17.** *United States v. Cantrell*, 44 M.J. 711, 714 (A.F.C.C.A.1996) (citing *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A.1982); *United States v. Mamaluy*, 10 U.S.C.M.A. 102, 27 C.M.R. 176 (1959)).

**18.** U.S. Const., Art. I, § 8, cl. 10 states Congress shall have Power "to define and punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations."

**19.** The Supreme Court stated, "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." *Demore v. Kim*, 538 U.S. 510, 522, 123 S.Ct. 1708, 155 L.Ed.2d 724 (2003) (citing *Mathews v. Diaz*, 426 U.S. 67, 81 n. 17, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976) and quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89, 72 S.Ct. 512, 96 L.Ed. 586 (1952)); *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 413–15, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003) (foreign affairs); *Quirin*, 317 U.S. at 26–28, 63 S.Ct. 2 (discussing constitutional sources of war powers).

**20.** In *Ex parte Quirin*, 317 U.S. 1, 25–26, 63 S.Ct. 2, 87 L.Ed. 3 (1942) the Court stated:

Congress and the President, like the courts, possess no power not derived from the Constitution. But one of the objects of the Constitution, as declared by its preamble, is to "provide for the common defence." As a means to that end, the Constitution gives to Congress the power to "provide for the common Defence," Art. I, § 8, cl. 1; "To raise and support Armies," "To provide and maintain a Navy," Art. I, § 8, cl. 12, 13; and "To make Rules for the Government and Regulation of the land and naval Forces," Art. I, § 8, cl. 14. Congress is given authority "To declare War, grant Letters of Marque and Reprisal, and make Rules concerning Captures on Land and Water," Art. I, § 8, cl. 11; and "To define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations," Art. I, § 8, cl. 10. And finally, the Constitution authorizes Congress "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." Art. I, § 8, cl. 18. The Constitution confers on the President the "executive Power," Art. II, § 1, cl. 1, and imposes on him the duty to "take Care that the Laws be faithfully executed." Art. II, § 3. It makes him the Commander in Chief of the Army and Navy, Art. II, § 2, cl. 1, and empowers him to appoint and commission officers of the United States. Art. II, § 3, cl. 1.

emphasized the nation's war powers include:

> the power to wage war successfully.... Since the Constitution commits to the Executive and to Congress the exercise of the war power in all the vicissitudes and conditions of warfare, it has necessarily given them wide scope for the exercise of judgment and discretion in determining the nature and extent of the threatened injury or danger and in the selection of the means for resisting it.

*Lichter v. United States,* 334 U.S. 742, 767 n. 9, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948) (citations omitted).

"From the very beginning of its history [the Supreme Court] has recognized and applied the law of war as including that part of the law of nations which prescribes, for the conduct of war, the status, rights and duties of enemy nations as well as of enemy individuals." *Ex parte Quirin,* 317 U.S. 1, 27–28, 63 S.Ct. 2, 87 L.Ed. 3 (1942). Like the law of nations, the law of war must adapt to changing circumstances to be effective. This requirement was recognized during the trials of Nazi war criminals after World War II:

> The sources of international law which are usually enumerated are (1) customs and practices accepted by civilized nations generally, (2) treaties, conventions, and other forms of interstate agreements, (3) the decisions of international tribunals, (4) the decisions of national tribunals dealing with international

questions, (5) the opinions of qualified text writers, and (6) the diplomatic papers. These sources provide a frame upon which a system of international law can be built but they cannot be deemed a complete legal system in themselves. Any system of jurisprudence, if it is to be effective, must be given an opportunity to grow and expand to meet changed conditions. The codification of principles is a helpful means of simplification, but it must not be treated as adding rigidity where resiliency is essential. To place the principles of international law in a formalistic strait-jacket would ultimately destroy any effectiveness that it has acquired.[21]

■ Using its authority to define and punish offenses against the law of nations, Congress approves, within constitutional limitations, jurisdiction of military commissions to try persons for offenses against the law of war. *Quirin,* 317 U.S. at 26–31, 63 S.Ct. 2. An important tool of the military command, military commissions are "an institution of the greatest importance in a period of war and should be preserved." *Madsen v. Kinsella,* 343 U.S. 341, 353 n. 20, 72 S.Ct. 699, 96 L.Ed. 988 (1952) (quoting S.Rep. No. 229, 63d Cong., 2d Sess. 53, 98–99 (1914) (reporting testimony of Brig. Gen. Enoch M. Crowder to the House Committee on Military Affairs in 1912 and to the Sen. Subcommittee on Military Affairs, *Revision of the Articles of War,* Feb. 7, 1916, vol. I, 40–41)). As Colonel Winthrop, the "Blackstone of Military Law," [22] explained:

---

**21.** *See* 11 *Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10* at 1235 (1950) (NMT Tribunals). The 15–volume record of the NMT Tribunals is available at *http://www.loc. gov/rr/frd/Military_Law/NTs_war-criminals. html.* The 42–volume record of the Trial of the Major War Criminals before the International Military Tribunal at Nuremberg, Nov. 14, 1945 to Oct. 1, 1946 is available at *http:// www.loc.gov/rr/frd/Military_Law/NT_major-war-criminals.html.*

**22.** *Hamdan,* 548 U.S. at 597, 126 S.Ct. 2749 (Stevens, Souter, Ginsburg, and Breyer, JJ., concurring) (referring to Winthrop's *Military Law and Precedents* as "[t]he classic treatise penned by Colonel William Winthrop, whom we have called the 'Blackstone of Military Law.' ") (quoting *Reid v. Covert,* 354 U.S. 1, 19 n. 38, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (plurality opinion)). "All parties agree that Colonel Winthrop's treatise accurately describes the common law governing military commissions." *Id.* at 598.

[I]n general, it is those provisions of the Constitution which empower Congress to "declare war" and "raise armies," and which, in authorizing the initiation of *war*, authorize the employment of all necessary and proper agencies for its due prosecution, from which this tribunal derives its original sanction. Its authority is thus the same as the authority for the making and waging of war and for the exercise of military government and martial law. *The commission is simply an instrumentality for the more efficient execution of the war powers vested in Congress and the power vested in the President as Commander-in-chief in war.*[23]

More recently, the Supreme Court reemphasized the necessity for the Judiciary to refrain from review of "issues aris[ing] in the context of ongoing military operations conducted by American Forces overseas . . . . [being] cognizant that 'courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs.' " *Munaf v. Geren,* 553 U.S. 674, 689, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008) (quoting *Dep't of the Navy v. Egan,* 484 U.S. 518, 530, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988)). For example, the Supreme Court declined to permit habeas intervention, over the objection of the executive branch, in an Iraq court case involving a U.S. citizen held by U.S. forces stating:

The Judiciary is not suited to second-guess such determinations—determina-

tions that would require federal courts to pass judgment on foreign justice systems and undermine the Government's ability to speak with one voice in this area. *See* The Federalist No. 42, p. 279 (J. Cooke ed. 1961) (J. Madison) ("If we are to be one nation in any respect, it clearly ought to be in respect to other nations"). In contrast, the political branches are well situated to consider sensitive foreign policy issues, such as whether there is a serious prospect of torture at the hands of an ally, and what to do about it if there is. As Judge Brown noted, "we need not assume the political branches are oblivious to these concerns. Indeed, the other branches possess significant diplomatic tools and leverage the judiciary lacks."[24]

■■■ Although "deference does not mean abdication," the Supreme Court has consistently refrained from interfering in congressional decisions made pursuant to the national security clauses.[25] "[J]udicial deference to [a] congressional exercise of authority is at its apogee when legislative action under the congressional authority to raise and support armies and make rules and regulations for their governance is challenged." *Rostker v. Goldberg,* 453 U.S. 57, 70, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981). Similarly, the political branches' determination of United States' obligations under international law is a determination about the conduct of American foreign policy.[26]

---

**23.** William Winthrop, *Military Law and Precedents* 831 (2d ed. 1920) (1920 Winthrop) (first alteration in original; second alteration added).

**24.** *Munaf v. Geren,* 553 U.S. 674, 702–03, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008) (citation omitted).

**25.** *Rostker v. Goldberg,* 453 U.S. 57, 70, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981). *See also e.g., Weiss v. United States,* 510 U.S. 163, 177,

114 S.Ct. 752, 127 L.Ed.2d 1 (1994); *Egan,* 484 U.S. at 527–34, 108 S.Ct. 818 (declining to review the President's authority as Commander in Chief to "classify and control access to information bearing on national security").

**26.** Congress made special findings about the importance of international relations in the fight against terrorism. *See* pp. 1274–77, *infra.*

## 2. Foreign Affairs

 Defining and enforcing the United States' obligations under international law implicitly require the making of extremely sensitive policy decisions. Such decisions will inevitably color our relationships with other nations. Decisions of this nature "are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility...." *Finzer v. Barry,* 798 F.2d 1450, 1458–59 (D.C.Cir.1986) (citation omitted), *affirmed in part and reversed in part, Boos v. Barry,* 485 U.S. 312, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988). Under the "political question" doctrine, courts should abstain from cases where there "is found a textually demonstrable constitutional commitment of the issue to a coordinate political department." *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

 Article II of the Constitution establishes that the "President has the lead role ... in foreign policy" and the "vast share of responsibility for the conduct of our foreign relations." *Am. Ins. Ass'n v. Garamendi,* 539 U.S. 396, 414–15, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003) (citations omitted; internal quotation marks omitted). The President's constitutional function "uniquely qualifies him to resolve the sensitive foreign policy decisions that bear on compliance" with inter-national agreements. *Medellin v. Texas,* 552 U.S. 491, 523–24, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008) (citations omitted; internal quotation marks omitted). The United States Government's interpretation, construction and application of treaty provisions and responsibilities are "entitled to great weight." *Id.* at 513, 128 S.Ct. 1346 (quoting *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 184–85, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982)); *see also Kolovrat v. Oregon,* 366 U.S. 187, 194, 81 S.Ct. 922, 6 L.Ed.2d 218 (1961). In addition, the President "has a degree of independent authority to act" in foreign affairs. *Am. Ins. Ass'n,* 539 U.S. at 414, 123 S.Ct. 2374 (citation omitted).

Justice Jackson described the President's authority for executive action when national security relating to foreign affairs is an issue and Congress has provided express authorization stating:

> [The President's authority] is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate. In these circumstances, and in these only, may he be said (for what it may be worth) to personify the federal sovereignty. If his act is held unconstitutional under these circumstances, it usually means that the Federal Government as an undivided whole lacks power. [An action] executed by the President pursuant to an Act of Congress would be supported by the strongest of presumptions and the widest latitude of judicial interpretation, and the burden of persuasion would rest heavily upon any who might attack it.[27]

---

**27.** *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635–37, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring; citations omitted). Justice Jackson's opinion in *Youngstown* has been frequently quoted, including in *Hamdan,* 548 U.S. at 638, 680, 126 S.Ct. 2749, as a clear expression of the Government's power to regulate conduct in matters of national security. *See e.g., Kiyemba v. Obama,* 555 F.3d 1022, 1026–29 (D.C.Cir. 2009) (discussing authority of courts to order release of detainees in the United States), *vacated due to change in status of petitioners,* — U.S. —, 130 S.Ct. 1235, 175 L.Ed.2d 1070 (2010); *Kiyemba v. Obama,* 561 F.3d 509, 522 (D.C.Cir.2009) (Kavanaugh, J., concurring) (discussing wartime authority of Executive Branch in connection with detainees and holding "the U.S. Government may transfer Guantanamo detainees to the custody

■ There is no dispute that "the United States has a vital national interest in complying with international law. The Constitution itself attempts to further this interest by expressly authorizing Congress 'to define and punish.... Offenses against the Law of Nations.' U.S. Const., Art. I, § 8, cl. 10." *Boos v. Barry*, 485 U.S. 312, 323, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988). "[T]he Constitution authorized Congress to derive from the often broadly phrased principles of international law a more precise code ... [to comply] with rules governing the international community." *Finzer*, 798 F.2d at 1455.

■ There is judicial precedent for the proposition that Congress's authority is not restrained "by principles of customary international law in its ability to legislate in respect of extraterritorial conduct." *United States v. Yousef*, 327 F.3d 56, 109 n. 44 (2d Cir.2003) (citing *The Nereide*, 13 U.S. 388, 9 Cranch 388, 3 L.Ed. 769 (1815)). Congress has constitutional authority to "manifest [its] will" to establish a rule not necessarily reflective of customary international law "by passing an act for the purpose." *Id.* at 109 (quoting *The Nereide*, 13 U.S. at 423). "[S]ubsequently enacted statutes ... preempt existing principles of customary international law—just as they displaced prior inconsistent

treaties" and "no enactment of Congress can be challenged on the ground that it violates customary international law." *Committee of United States Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 939 (D.C.Cir.1988). Further, courts are required to defer to Congress's "unambiguous exercise" of its power to grant jurisdiction to agencies or to courts, and that is true even if such an exercise might be argued to "exceed the limitations imposed by international law." *FTC v. Compagnie de Saint-Gobain-Pont-a-Mousson*, 636 F.2d 1300, 1323 (D.C.Cir.1980) (citation omitted). We will not assume the scope of this principle to be so expansive as to contravene the precedence of U.S. law as provided for by the Constitution.

■ In this case, Congress and the President seek to protect our Nation's interests in ensuring compliance with the law of war and adherence to the law of nations, including customary international law, through adjudication and punishment of particular crimes against the law of war. The nature of questions concerning the jurisdiction of a military commission to prosecute specific war crimes authorized by statute "requires us to proceed with circumspection" to avoid "adjudicating issues inevitably entangled in the conduct of our international relations."[28]

of foreign nations without judicial intervention-at least so long as the Executive Branch declares, as it has for the Guantanamo detainees, that the United States will not transfer 'an individual in circumstances where torture is likely to result.' ") (citing *Munaf*, 128 S.Ct. at 2226).

**28.** *Munaf v. Geren*, 553 U.S. 674, 689, 128 S.Ct. 2207, 171 L.Ed.2d 1 (2008) (citation and internal quotation marks omitted). In *Ex parte Vallandigham*, 68 U.S. 243, 1 Wall. 243, 17 L.Ed. 589 (1864), the Court quoted an order prepared by Francis Leiber, LL.D., later approved by President Lincoln, which illustrated the Government's view in 1863 that the scope of military commission jurisdiction could be controlled by statute stating:

It is affirmed in these instructions that military jurisdiction is of two kinds. *First, that which is conferred and defined by statute;* second, that which is derived from the common law of war. Military offences, under the statute, must be tried in the manner therein directed; but military offences, which do not come within the statute, must be tried and punished under the common law of war.

*Id.* at 248–49 (internal quotation marks and citations omitted; emphasis added). Historically, the jurisdiction for military commissions arose from two sources, "the first is exercised by courts-martial, while cases which do not come within the 'rules and regulations of war,' or the jurisdiction conferred by statute or court-martial, are tried by

 The protective principle in international law provides a basis for jurisdiction of offenses occurring outside the United States. Recently, the courts have discussed the constitutional authority of Congress to establish and punish drug traffickers apprehended outside U.S. territorial waters under the Maritime Drug Law Enforcement Act (MDLEA).[29] The Supreme Court noted that Congress may constitutionally operate under a broader inherent authority when acting to protect national interests. *Youngstown*, 343 U.S. at 637, 72 S.Ct. 863. This is so even in instances where the act occurs outside the territory of the United States. In a challenge to the constitutionality of the MDLEA to prosecute noncitizen defendants captured on the high seas, the 1st Circuit Court noted:

> Under the protective principle of international law, Congress can punish crimes committed on the high seas regardless of whether a vessel is subject to the jurisdiction of the United States. Under the protective principle, [a] state has jurisdiction to prescribe a rule of law attaching legal consequences to conduct outside its territory that threatens its security as a state or the operation of its governmental functions, provided the conduct is generally recognized as a

crime under the law of states that have reasonably developed legal systems.

*United States v. Vilches–Navarrete*, 523 F.3d 1, 21–22 (1st Cir.2008) (Lynch, J., concurring in judgment) (quotation marks and citations omitted). More specifically, in dealing with a direct challenge to constitutionality of the 1990 Antiterrorism Act for murder of U.S. nationals outside the United States, a Federal District Court made the following observation, which provides some authority for concluding the Define and Punish Clause does not limit prosecution of extraterritorial conduct connected to terrorism:

> [E]ven assuming that the acts described in [the Antiterrorism Act] are not widely regarded as violations of international law, it does not necessarily follow that these provisions exceed Congress's authority under [Article I, Section 8,] Clause 10. Clause 10 does not merely give Congress the authority to punish offenses against the law of nations; it also gives Congress the power to "define" such offenses. Hence, provided that the acts in question are *recognized by at least some members of the international community as being offenses against the law of nations,*[30] *Congress arguably has the power to criminalize these acts pursuant to its power to de-*

---

military commissions. These jurisdictions are applicable, not only to war with foreign nations, but to a rebellion ...." *Id.*

**29.** *See* 46 U.S.C. §§ 70503–70507. *Compare United States v. Vilches–Navarrete*, 523 F.3d 1, 21–22 (1st Cir.2008) *and United States v. Tinoco*, 304 F.3d 1088, 1106–11 (11th Cir.2002) *with United States v. Perlaza*, 439 F.3d 1149, 1159–60, 1167 (9th Cir.2006). *See also Morrison v. National Australia Bank*, 561 U.S. ——, 130 S.Ct. 2869, 2877–78, 177 L.Ed.2d 535 (2010) ("[U]nless a contrary intent appears, [legislation of Congress] is meant to apply only within the territorial jurisdiction of the United States. This principle represents a canon of construction, or a presumption

about a statute's meaning, rather than a limit upon Congress's power to legislate. When a statute gives no clear indication of an extraterritorial application, it has none." (citations and internal quotation marks omitted)).

**30.** And this would appear to be the case. *See* [Christopher L.] Blakesley, *Extraterritonal Jurisdiction* [in M. Cherif Bassiouni (ed.), INTERNATIONAL CRIMINAL LAW] 72, 70 [(2d ed. 1999)] (noting that terrorist violence includes "wanton violence against innocent civilians," and that this offense is "condemned by virtually all domestic law"); *id.* at 73 ("All nations condemn, prosecute and punish terrorist violence, when perpetrated against them or their nationals.").

*fine offenses against the law of nations.*[31] *See United States v. Smith,* 18 U.S. (5 Wheat.) 153, 159, 5 L.Ed. 57 (1820) (Story, J.) ("Offenses ... against the law of nations, cannot, with any accuracy, be said to be completely ascertained and defined in any public code recognized by the common consent of nations.... Therefore ..., there is a peculiar fitness in giving the power to define as well as to punish.").[32] There is no constitutional prerequisite of universal, international, or scholarly unanimity before Congress may act to subject appellant to trial before a military commission for his support of bin Laden and al Qaeda in the unlawful conflict they are waging against the United States.[33]

## B. Defining Terrorism and Providing Material Support for Terrorism

### 1. U.S. Domestic Terrorism Offenses— Title 18

Congress passed prohibitions against terrorism in 1996, including providing material support for terrorism under 18 U.S.C. §§ 2339A and 2339B. Congress made specific findings emphasizing the im-

portance of combating terrorism under multiple specific powers, interests, and concerns. Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), § 301, 110 Stat. 1247, note following 18 U.S.C. § 2339B (Findings and Purpose), and § 324, 110 Stat. 1255, note following 18 U.S.C. 2339A (Findings) (Apr. 24, 1996). *See also Holder v. Humanitarian Law Project,* 561 U.S. ——, 130 S.Ct. 2705, 2712, 2724–26, 2729, 2733, 2735, 177 L.Ed.2d 355 (2010) (citing provisions from Congress's specific findings in § 301). Congress described the purpose and made the following specific findings for AEDPA § 301:

(a) **Findings.** The Congress finds that—(1) international terrorism is a serious and deadly problem that threatens the vital interests of the United States; (2) the Constitution confers upon Congress the power to punish crimes against the law of nations and to carry out the treaty obligations of the United States, and therefore Congress may by law impose penalties relating to the provision of material support to for-

**31.** *See also* Steven R. Swanson, *Terrorism, Piracy, and the Alien Tort Statute,* 40 Rutgers L.J. 159, 217 (2008) (discussing treaties and agreements and concluding, "[a] close look at the international community's attempts to define and punish terrorism over the last 50 years, and more specifically since the historical attacks on the United States in 2001, shows that there is almost unanimous agreement that terrorist acts constitute an international crime on the same level that piracy did in the eighteenth century.... The courts should recognize that today's terrorists are much the same as pirates of old....").

**32.** *United States v. Bin Laden,* 92 F.Supp.2d 189, 220–21 (S.D.N.Y.2000) (emphasis added) (citing Note, Patrick L. Donnelly, *Extraterritorial Jurisdiction Over Acts of Terrorism Committed Abroad: Omnibus Diplomatic Security and Antiterrorism Act of 1986,* 72 Cornell L.Rev. 599, 611 (1987) ("Congress may define and punish offenses in international law, not-

withstanding a lack of consensus as to the nature of the crime in the United States or in the world community.")).

**33.** Our superior court has noted, "[t]he international laws of war as a whole have not been implemented domestically by Congress and are therefore not a source of authority for U.S. courts." *Al–Bihani v. Obama,* 590 F.3d 866, 871 (D.C.Cir.2010) (citing *Restatement (Third) of Foreign Relations Law of the United States* § 111(3)-(4) (1987)). *See also id.* at 884 (Williams, J., concurring in part and concurring in the judgment) ("Whatever the appropriate role of the laws of war in determining what powers the President derived from the AUMF, it cannot be to render unlawful the President's use of force in Afghanistan in the fall of 2001–which the Supreme Court has repeatedly acknowledged was permitted under the AUMF.") (citing *Boumediene v. Bush,* 553 U.S. 723, 732–34, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008)).

eign organizations engaged in terrorist activity; (3) the power of the United States over immigration and naturalization permits the exclusion from the United States of persons belonging to international terrorist organizations; (4) international terrorism affects the interstate and foreign commerce of the United States by harming international trade and market stability, and limiting international travel by United States citizens as well as foreign visitors to the United States; (5) international cooperation is required for an effective response to terrorism, as demonstrated by the numerous multilateral conventions in force providing universal prosecutive jurisdiction over persons involved in a variety of terrorist acts, including hostage taking, murder of an internationally protected person, and aircraft piracy and sabotage; (6) some foreign terrorist organizations, acting through affiliated groups or individuals, raise significant funds within the United States, or use the United States as a conduit for the receipt of funds raised in other nations; and (7) foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct.

(b) **Purpose.** The purpose of this subtitle [for full classification, consult USCS Tables volumes] is to provide the Federal Government the fullest possible basis, consistent with the Constitution, to prevent persons within the United States, or subject to the jurisdiction of the United States, from providing material support or resources to foreign organizations that engage in terrorist activities.

In AEDPA § 324, the Congress found that:

(1) international terrorism is among the most serious transnational threats faced by the United States and its allies, far eclipsing the dangers posed by population growth or pollution; (2) the President should continue to make efforts to counter international terrorism a national security priority; (3) ... the President should undertake immediate efforts to develop effective multilateral responses to international terrorism as a complement to national counter terrorist efforts; [and;] (4) the President should use all necessary means, including covert action and military force, to disrupt, dismantle, and destroy international infrastructure used by international terrorists, including overseas terrorist training facilities and safe havens....

All of those same necessary concerns, plus the necessity to successfully prosecute the *ongoing conflict,* are present in the 2006 M.C.A.'s codification of the offense of providing material support for terrorism under § 950v(a)(25).

Providing material support for terrorism (18 U.S.C. §§ 2339A, 2339B) was the basic model for the 2006 M.C.A. offense bearing the same name.[34] On September 13, 1994, Congress enacted 18 U.S.C. 2339A. Title 18 U.S.C. 2339A was amended on April 24, 1996 to read:

(a) OFFENSE.—Whoever, within the United States, provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in

---

**34.** Providing material support to terrorism under the M.C.A. reflects a law of war violation in existence before appellant's crimes, which were committed from 1996 through 2001. The offense of providing material support for terrorism under the M.C.A. is nar-

rower than the Title 18 offense. The Title 18 offense includes conduct unassociated with an armed conflict and it includes defendants who are not unlawful enemy combatants or unprivileged belligerents.

preparation for, or in carrying out, a violation of section 32, 37, 81, 175, 351, 831, 842(m) or (n), 844(f) or (i), 956, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, or 2340A of this title or section 46502 of title 49, or in preparation for, or in carrying out, the concealment from the commission of any such violation, shall be fined under this title, imprisoned not more than 10 years, or both.

(b) DEFINITION.—In this section the term, "material support or resources" means currency or other financial securities, financial services, lodging, training, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel, transportation, and other physical assets, except medicine or religious materials.[35]

On April 24, 1996, Congress enacted 18 U.S.C. § 2339B, "Providing material support or resources to designated foreign terrorist organizations," which included extraterritorial jurisdiction and provided:

(a) PROHIBITED ACTIVITIES.—
(1) Unlawful conduct.—Whoever, within the United States or subject to the jurisdiction of the United States, knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 10 years, or both.[36]

Al Qaeda was not designated as a "foreign terrorist organization" as required for 18 U.S.C. 2339B(a) until October 8, 1999.[37]

Under U.S. domestic law, members of al Qaeda have violated federal statutes relating to terrorism. Title 18 U.S.C. § 2331(1)

defines "international terrorism" to be activities that:

(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

(B) appear to be intended—(i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination or kidnapping; and

(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

On April 24, 1996, Congress enacted the AEDPA of 1996, 18 U.S.C. § 2332b, "Acts of terrorism transcending national boundaries." AEDPA includes extraterritorial jurisdiction under 18 U.S.C. § 2332b(e) for violations of 18 U.S.C. § 2332b(a), which now provides:

(a) PROHIBITED ACTS.—
(1) OFFENSES.—Whoever, involving conduct transcending national boundaries and in a circumstance described in subsection

(b)—[listing jurisdictional basis for U.S. prosecution]

(A) kills, kidnaps, maims, commits an assault resulting in serious bodily injury,

---

**35.** War Crimes Act of 1996, Pub.L. No. 104–132, Title III, Subtitle B, § 323, 110 Stat. 1255. (1996).

**36.** Pub.L. No. 104–132, Title III, Subtitle A, § 303(a), 110 Stat. 1250 (1996).

**37.** U.S. Dep't of State, 1999 Report Index: Foreign Terrorist Organizations (1999), *http://www.state.gov/s/ct/rls/rpt/fto/2682.htm*). This technical designation does not control prosecution for providing material support for terrorism under M.C.A. 2006. *See* n. 34, *supra.*

or assaults with a dangerous weapon any person within the United States; or

(B) creates a substantial risk of serious bodily injury to any other person by destroying or damaging any structure, conveyance, or other real or personal property within the United States or by attempting or conspiring to destroy or damage any structure, conveyance, or other real or personal property within the United States; in violation of the laws of any State, or the United States, shall be punished as prescribed in subsection (c).

(2) Treatment of threats, attempts and conspiracies. Whoever threatens to commit an offense under paragraph (1), or attempts or conspires to do so, shall be punished under subsection (c).

Section 2332b(g)(5), defines the term "Federal crime of terrorism" to mean an offense that—"(A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," and this definition is included in numerous offenses listed in § 2332b(g)(5)(B), several of which are particularly relevant to al Qaeda's at-

tacks upon U.S. citizens, diplomatic personnel, and facilities.[38]

## 2. Congressional Finding that Providing Material Support for Terrorism is a Traditional Law of War Offense

The 2006 M.C.A. § 950p defines preexisting violations of the law of war in its "Statement of substantive offenses" as follows:

(a) PURPOSE.—The provisions of this subchapter codify offenses that have traditionally been triable by military commissions. This chapter does not establish new crimes that did not exist before its enactment, but rather codifies those crimes for trial by military commission.

(b) EFFECT.—Because the provisions of this subchapter (including provisions that incorporate definitions in other provisions of law) are declarative of existing law, they do not preclude trial for crimes that occurred before the date of the enactment of this chapter.

After several witnesses discussed the issue of whether the M.C.A. offense of providing material support for terrorism could be retroactively applied to AUECs,[39] Con-

---

**38.** 18 U.S.C. § 2332b(g)(5)(B) (listing the following sections under Title 18: § 32 (destruction of aircraft or aircraft facilities), § 844(f)(2) or (3) (arson and bombing of Government property risking or causing death), § 844(i) (arson and bombing of property used in interstate commerce), § 930(c) (killing or attempted killing during an attack on a Federal facility with a dangerous weapon), § 956(a)(1) (conspiracy to murder, kidnap, or maim persons abroad), § 1114 (killing or attempted killing of officers and employees of the United States), § 1116 (murder or manslaughter of foreign officials, official guests, or internationally protected persons), § 1361 (government property or contracts), § 1992 (terrorist attacks and other acts of violence against railroad carriers and against mass transportation systems on land, on water, or through the air), § 2155 (destruction of national defense materials, premises, or utilities), § 2156 (national defense material,

premises, or utilities), § 2332 (certain homicides and other violence against United States nationals occurring outside of the United States), § 2332b (acts of terrorism transcending national boundaries), § 2332f (bombing of public places and facilities), § 2339 (harboring terrorists), § 2339A (providing material support to terrorists), § 2339B (providing material support to terrorist organizations), § 2339C (financing of terrorism), and § 2339D (military-type training from a foreign terrorist organization)).

**39.** *See e.g.*, Sen. Comm. on Armed Services, *Legal Issues Regarding Military Commissions and the Trial of Detainees for Violations of the Law of War*, 111th Cong., 1st Sess. 9, 12, 20–21, 53, 103–05, 121–23, 140–54 (July 7, 2009). H.R. Subcomm. on the Constitution, Civil Rights, and Civil Liberties of the Comm. on Jud., *Proposals for Reform of the Military Commissions System*, 111th Cong., 1st Sess.,

gress decided the M.C.A. offense was a recognized law of war violation. The 2009 M.C.A. § 950p(d) states:

> (d) EFFECT.—The provisions of this subchapter codify offenses that have traditionally been triable by military commission. This chapter does not establish new crimes that did not exist before the date of the enactment of this subchapter, ... but rather codifies those crimes for trial by military commission. Because the provisions of this subchapter codify offenses that have traditionally been triable under the law of war or otherwise triable by military commission, this subchapter does not preclude trial for offenses that occurred before the date of the enactment of this subchapter, as so amended.

### 3. The M.C.A. and Providing Material Support for Terrorism

The 2006 and 2009 versions of the M.C.A. contained identical language concerning the offense of providing material support for terrorism. *Compare* 2006

M.C.A. § 950v(b)(25) *with* 2009 M.C.A. § 950t(25). The 2007 M.M.C.[40] has drawn the elements for this offense from Section 950v(b)(25) of the 2006 M.C.A., which reads:

> (25) PROVIDING MATERIAL SUPPORT FOR TERRORISM.—
> (A) OFFENSE. Any person subject to this chapter [10 USCS §§ 948a *et seq.*] who provides material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, an act of terrorism (as set forth in paragraph (24) [of this section]),[41] or who intentionally provides material support or resources to an international terrorist organization engaged in hostilities against the United States, knowing that such organization has engaged or engages in terrorism (as so set forth), shall be punished as a military commission under this chapter [10 USCS §§ 948a *et seq.*] may direct.
> (B) MATERIAL SUPPORT OR RESOURCES DEFINED.—In this paragraph, the term "material support or resources" has the meaning given that term in section 2339A(b) of title 18.[42]

H.R. Doc 111–26 at 13, 31, 90–91, 109, 121–23 (July 30, 2009) (H.R. Doc 111–26); H.R. Subcomm. on the Constitution, Civil Rights, and Civil Liberties of the Comm. on Jud., *Legal Issues Surrounding the Military Commission System*, 111th Cong., 1st Sess., H.R. Doc. 111–18 at 34–38 (July 8, 2009).

**40.** The Defense Secretary's Forward for the 2007 M.M.C. states that it is "adapted from" the 2005 Manual for Courts–Martial (MCM) "to comport with" the 2006 M.C.A. The 2007 M.M.C. "applies the principles of law and rules of evidence in trial by general courts-martial" so far as "practicable or consistent with military or intelligence activities, and is neither contrary to nor inconsistent with" the 2006 M.C.A. *Id.*

**41.** 2006 M.C.A. § 950v(b)(24) ("TERRORISM.—Any person subject to this chapter who intentionally kills or inflicts great bodily harm on one or more protected persons, or intentionally engages in an act that evinces a wanton disregard for human life, in a manner calculated to influence or affect the conduct of government or civilian population by intimidation or coercion, or to retaliate against government conduct.").

**42.** 18 U.S.C. § 2339A(b) (stating, "Definitions. As used in this section—(1) the term 'material support or resources' means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials."). The definition of "material support or resources" in the 2007 M.M.C., Part IV, ¶ 6(a)25c is taken verbatim from 18 U.S.C. § 2339A(b)(1), and was provided to the military commission as part of the military commission judge's instructions prior to findings. Tr. 3751.

### 4. M.M.C.'s List of Elements for Appellant's Specifications

Appellant was convicted of Specifications 5 and 7 of Charge II, providing material support for *an act of terrorism.* The 2007 M.M.C., Part IV, ¶ 6(25)bA, lists the particular elements as follows:

A. (1) The accused provided material support or resources to be used in preparation for, or in carrying out, an act of terrorism (as set forth in paragraph (24)); [43]

(2) The accused knew or intended that the material support or resources were to be used for those purposes; [44] and

**43.** *See* M.M.C., Part IV, ¶ 6(a)(24)a. The military commission judge, at Tr. 3750, properly defined the term "terrorism," in accordance with the 2006 M.C.A. § 950(b)(24) and 2007 M.M.C., Part IV, ¶ 6(a)(24)a.

**44.** The military commission judge properly instructed the military commission of the *mens rea* requirement for providing material support for an act of terrorism as follows:

To convict the accused of providing material support for an act of terrorism, the government must prove beyond a reasonable doubt that the accused knew or intended to provide support for either the preparation for or the execution of a specific act of terrorism. The offense is inherently forward-looking and the accused cannot be convicted for providing material support for past acts of terrorism.

Tr. 3751.

**45.** The military commission judge properly instructed the military commission on this element. We recognize that Justices Thomas, Scalia, and Alito's dissent in *Hamdan,* defers to the Executive Branch's determination that the period of the conflict for military commission purposes began on or before August 1996 when bin Laden declared jihad against the Americans. 548 U.S. at 684, 126 S.Ct. 2749, *but see id.* at 599–600, 126 S.Ct. 2749 (Stevens, Souter, Ginsburg, and Breyer, JJ., concurring) (not questioning "the Government's position that the war commenced with the events of September 11, 2001," but not necessarily agreeing that the conflict began before

(3) The conduct took place in the context of and was associated with an armed conflict. [45]

Appellant was convicted of Specifications 2, 6, and 8 of Charge II, providing material support for *an international terrorist organization.* The 2007 M.M.C. in Part IV, ¶ 6(25)bB, lists the particular elements as follows:

B. (1) The accused provided material support or resources to an international terrorist organization engaged in hostilities against the United States;

(2) The accused intended to provide such material support or resources to such an international terrorist organization; [46]

that date) (noting the *Prize Cases,* 67 U.S. 635, 635, 2 Black 635, 17 L.Ed. 459 (1862), cited by Justice Thomas in his dissent, are "not germane to the analysis"). *See also Prize Cases,* 67 U.S. at 668. ("[I]t is none the less a war, although the declaration of it be 'unilateral.'"). The military commission had additional information not presented to the Supreme Court through the testimony and the video, "The al Qaeda Plan." *See* n. 5, *supra.*

**46.** The military commission judge properly instructed the military commission of the *mens rea* requirement for providing material support to an international terrorist organization in regard to elements two and three as follows, "Two, that he intended to provide such material support or resources to al Qaeda, an international terrorist organization engaged in hostilities against the United States; [and] Three, that he knew that al Qaeda was engaged in or engages in terrorism." Tr. 3744–45. *See also* Tr. 3749–50. The military commission judge also explained:

To convict the accused of providing material support for an international terrorist organization, the government most prove beyond a reasonable doubt that in providing material support or resources, the accused did so knowing that the material support or resources could or would be utilized to further the activities of the international terrorist organization and not merely the personal interests of al Qaeda's individual members.

Tr. 3751–52.

(3) The accused knew that such organization has engaged or engages in terrorism; and

(4) The conduct took place in the context· of and was associated with an armed conflict.

b. *Elements.*[47] The elements of this offense can be met either by meeting (i) all of the elements in A, or (ii) all of the elements in B, or (iii) all of the elements in both A and B.

### 5. Criminal Intent and Wrongfulness

It is not appellant's conduct in isolation that constitutes a law of war violation triable by military commission. Rather, it is his knowledge, intent, and conduct, in support of terrorism, and in the specific context of a conflict triggering application of U.S. treaty obligations per Common Article 3, which make it cognizable under the 2006 M.C.A. In enacting the 2006 M.C.A., Congress circumscribed the capacity of the military to unilaterally interpret the law of war and craft law of war offenses and punishments in connection with al Qaeda and terrorism offenses. The charges at bar are not the exercise of fiat or expediency by the executive branch; they are the product of closely prescribed statutes of limited application encompassing the peculiarities of the modern geopolitical environment.

■■■ First, the 2006 M.C.A. strictly limited jurisdiction of military commissions to AUECs,[48] as defined under the 2006

---

**47.** *See United States v. Vilches–Navarrete*, 523 F.3d 1, 20 (1st Cir.2008) (Congress enjoys latitude in determining what facts constitute elements of a crime which must be tried before a jury and proved beyond a reasonable doubt and which do not.) *See, e.g., Staples v. United States*, 511 U.S. 600, 604, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994) (noting that the "definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute" (second and third citation omitted)).

**48.** Sections 948c, 948d(a), and 948d(c) of the 2006 M.C.A. limit jurisdiction of military commissions convened under the M.C.A. to AUECs. 10 U.S.C. § 948c reads, "[a]ny alien unlawful enemy combatant is subject to trial by military commission under this chapter." 10 U.S.C. § 948d(a) and (c) state, respectively:

(a) JURISDICTION.—A military commission under this chapter shall have jurisdiction to try any offense made punishable by this chapter or the law of war when committed by an alien unlawful enemy combatant before, on, or after September 11, 2001.

\* \* \*

(c) DETERMINATION OF UNLAWFUL ENEMY COMBATANT STATUS DISPOSITIVE.—A finding, whether before, on, or after the date of the enactment of the Military Commissions Act of 2006, by a Combatant Status Review Tribunal or another competent tribunal established under the authority of the President or the Secretary of Defense that a· person is an unlawful enemy combatant is dispositive for purposes of jurisdiction for trial by military commission under this chapter. The 2009 M.C.A. § 948a(7) replaced the term "unlawful enemy combatant" with the term "unprivileged enemy belligerent." *See Ex parte Quirin*, 317 U.S. 1, 31, 63 S.Ct. 2, 87 L.Ed. 3 (1942) (Unlawful combatants are subject "to trial and punishment by military tribunals for acts which render their belligerency unlawful."). The 4th Circuit explained why the term "unlawful enemy combatant" is not preferred in connection with the hostilities in Afghanistan:

In *Hamdan*, the [Supreme] Court held that because the conflict between the United States and al Qaeda in Afghanistan is not "between nations," it is a " 'conflict not of an international character' "—and so is governed by Common Article 3 of the Geneva Conventions. *See* 126 S.Ct. at 2795; *see also id.* at 2802 (Kennedy, J., concurring). Common Article 3 and other Geneva Convention provisions applying to non-international conflicts (in contrast to those applying to international conflicts) simply do *not* recognize the "legal category" of enemy combatant. *See* Third Geneva Convention, art. 3, 6 U.S.T. at 3318. As the International Committee of the Red Cross—the official codifier of the Geneva Conventions—explains, "an 'enemy combatant' is a person who, either lawfully or unlawfully, engages in hostilities for the opposing side in an

M.C.A. §§ 948a(1)(A) and 948a(3).[49] Our Court explained in 2007:

> This critical determination of "lawful" or "unlawful" combatant status is far more than simply a matter of semantics.... [U]nder the well recognized body of customary international law relating to armed conflict, and specific provisions of GPW III, lawful combatants enjoy "combatant immunity" for their pre-capture acts of warfare, including the targeting, wounding, or killing of other human beings, provided those actions were performed in the context of ongoing hostilities against lawful military targets, and were not in violation of the law of war. *See Johnson v. Eisentrager*, 339 U.S. 763, 793, 70 S.Ct. 936, 94 L.Ed. 1255 (1950) (Black, J. dissenting) ("Legitimate 'acts of warfare,' however murderous, do not justify criminal conviction.... It is no 'crime' to be a soldier

....") (citing *Ex parte Quirin*, 317 U.S. 1, 30–31, 63 S.Ct. 2, 87 L.Ed. 3 (1942)) ("Mere membership in the armed forces could not under any circumstances create criminal liability...."); [*United States v.*] *Lindh*, 212 F.Supp.2d [541, 553 (E.D.Va.2002) ] (citing Waldemar A. Solf & Edward R. Cummings, *A Survey of Penal Sanctions Under Protocol I to the Geneva Conventions of August 12, 1949*, 9 Case W. Res. J. Int'l L. 205, 212 (1977)).

*United States v. Khadr*, 717 F.Supp.2d 1215, 1221 (USCMCR 2007) (internal footnote omitted). Lawful enemy combatants and those lawfully aiding or providing material support to lawful enemy combatants receive various privileges under international law, including combatant immunity. *Id.* The M.C.A. incorporates the necessity that the accused must be an unlawful combatant to emphasize the requirement of

---

*international* armed conflict;" in contrast, "[i]n non-international armed conflict combatant status *does not exist.*" Int'l Comm. of the Red Cross, Official Statement: The Relevance of IHL in the Context of Terrorism, at 1, 3 (Feb. 21, 2005), *http://www.icrc. org/Web/Eng/siteeng0.nsf/htmlall/ terrorismihl–210705* (emphasis added). *al–Marri v. Pucciarelli*, 534 F.3d 213, 233 (4th Cir.2008), *vacated sub nom. al-Marri v. Spagone*, 555 U.S. 1220, 129 S.Ct. 1545, 173 L.Ed.2d 671 (2009). For purposes of appellant's case, we apply the definition for "unlawful enemy combatant" in the 2006 M.C.A. *See* n. 49, *infra.*

**49.** The 2006 M.C.A. § 948a(1)(A)(i) defines the term "unlawful enemy combatant" as "a person who has engaged in hostilities or who has purposefully and materially supported hostilities against the United States or its co-belligerents who is not a lawful enemy combatant (including a person who is part of the Taliban, al Qaeda, or associated forces) ...." The 2006 M.C.A. § 948a(2) defines the term "lawful enemy combatant" to be a person who is:

(A) a member of the regular forces of a State party engaged in hostilities against the United States; (B) a member of a mili-

tia, volunteer corps, or organized resistance movement belonging to a State party engaged in such hostilities, which are under responsible command, wear a fixed distinctive sign recognizable at a distance, carry their arms openly, and abide by the law of war; or (C) a member of a regular armed force who professes allegiance to a government engaged in such hostilities, but not recognized by the United States.

The 2006 M.C.A. § 948a(3) defines the term "alien" to mean "a person who is not a citizen of the United States." Winthrop defines the term, "enemy" to include "not only civilians, soldiers, & c., but also persons who, by the laws of war, are outlaws—as 'guerillas' and other freebooters." 1920 Winthrop, *supra* n. 23, at 631 (citation omitted). *See also* 2008 MCM, Part IV, ¶ 23c(1)(b), *referred to by* 2008 MCM, Part IV, ¶ 28c(2) (stating the 2008 MCM term "enemy" includes "organized forces of the enemy in time of war, any hostile body that our forces may be opposing, such as a rebellious mob or a band of renegades, and includes civilians as well as members of military organizations. 'Enemy' is not restricted to the enemy government or its armed forces. All the citizens of one belligerent are enemies of the government and all the citizens of the other.").

wrongfulness.[50] In addition, the military commission members must determine that appellant's conduct was wrongful—that is in furtherance of an act of terrorism, and not legitimate warfare undertaken by a lawful combatant.[51]

**50.** *See* Elements, *infra* at pp. 1282–84. (M.M.C., Part IV, ¶¶ 6(25)bA(3) and 6(25)bB(4)). The term "wrongfully" is frequently used in court-martial practice. *See* 2008 MCM, Part IV (numerous paragraphs reference the term "wrongful" or "wrongfulness"). The concept of wrongfulness is also explicit in military commission practice. *See e.g.,* 2007 M.M.C., Part IV, ¶¶ 6(12)b(1), 6(21)(b)(1), 6(21)c(3), 6(22)b(1). The 2007 M.M.C. also recognizes an inherent or implied element of wrongfulness. For example, in the offense "Terrorism" the M.M.C. does not include wrongfulness in the elements of the offense but notes in the comments, "The requirement that the conduct be wrongful for this crime necessitates that the conduct establishing this offense not constitute an attack against a lawful military objective undertaken by military forces of a State in the exercise of their official duties." 2007 M.M.C., Part IV, ¶ 24c(2). *See also* Military Commission Instruction (MCI) No. 2, which addresses the requirement of wrongfulness in various paragraphs.

**51.** The military commission judge properly instructed the commission about this necessity stating:

In order to be an act of terrorism, the act must be wrongful, which means that it was undertaken without legal justification or excuse. An act—an attack on a military objective undertaken by military forces of a state in the exercise of their official duties would not constitute an act of terrorism. Tr. 3751.

**52.** *See* Elements, *infra* at pp. 1282–84. (M.M.C., Part IV, ¶¶ 6(25)bA(3) and 6(25)bB(4)).

**53.** *See Hamdan,* 548 U.S. at 599–600, 126 S.Ct. 2749 (Stevens, Souter, Ginsburg, and Breyer, JJ., concurring); *id.* at 683–88, 126 S.Ct. 2749 (Thomas, Scalia, and Alito, JJ., dissenting). "As explained in the text, the law of war permits trial only of offenses 'committed within the period of the war.' " *Id.* at 599 n. 31, 126 S.Ct. 2749 (citing *Quirin,* 317 U.S. at 28–29, 63 S.Ct. 2; 1920 Winthrop, *supra* n.

Second, the conduct took place in the context of and was associated with an armed conflict.[52] The Supreme Court emphasized the importance of this requirement.[53] The military commission judge properly instructed,[54] and the military

23, at 837) (Stevens, Souter, Ginsburg, and Breyer, JJ., concurring).

**54.** The military commission judge properly instructed the members concerning this element of the offense as follows:

With respect to each of the ten specifications [of providing material support for terrorism] before you, the government must prove beyond a reasonable doubt that the actions of the accused took place in the context of and that they were associated with armed conflict. In determining whether an armed conflict existed between the United States and al Qaeda and when it began, you should consider the length, duration, and intensity of hostilities between the parties, whether there was protracted armed violence between governmental authorities and organized armed groups, whether and when the United States decided to employ the combat capabilities of its armed forces to meet the al Qaeda threat, the number of persons killed or wounded on each side, the amount of property damage on each side, statements of the leaders of both sides indicating their perceptions regarding the existence of an armed conflict, including the presence or absence of a declaration to that effect, and any other facts or circumstances you consider relevant to determining the existence of armed conflict. The parties may argue the existence of other facts and circumstances from which you might reach your determination regarding this issue. In determining whether the acts of the accused took place in the context of and were associated with an armed conflict, you should consider whether the acts of the accused occurred during the period of an armed conflict as defined above, whether they were performed while the accused acted on behalf of or under the authority of a party to the armed conflict, and whether they constituted or were closely and substantially related to hostilities occurring during the armed conflict and other facts and circumstances you consider relevant to this issue. Coun-

commission found beyond a reasonable doubt that this requirement was met.

Third, appellant had the requisite criminal intent and knowledge. The military commission judge properly instructed about these elements, *see* pp. 1282–84, *infra*, and the military commission found these requirements were met.

The acts were committed by an AUEC in the context of an armed conflict with the requisite knowledge and intent. Accordingly, we find they constitute clear law of war violations per the 2006 M.C.A.

## 6. Findings of the Military Commission Judge

At trial, the military commission judge considered various U.N. Security Council Resolutions against terrorism, referenced in the domestic criminal offense of providing material support for terrorism in Title 18 of the U.S. Code. *See* AE 263. He also discussed records about "guerilla-marauders," "bushwhackers," and "jayhawkers" dating from the American Civil War. *See* AE 263 at 4–5. The military commission judge quoted Winthrop's description of these "armed prowlers":

> These were persons acting independently, and generally in bands, within districts of the enemy's country or on its borders, who engaged in the killing, disabling and robbing of peaceable citizens or soldiers, in plunder and pillage, and even in the ransacking of towns, from motives mostly of personal profit or revenge.

*Id.* at 4 (quoting 1920 Winthrop, *supra* n. 23, at 783–84). *See* p. 57, *infra* (quoting *Lieber's Instructions* 26–27 (Articles 82

and 84)). He equated the conduct of these marauding bands with terrorism, "[i]n modern parlance, they might be referred to as terrorists, or those who provided material support for terrorism." AE 263 at 5. He concluded "that Congress 'had an adequate basis' to conclude that providing material support for terrorism has "traditionally been considered [a violation] of the law of war," and he denied appellant's *ex post facto* motion to dismiss. *Id.* at 6.

## C. Criminalization of Analogous Global Conduct

 Even though Congress concluded the offense of providing material support for terrorism has "traditionally been triable under the law of war or otherwise triable by military commission," that conclusion is not due absolute deference by this court. "It is emphatically the province and duty of the judicial department to say what the law is," *Marbury v. Madison*, 5 U.S. 137, 177, 1 Cranch 137, 2 L.Ed. 60 (1803). We have an independent responsibility to determine whether appellant's charged conduct existed as well-recognized criminal conduct.

We, like the military commission judge, consider international and domestic sources of law[55] for pre-existing examples of criminalization under the law of war of conduct similar to that for which appellant was convicted. In addition to those sources discussed from pp. 1272 to 1280, *supra*, we look to international conventions and declarations, international tribunals, and other U.S. precedent associated with armed conflict.

---

sel may address this matter during their closing arguments, and may suggest other factors for your consideration. Conduct of the accused that occurs at a distance from the area of conflict can still be in the context of and associated with armed conflict,

as long as it was closely and substantially related to the hostilities that comprised the conflict.
Tr. 3752–53.

**55.** *See e.g.,* Title 18 terrorism statutes at pp. 1272 through 1280, *supra*.

## 1. International Conventions and Declarations

■ "Customary international law results from a general and consistent practice of states followed by them from a sense of legal obligation." *Restatement (Third) of Foreign Relations Law of the United States* § 102(2) (Am. L. Inst. 1987). "International agreements" establish duties and responsibilities for the state parties and can be evidence of customary international law "when such agreements are intended for adherence by states generally and are in fact widely accepted." *Id.* at § 102(3). We are concerned here with a specific subset of this body of law, the laws or customs of war. Colonel Winthrop described in his influential treatise, *supra* n. 23, at 42, the manner of application of "Laws or Customs of War" stating:

These are the rules and principles, almost wholly unwritten,[56] which regulate the intercourse and acts of individuals during the carrying on of war between hostile nations or peoples. While properly observed by military commanders in the field, they may often also enter into the question of the due administration of justice by military courts in cases of persons charged with offences growing out of the state of war. Such laws and customs would especially be taken into consideration by *military commissions* in passing upon offences in violation of the laws of war.

In 1949, four separate international conventions were adopted to address the needs of (1) wounded and sick in the field; (2) wounded, sick, and shipwrecked at sea; (3) prisoners of war; and (4) civilians.[57]

**56.** One of the earliest international restrictions on warfare was the Hague Regulations Respecting the Laws and Customs of War on Land, annexed to Convention No. IV, *Respecting the Laws and Customs of War on Land* (Oct. 18, 1907), *ratified by the United States* Feb. 23, 1909, *entered into force* Jan. 26, 1910, *for the United States*, 36 Stat. 2277. Article 23 of these regulations is violated when innocent civilians (protected persons) are unnecessarily killed.

**57.** *Geneva Convention (I) for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field* (Aug. 12, 1949), entered into force Oct. 21, 1950, for the United States Feb. 2, 1956, 6 U.S.T. 3114, T.I.A.S. 3362, 75 U.N.T.S. 31 (No. 970); *Geneva Convention (II) for the Amelioration of the Condition of Wounded, Sick and Shipwrecked Members of the Armed Forces at Sea* (Aug. 12, 1949), entered into force Oct. 21, 1950, for the United States Feb. 2, 1956, 6 U.S.T. 3217, T.I.A.S. 3363, 75 U.N.T.S. 85 (No. 971); *Geneva Convention (III) Relative to the Treatment of Prisoners of War* (Aug. 12, 1949), entered into force Oct. 21, 1950, for the United States Feb. 2, 1956, 6 U.S.T. 3316, T.I.A.S. 3364, 75 U.N.T.S. 135 (No. 972); *Geneva Convention (IV) Relative to the Protection of Civilian Persons in Time of War* (Aug. 12, 1949), entered into force Oct. 21, 1950, for the United States

Feb. 2, 1956, 6 U.S.T. 3516, T.I.A.S. 3365, 75 U.N.T.S. 287 (No. 973); *Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of International Armed Conflicts (Protocol I)* (Geneva, June 8, 1977), 1125 U.N.T.S. 3 (No. 17512); *Protocol Additional to the Geneva Conventions of 12 August 1949, and Relating to the Protection of Victims of Non–International Armed Conflicts (Protocol II)* (June 8, 1977), 1125 U.N.T.S. 609 (No. 17513), 16 I.L.M. 1442, entered into force for UN July 12, 1978 (Geneva, June 8, 1977). Protocol I has 170 state parties and 5 state signatories. Protocol II has 165 state parties and 4 state signatories. The United States signed Protocols I and II on December 12, 1977; however, the United States has not ratified either Protocol. *See also Kadic v. Karadzic*, 70 F.3d 232, 243 n. 7 (2d Cir.1995) (listing signing and effective dates for four Geneva Conventions). The four Geneva Conventions have 194 state parties. The International Committee of the Red Cross (ICRC), International Humanitarian Law—Treaties and Documents webpage contains a current list of nations that have signed and ratified various international humanitarian treaties. *http://www.icrc.org*. The UN website is the source for the UN "entry into force," state signatories, and state parties information in this decision, *http://treaties.un.org/Home.aspx?lang=en*.

The Geneva Conventions articulated various positive and negative duties towards each of these groups. Common Article 3 to the Geneva Conventions of 1949 requires humane treatment of persons taking no active part in the hostilities and prohibits violence against such persons.[58] Numerous antiterrorism treaties or conventions predate appellant's offenses.[59] Congress made violation of Common Arti-

**58.** *Kadic,* 70 F.3d at 243 (quoting Common Article 3). Subsequent protocols to protect civilians were adopted by many nations. *See e.g., Protocol II,* Article 13, *supra* n. 57 ("Article 13. *Protection of the civilian population.* 1. The civilian population and individual civilians shall enjoy general protection against the dangers arising from military operations. To give effect to this protection, the following rules shall be observed in all circumstances. 2. The civilian population as such, as well as individual civilians, shall not be the object of attack. Acts or threats of violence the primary purpose of which is to spread terror among the civilian population are prohibited. 3. Civilians shall enjoy the protection afforded by this Part, unless and for such time as they take a direct part in hostilities.").

**59.** *See, e.g.,* (1) *International Convention for the Suppression of the Financing of Terrorism* (New York, Dec. 9, 1999) (*1999 Financing Convention*), 2178 U.N.T.S. 197, 39 I.L.M. 270, G.A. Res. 54/109, entered into force for the UN Apr. 10, 2002, ratified on June 26, 2002 and entered into force for the U.S. July 26, 2002 (signatories: 132; parties: 174); (2) *International Convention for the Suppression of Terrorist Bombings* (New York, Dec. 15, 1997) (*1997 Bombing Convention*), 37 I.L.M. 249, G.A. Res. 52/164, entered into force for the UN May 23, 2001, ratified June 26, 2002 and entered into force for the U.S. July 26, 2002 (signatories: 58; parties: 164); (3) *Convention on the Marking of Plastic Explosives for the Purpose of Detection* (Mar. 1, 1991), 30 I.L.M. 726, 2122 U.N.T.S. 359 ratified or accessed by the U.S. Apr. 9, 1997, entered into force for the U.S. and UN June 21, 1998 (parties: 147); (4) *Protocol for the Suppression of Unlawful Acts Against the Safety of Fixed Platforms Located on the Continental Shelf* (Rome, Mar. 10, 1988), 27 I.L.M. 685, 1678 U.N.T.S. 304, entered into force for the UN Mar. 1, 1992, ratified or accessed by the U.S. Dec. 6, 1994, entered into force for the U.S. Mar. 6, 1995; (5) *Convention for the Suppression of Unlawful Acts Against the Safety of Maritime Navigation* (Rome, Mar. 10, 1988), 27 I.L.M. 668, 1678 U.N.T.S. 221, entered into force for the UN Mar. 1, 1992 (parties: 157); (6) *Protocol for the Suppression of Un-* *lawful Acts of Violence at Airports Serving International Civil Aviation* (Montreal, Feb. 24, 1988), 27 I.L.M. 627, 1589 U.N.T.S. 474, entered into force for the UN Aug. 6, 1989, ratified or accessed by the U.S. Oct. 19, 1994, entered into force for the U.S. Nov. 18, 1994 (parties: 171); (7) *Convention on the Physical Protection of Nuclear Material* (Vienna, Oct. 26, 1979), 18 I.L.M. 1419, 1456 U.N.T.S. 1987 (No. 24631), ratified or accessed by the U.S. Dec. 13, 1982, entered into force for the U.S. and UN Feb. 8, 1987 (signatories: 44; parties: 145); (8) *International Convention Against the Taking of Hostages* (New York, Dec. 17, 1979) (*1979 Hostage Convention*), G.A. Res. 34/146, U.N. Doc. A/34/46, 1316 U.N.T.S. 205 (No. 21931), entered into force for the UN June 3, 1983, ratified or accessed by the U.S. Dec. 7, 1984, entered into force for the U.S. Jan. 6, 1985 (signatories: 39; parties: 168); (9) *Convention on the Prevention and Punishment of Crimes against Internationally Protected Persons, including Diplomatic Agents* (New York, Dec. 14, 1973) (*1973 Protected Persons Convention*), 28 U.S.T. 1975, 1035 U.N.T.S. 167 (No. 15410), ratified or accessed by the U.S. Oct. 26, 1976, entered into force for the U.S. and UN Feb. 20, 1977 (signatories: 25; parties: 173); (10) *Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation* (Sept. 23, 1971) (*1971 Aviation Convention*), 24 U.S.T. 565, 974 U.N.T.S. 177 (No. 14118) ratified or accessed by the U.S. Nov. 1, 1972, entered into force for the U.S. and UN Jan. 26, 1973 (parties: 188); (11) *Convention for the Suppression of Unlawful Seizure of Aircraft* (The Hague, Dec. 16, 1970), 22 U.S.T. 1641, 860 U.N.T.S. 105 (No. 12325), ratified or accessed by the U.S. Sept. 14, 1971, entered into force for the U.S. and UN Oct. 14, 1971 (parties: 185); (12) *Convention on Offenses and Certain Other Acts Committed on Board Aircraft* (Tokyo, Sept. 14, 1963), 20 U.S.T. 2941, 704 U.N.T.S. 219 (No. 10106), ratified or accessed by the U.S. Sept. 5, 1969, entered into force for the U.S. and UN Dec. 4, 1969 (parties: 185). *See* U.S. Dept. of State, *A List of Treaties and Other International Agreements of the United States in Force on January 1, 2010. See also* Young, *infra* n. 85, at 34 n. 52, 103 (noting United

cle 3 a war crime under the War Crimes Act of 1996.[60] The Rome Statute for the International Criminal Court and the War Crimes Act of 1996, have explicitly referenced the standards for grave breaches of the Geneva Conventions in defining war crimes.[61] For example, the *1971 Terrorism and Extortion Convention* [62] provides that the contracting States:

[U]ndertake to cooperate among themselves by taking all the measures that they may consider effective, under their own laws, and especially those established in this convention, prevent and punish acts of terrorism, especially kidnapping, murder, and other assaults against the life or physical integrity of those persons to whom the state has the duty according to international law to give special protection, as well as extortion in connection with those crimes.

Similarly, the *1971 Aviation Convention,* *supra* n. 59, asserts criminal liability for both hijackers and their accomplices. Other conventions follow this scheme.[63] In 1994, the UN General Assembly solemnly declared:

1. The States Members of the United Nations solemnly reaffirm their unequivocal condemnation of all acts, methods and practices of terrorism, as *criminal* and unjustifiable, wherever and by whomever committed . . . ;

2. Acts, methods and practices of terrorism constitute a *grave violation* of the purposes and principles of the United Nations, which may pose a threat to international peace and security, jeopardize friendly relations among States, hinder international cooperation and aim at the destruction of human rights, fundamental freedoms and the democratic bases of society;

3. *Criminal acts* intended or calculated to provoke a state of terror in the general public, a group of persons or particular persons for political purposes are in any circumstance unjustifiable, whatever the considerations of a political, philosophical, ideological, racial, ethnic, religious or any other nature that may be invoked to justify them[.] [64]

The *1994 Terrorism Declaration* urged action "to ensure the apprehension and prosecution or extradition of perpetrators of terrorist acts. . . ." § I5(b), *supra* n. 64.

Describing terrorism as a crime of international significance, the treaties oblige the parties to criminalize various facets of terrorism in their domestic criminal codes

---

Nations Secretary General's identification of 12 global and 9 regional treaties addressing international terrorism and listing the 12 global treaties as well as numbers of signatory, ratification, accession, and succession states for each treaty).

**60.** Aug. 21, 1996, P.L. 104–192, § 1, 110 Stat. 2104. *See* 18 U.S.C. § 2441(d) (listing Common Article 3 grave breaches and stating that Common Article 3 violations are a serious breach of international law and a war crime). *See e.g., Kadic,* 70 F.3d at 242–43; *Doe v. Islamic Salvation Front,* 993 F.Supp. 3, 5–8 (D.D.C.1998).

**61.** *Rome Statute of the International Criminal Court* (Rome Statute), art. 126, U.N. Doc. A/Conf.183/9, July 17, 1998, 2187 U.N.T.S. 90. United States terrorism laws under Title

18 are described in more detail at pp. 1272–80, *supra.*

**62.** The *Convention to Prevent and Punish the Acts of Terrorism Taking the Form of Crimes Against Persons and Related Extortion that are of International Significance* (Feb. 2, 1971) (1971 Terrorism and Extortion Convention), 27 U.S.T. 3949; T.I.A.S. 8413, *entered into force,* Oct. 16, 1973, *for the United States,* Oct. 20, 1976.

**63.** *1973 Protected Persons Convention, supra* n. 59; *1979 Hostage Convention, supra* n. 59.

**64.** *Declaration on Measures to Eliminate International Terrorism of 1994,* G.A. Res. 49/60, U.N. Doc. A/RES/49/60 (Dec. 9, 1994) (*1994 Terrorism Declaration* ), § I.1–3. (emphasis added).

and to cooperate amongst themselves to prevent and punish acts of terrorism. The *1997 Bombing Convention, supra* n. 59, has 58 signatories and 164 state parties. It adopted broad language similar to providing material support for terrorism. In Article 2, ¶ 2, this Convention provides criminal liability for any person who:

> (a) Participates as an accomplice in an offence ...; (b) Organizes or directs others to commit an offence ...; or (c) In any other way contributes to the commission of one or more offences ... by a group of persons acting with a common purpose; such contribution shall be intentional and either be made with the aim of furthering the general criminal activity or purpose of the group or be made in the knowledge of the intention of the group to commit the offence or offences concerned.

Similarly, the *1999 Financing Convention, supra* n. 59, provides, "Any person commits an offence within the meaning of this Convention if that person by any means, directly or indirectly, unlawfully and willfully, provides or collects funds with the intention that they should be used ... in full or in part, in order to carry out" violent terrorism-type offenses or offenses "within the scope and defined in" one of the nine UN Conventions or Protocols listed in the *1999 Financing Convention's* Annex. *Id.* at Article 2, ¶ 1. *See also, id.* at Article 2, ¶¶ 3–5. This language is of particular significance to our analysis insofar as it seeks to criminalize conduct falling within the definition of providing material support for terrorism articulated in the M.C.A.

Gradually, regional conventions focused on combating terrorism began to encourage member states to broaden their application of criminal liability.[65] Forty-six member countries of the Council of Europe ratified or accessed a treaty supporting the extradition of those who commit or support terrorist acts, and recognized kidnapping, hostage taking, bombing, attempts, and "participation as an accomplice" in such activity.[66] If the suspected terrorist is not extradited, a State shall "submit the case, without exception whatsoever and without undue delay, to its competent authorities for the purpose of prosecution." *Id.* at Art. 7. More recently, the South Asian Association for Regional Cooperation (SAARC) Regional Convention on Suppression of Terrorism, (Nov. 4, 1987) was signed by representatives from Bangladesh, India, Nepal, Bhutan, Maldives, Pakistan, and Sri Lanka.[67] Under

---

**65.** Hans Corell, United Nations Under Secretary General for Legal Affairs, *The International Instruments Against Terrorism: The Record So Far and Strengthening the Existing Regime* 5–6 (June 3, 2002) (listing regional conventions including, the Organization of American States adoption of the *Convention to Prevent and Punish the Acts of Terrorism Taking the Form of Crimes Against Persons and related Extortion that are of International Significance* (1971), the League of Arab States adoption of the *Arab Convention on the Suppression of Terrorism* (April 22, 1988), the Organization of the African Unity (OAU) adoption of the *Convention on the Prevention and Combating of Terrorism* (July 14, 1999), the *Treaty on Cooperation among the States of the Commonwealth of Independent States in* *Combating Terrorism* (1999), and the *Convention of the Organization of the Islamic Conference on Combating International Terrorism* (1999). *www.un.org/law/counsel/english/ remarks.pdf.*

**66.** *The European Convention on the Suppression of Terrorism* (Strasbourg, Jan. 27, 1977), entered into force Aug. 4, 1978, registered by the Secretary General of the Council of Europe May 30, 1979, 1137 V.N.T.S. 1–17828, Art. I and Status Chart.

**67.** SAARC Regional Convention on Suppression of Terrorism, Nov. 4, 1987, on deposit with Sec'y Gen'l, So. Asian Assoc. for Regional Coop., is the source for the information in the remainder of this paragraph. 2219 V.N.T.S. 179.

Article I, it listed as cognizable crimes various terrorism-related offenses, including attempt, conspiracy, aiding, abetting, accomplice, and counseling, when connected to multiple UN Conventions or other violent-terrorism-type offenses. Articles II–VIII urge members to facilitate extradition and prosecution.

These conventions occurred in the context of the United Nations Security Council's condemnations of international terrorism and its supporters. At a Security Council meeting on January 31, 1992, "at the level of Heads of State and Government, the Council expressed its deep concern over acts of international terrorism, and emphasized the need for the international community to deal effectively with all such criminal acts." [68] In 1998, the Security Council adopted Resolution 1189 "[s]trongly condem[ning] the terrorist bomb attacks in Nairobi, Kenya and Dar-es–Salaam, Tanzania on August 7, 1998 which claimed hundreds of innocent lives, injured thousands of people and caused massive destruction to property." *Id.* at ¶ 1. It "calls upon all states and international institutions to cooperate" and provide assistance "to apprehend the perpetrators of these cowardly criminal acts and to bring them swiftly to justice." *Id.* at ¶ 3. Finally, it urges "all States to adopt ... effective and practical measures ... for the prevention of such acts of terrorism, and for the prosecution and punishment of their perpetrators." *Id.* at ¶ 5. In the same year, the Security Council expressed its concern in Resolution 1214 about "the continuing use of Afghan territory, especially areas controlled by the Taliban, for the sheltering and training of terrorists and the planning of terrorist acts, and *reiterating* that the suppression of international terrorism is essential for the maintenance of international peace and security." S.C. Res. 1214, U.N. Doc. S/RES/1214 (Dec. 8, 1998), Preamble (emphasis in original). It demanded "that the Taliban stop providing sanctuary and training for international terrorists and their organizations." *Id.* at ¶ 13.

Although the approach of various nations towards punishment of terrorism-related offenses varies, prosecution of such offenses has been encouraged by the United Nations Security Council and treaties. *See* n. 59, *supra.* We are satisfied that international conventions and treaties provided an additional basis in international law that appellant's charged conduct in support of terrorism was internationally condemned and criminal.

## 2. International Criminal Tribunals

In 1993, the United Nations Security Council established the first of the modern international tribunals—the International Criminal Tribunal for the former Yugoslavia (ICTY)—as an *ad hoc* court to prosecute crimes committed during the period of armed conflict in the former Yugoslavia.[69] The Security Council's mandate limited ICTY jurisdiction to those areas of international humanitarian law which were "beyond any doubt" part of customary international law.[70] Consequently, the subject matter jurisdiction of the Yugoslavia Tribunal was limited to:

---

**68.** S.C. Res. 1189, U.N. Doc. S/RES/1189 (Aug. 13, 1998), Preamble (citing Note by President of the Security Council, S/23500 (Jan. 31, 1992) at 3).

**69.** Statute of the International Criminal Tribunal for the Former Yugoslavia, S.C. Res. 827, *reprinted in* 32 I.L.M. 1203 (1993).

**70.** The Secretary–General, *Report of the Secretary–General Pursuant to Paragraph 2 of Security Council Resolution 808,* ¶ 34 U.N. Doc. S/25704 (1993).

the Geneva Conventions of 12 August 1949 for the Protection of War Victims; the Hague Convention (IV) Respecting the Laws and Customs of War on Land and the Regulations annexed thereto of 18 October 1907, the Convention on the Prevention and Punishment of the Crime of Genocide of 9 December 1948, and the Charter of the International Military Tribunal of 8 August 1945.[71] Since the first hearing in 1994, the ICTY has indicted 161 individuals, completed trials on 125 persons, and 36 proceedings are ongoing.[72] Defendants range from common soldiers to generals and Prime Minister Slobodan Milosevic. *Id.*

▮ International law also recognizes joint criminal enterprise (JCE) as a theory of criminal liability. At appellant's trial, the military commission judge granted a defense motion and excepted the JCE language from appellant's conspiracy specification, of which he was acquitted. The deletion of these words and the ultimate finding on this specification, however, do not forestall this court in this or future cases from considering JCE as a recognized theory of criminal liability for purposes of determining whether an appellant's conduct was prohibited and historically punishable as a law of nations offense.[73] Our focus here is on whether the international community considered appellant's actions to be criminally punishable when he provided material support to al Qaeda.

▮ Membership in a criminal enterprise by itself is distinguishable from JCE. "[O]nly natural persons (as opposed to juridical entities) were liable under the Tribunal's Statute, and that mere membership in a given criminal organi[z]ation [is] not sufficient to establish individual criminal responsibility" or liability under JCE.[74] JCE is "concerned with the participation in the commission of a crime as part of a [JCE], a different matter."[75] To be clear, the doctrine of JCE entails a combination of membership, organizational liability, and participation of the individual. Appellant's membership in Al Qaeda and knowledge of its purposes was established at the military commission. The participation aspect was met through the conduct comprising the specifications before us.

▮ JCE doctrine provides a theory of liability for proving a specific crime, and it is not a stand-alone substantive offense.[76] JCE considers each member of an organized criminal group individually responsible for crimes committed by the group within the common plan or purpose,

---

71. *Id. See* Hague Convention, *supra* n. 56; Geneva Conventions, *supra* n. 57; IMT Charter, *infra* n. 149; *The Convention on the Prevention and Punishment of the Crime of Genocide* (Dec. 9, 1948) (*Genocide Convention* ), 78 U.N.T.S. 278, *entered into force* Jan. 12, 1951, *for the United States* Feb. 23, 1989. The Genocide convention has 141 state parties and one state signatory.

72. ICTY webpage, *http://www.icty.org.*

73. *See Hamdan,* 548 U.S. at 611, n. 40, 126 S.Ct. 2749 (Stevens, Souter, Ginsburg, and Breyer, JJ., concurring)(noting ICTY has adopted JCE, which "is a species of liability (akin to aiding and abetting)") (citations omitted).

74. *Prosecutor v. Milutinović,* Decision on Dragoljub Ojdanić's Motion Challenging Jurisdiction—Joint Criminal Enterprise, Case No. IT–99–37–AR72, ¶ 25 (ICTY App. Chamber, May 21, 2003) (*Milutinović* Appeal Chamber). The Appeals Chamber referred the Secretary–General's Report, *supra* n. 70, at ¶¶ 50 and 51.

75. *Id.* at ¶ 26 (discussing *Prosecutor v. Tadić,* Judgment, Case No. IT–94–1–A, ¶¶ 200–227 (ICTY Appeal Chamber, July 15, 1999) (*Tadić* Appeal Chamber)).

76. *See generally,* Allison M. Danner and Jenny S. Martinez, *Guilty Associations: Joint Criminal Enterprise, Command Responsibility, and the Development of International Criminal Law,* 93 Calif. L.Rev. 75, 118 (2005).

and it requires an overt act in support of the offense. As such, the doctrine brings a similar analytical nexus to providing material support for terrorism.[77]

■ In *Tadić*, the Trial Chamber found no direct evidence that the accused had taken an actual part in the killings charged. *Tadić* Appeal Chamber, *supra* n. 75, at ¶¶ 178–183. The Appeals Chamber, however, overturned the Trial Chamber and convicted Tadić relying on the concept of common purpose, later referred to as JCE. Under JCE "responsibility for a crime other than the one agreed upon in the common plan arises if, under the circumstances of the case, (i) it was *foreseeable* that a crime might be perpetrated by one or other members of the group and (ii) the accused *willingly took that risk.*" *Id.* at ¶ 228 (emphasis in original). Tadić actively took part in the attack on the town, and was involved in beating a resident. *Id.* at ¶ 232. Tadić was found criminally liable because he shared the intent of the JCE to use violence to ethnically cleanse the town of Jaskici. *Id.* at ¶¶ 232–33. He was, therefore, held to be responsible for the five deaths since they were perpetrated in the course of the removal and were a foreseeable consequence of the plan. *Id.* at ¶¶ 233–34. Tadić was found guilty of a "violation of the laws or customs of war in terms of . . . murder," among other offenses. *Id.* at ¶¶ 235–37.

■ In JCE, the establishment of a common purpose is critical for criminal liability. In the *Milosevic* case, prosecutors argued that the indictments against Milosevic were "all part of a common scheme, strategy, or plan on the part of the accused to create a 'Greater Serbia,' . . . and that this plan was to be achieved by forcibly removing non-Serbs from large geographical areas through the commission of the crimes charged in the indictments."[78] Under this theory of criminal liability, members of the JCE were held responsible for all of the crimes committed by the group in furtherance of the "Greater Serbia" plan.

■ Although the members of the JCE must have a common purpose, it is not necessary for the participants to be organized "into any sort of military, political, or administrative structure."[79] The common purpose need not be previously

---

77. The ICTY recognizes three types of JCE, and each has different elements. *Prosecutor v. Tadić, supra* n. 75, at ¶ 195. The first category has two pertinent elements: "(i) the accused must voluntarily participate in one aspect of the common design (for instance, by inflicting non-fatal violence upon the victim, or by providing material assistance to facilitating the activities of his co-perpetrators); and (ii) the accused, even if not personally effecting the killing, must nevertheless intend this result." *Id.* at ¶ 196. The *Tadić* Appeal Chamber notes that although the accused's acts "must form a link in the chain of causation, it was not necessary that his participation be a *sine qua non,* or that the offense would not have occurred but for his participation." *Id.* at ¶ 199 (citation omitted). *See also Prosecutor v. Vujadin Popovic,* Case No. IT–05–88–T (Appeals Judgement, vol. I, June 10, 2010), ¶¶ 1021–32 n. 3357–93.

78. *Prosecutor v. Slobodan Milosevic,* Case Nos. IT–99–37–AR73, IT–01–50–AR73, IT–01–51–AR73, Reasons for Decision on Prosecution Interlocutory Appeal from Refusal to Order Joinder (Appeal Chamber Apr. 18, 2002), ¶ 8. The Trial Chamber concluded that the events in Kosovo were separated from the events in Bosnia by more than three years and the two enterprises lacked sufficient connection to form a common scheme. *Id.* at ¶¶ 9–10. Thus, the Kosovo indictment was severed from the Bosnia and Croatia indictments. *Id.* at ¶¶ 1–2. The Appeal Chamber overruled the Trial Chamber and concluded the Kosovo events were part of the same transaction as the events in Croatia and Bosnia. *Id.* at ¶ 21.

79. The source for the facts and quoted passages in this and the next paragraph is *Popovic, supra* n. 77, at ¶¶ 1023–31 (citations omitted).

"arranged or formulated but 'may materiali[z]e extemporaneously and be inferred from the fact that a plurality of persons act in unison to put into effect a joint criminal enterprise.' " The "common criminal purpose in terms of both the criminal goal intended and its scope" may be specified in general terms, such as ethnic cleansing of certain geographic areas. Under the third category of JCE, "the accused does not need to possess the requisite intent for the extended crime—the crime falling outside the common purpose."

■■■■ JCE liability does not require "that the accused [be] present at the time and place of perpetration of the crime . . ., it suffices that an accused perform acts 'that in some way are directed to the furthering of the common plan or purpose.' " Although the accused's "participation or contribution . . . to the common purpose need not be substantial, . . . 'it should at least be a significant contribution to the crimes for which the accused is found responsible.' "

■■■■ An accused's participation in a JCE need not involve an act or failure "to act in a way that assists, encourages, or lends moral support to another in the perpetration of a crime or underlying offence. Rather, the accused need merely act or fail to act 'in some way . . . directed to the furtherance of the common plan or purpose.' " [80] An accused who is convicted for participating in the JCE "is guilty of the substantive crime or underlying offence committed, regardless of the role that he played in the enterprise."

On July 17, 1998, the Rome conference adopted the proposed Statute for a permanent International Criminal Court (ICC) with 120 voting in favor, 7 voting against (including the United States), and 21 abstentions.[81] On April 11, 2002, the 60th ratification of the Rome Statute occurred, and the ICC came into existence on July 1, 2002. As of June 24, 2011, there are 115 state parties, and 139 states have signed the Rome Statute of the ICC,[82] creating a standing tribunal with jurisdiction over individuals who commit genocide, crimes against humanity, war crimes, and eventually, crimes of aggression.[83] The Rome Statute gives the ICC an expansive list of available theories of liability for individual criminal responsibility, and it provides as follows:

3. In accordance with this Statute, a person shall be criminally responsible and liable for punishment for a crime within the jurisdiction of the Court if that person:

(a) Commits such a crime, whether as an individual, jointly with another or through another person, regardless of whether that other person is criminally responsible; (b) Orders, solicits or induces the commission of such a crime which in fact occurs or is attempted; (c) *For the purpose of facilitating the com-*

**80.** The source for the facts and quoted passages in this paragraph is *Prosecutor v. Milan Milutinović*, Case No. IT–05–87–T (Appeals Judgement, vol. I, Feb. 26, 2009), ¶¶ 103, 105 (citations omitted).

**81.** Lucy Martinez, *Prosecuting Terrorists at the International Criminal Court: Possibilities and Problems*, 34 Rutgers L.J. 1, 15 (2002) (citations omitted).

**82.** The United States has signed but not ratified the Rome Statute. *See Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 276 n. 9 (2d Cir.2007) (noting that the United States has not ratified the Rome Statute because of concerns about potential abuse of prosecutorial authority). The ICRC website, *supra* n. 57, is the source of the information about state parties and signatures.

**83.** Rome Statute, *supra* n. 61 at art. 5. *See also* Report of the International Criminal Court to the UN General Assembly, A/65/313, pp. 6–7 (Aug. 19, 2010).

mission of such a crime, aids, abets or otherwise assists in its commission or its attempted commission, including providing the means for its commission; (d) *In any other way contributes to the commission or attempted commission of such a crime by a group of persons acting with a common purpose.* Such contribution shall be intentional and shall either: (i) Be made with the aim of furthering the criminal activity or criminal purpose of the group, where such activity or purpose involves the commission of a crime within the jurisdiction of the Court; or (ii) Be made in the knowledge of the intention of the group to commit the crime.

*Id.* at Art. 25(3) (emphasis added). Thus, the ICC articulates a theory of criminal liability under international law which permits it to hold individuals responsible not only for committing crimes but also for aiding, abetting, and assisting in the commission of crimes as well as the knowing or purposeful contribution to the commission or attempted commission of such crimes by a group acting with a common purpose.

In applying the JCE liability analysis, appellant's underlying conduct constitutes known, unlawful acts historically punishable and established before 1996.

### 3. Non–United States Domestic Terrorism Laws

There are a variety of definitions of terrorism in both domestic and international sources, but most of them entail politically motivated violence against civilians designed to coerce governments or intimidate civilian populations.[84] It is the duty of this court to ascertain whether appellant's conduct, providing material support for terrorism, constituted an offense against the law of nations. In doing so, we apply the definition of terrorism in 2006 M.C.A. § 950v(b)(24), *supra* n. 41, and we consider the degree to which appellant's underlying conduct violated international standards defining crimes as shown by various national laws prohibiting terrorism. *See Bin Laden,* 92 F.Supp.2d at 220–21 (*quoted* at pp. 1272–74, *supra*).

While some nations have considerable experience with using laws to combat violence against civilians for political ends, after the attacks on September 11, 2001, many additional nations enacted criminal prohibitions against providing assistance to terrorist organizations and involvement in terrorist acts.[85] UN Security Council Resolution 1373,[86] Section 2(e) required all member states to establish as serious

---

**84.** *See, e.g.,* 22 U.S.C. § 2656f(d); Nicholas J. Perry, *The Numerous Federal Legal Definitions of Terrorism: The Problem of Too Many Grails,* 30 J. Legis. 249, 254–55 (2004) ("There are at least nineteen definitions or descriptions of terrorism, as well as three terms relating to the support of terrorism, in federal law." (citations omitted)).

**85.** *See* Reuven Young, *Defining Terrorism: The Evolution of Terrorism as a Legal Concept in International Law and Its Influence on Definitions in Domestic Legislation,* 29 B.C. Int'l Comp. L.Rev. 23, 73–75, 80–89 (2006) (discussing development of anti-terrorism laws in the United Kingdom, India, and New Zealand). *See also* Adam Tomkins, *Criminalizing*

*Support for Terrorism: A Comparative Perspective,* 6 Duke J. Const. Law & Pub. Pol'y 81, 86–97 (2010) (discussing anti-terrorism laws and prohibitions against providing support for terrorist organization in the United Kingdom); Report of Lord Carlile of Berriew Q.C., *The Definition of Terrorism* (Berriew Report) 1, 9–15 (2007).

**86.** S/Res/1373 (2001), Sep. 28, 2001. Eleven follow-up Security Council Resolutions addressed suppression of terrorism. Security Council Resolution 1904 (2009), S/Res/1904 (2009), (Dec. 17, 2009) pp. 1, 3 (emphasizing condemnation of al Qaeda, bin Laden and the Taliban as well as associated groups and reaffirming measures to suppress these entities).

criminal offenses in domestic law any planning, preparation, support, and perpetration of terrorist acts, and report by the end of 2001 steps taken to implement this resolution. *Id.* Section 6. By the time the 2006 M.C.A. was enacted, providing material support for terrorism was recognized by various "members of the international community as being [an offense] against the law of nations," [87] as shown by their adoption of domestic laws prohibiting assistance to terrorist organizations or various levels of involvement in terrorist acts.[88]

Some nations have had prohibitions against offenses involving criminal organizations for many years,[89] and such laws may also be available to punish terrorist crimes involving violence. Other nations have statutes specifically prohibiting aiding or assisting a terrorist organization or aiding in a terrorist act or similar offenses. The developments in anti-terrorism laws taking place in Canada, India, and Pakistan are briefly illustrated here.[90]

Canada's 2001 Anti-terrorism Act (2001 ATA), ¶ 83.01 defines "Terrorist Activity"

in two ways, and "satisfying either part constitutes a 'terrorist activity.'" [91] First, it includes in Section 83.01(1)(a), "an act or omission that is committed in or outside Canada and that, if committed in Canada," is an offense under ten specified United Nations (UN) Conventions and Protocols relating to terrorism that the Canadian Government has signed and ratified.[92] Second, the 2001 ATA, § 83.01(1) includes "(b) an act or omission, in or outside Canada, (i) that is committed (A) in whole or in part for a political, religious or ideological purpose, objective or cause, and" is intended to intimidate "the public or a segment of the public" or to compel "a person, a government or a domestic or an international organization to do or to refrain from doing any act . . . and (ii) that intentionally (A) causes death or serious bodily injury to a person by the use of violence," or that intentionally "(B) endangers a person's life, [or] (C) causes a serious risk to the health or safety of the public or any segment of the public . . ." "The definition of

---

**87.** *See Bin Laden,* 92 F.Supp.2d at 220–21 (passage quoted at p. 1269, *supra* ).

**88.** *See* Berriew Report, *supra* n. 85, at 9–15 (comparing definitions of terrorism and similar terror-type prohibitions in 60 countries with the United Kingdom's definition).

**89.** *See* Edward M. Wise, *RICO Thirty Years Later: A Comparative Perspective: RICO and Its Analogues: Some Comparative Considerations,* 27 Syracuse J. Int'l L. & Com. 303, 314–22 (2000) (discussing crimes involving assistance to or complicity in criminal organizations in France, Italy, and Germany); Alexander D. Tripp, *Margins of the Mob: A Comparison of Reves v. Ernst & Young with Criminal Association Laws in Italy and France,* 20 Fordham Int'l L.J. 263, 298–309 (1996) (discussing legal liability for criminal association, accomplice, and complicity in Italy and France); Matthew H. James, *Keeping the Peace–British, Israeli, and Japanese Legis-*

*lative Responses to Terrorism,* 15 Dick. J. Int'l L. 405 (1997).

**90.** *See e.g.,* United Kingdom Secretary of State for Foreign and Commonwealth Affairs, *Counter–Terrorism Legislation and Practice: A Survey of Selected Countries* (Oct. 2005) (U.K. Report) (discussing counter-terrorism laws in Australia, Canada, France, Germany, Greece, Italy, Norway, Spain, Sweden, and the United States) (on file with the USCMCR Clerk of Court).

**91.** The Department of Justice (DoJ), Canada, *The Anti-terrorism Act, Definition of Terrorist Activity,* (Canadian DoJ webpage). Updated to Apr. 1, 2008. *http://www.justice.gc.ca/antiter/sheetfiche/terrordefp1–terreurdefp1–eng.asp.*

**92.** *Id.* (listing in Criminal Code, R.S.C. 1985, c. C–46 (Canadian Criminal Code) § 83.01(1)(a)(i) to (x), "the offences referred to in" ten United Nations counter-terrorism Conventions and Protocols).

'terrorist activity' includes conspiracy, attempt or threat to commit any act or omission that would fall within the definition of 'terrorist activity', or being an accessory after the fact or counseling in relation to any such act or omission."[93]

Under the 2001 ATA, a terrorist group is defined as an entity that has as one of its purposes or activities the facilitating or carrying out of terrorist activities or any entity that associates with such a group.[94] The entity is set forth in a list established by regulation.[95] Being on the list does not

itself constitute a criminal offence, although "it can lead to criminal consequences."[96]

After Indira Gandhi's assassination in 1984, India prohibited various terrorism-related activities.[97] The Terrorist and Disruptive Activities (Prevention) Act, No. 31 of 1985 and No. 43 of 1987 (1987 TADA), were Amended by Act 43 of 1993.[98] The 1987 TADA punished "terrorist acts"[99] and various offenses related to terrorist acts.[100] Moreover, anyone who harbors or conceals a terrorist is criminally liable, as

---

**93.** Canadian DoJ webpage, *http://www.justice. gc.ca/antiter/sheetfiche/terrordefp4–terreurdefp 1–eng.asp.* Canada's Criminal Code prohibits participating in, facilitating, or providing instructions concerning terrorist activity and harboring others who carry out terrorist activity. Annemieke Holthuis, *Seeking Equilibrium: Canada's Anti–Terrorism Act and the Protection of Human Rights,* Seminar on Prosecution Practices to Implement the International Covenant on Civil and Political Rights and Other Instruments 1, 8 n. 35 (Beijing, China, 2007) (citing Canadian Criminal Code §§ 83.18, 83.19, 83.21, 83.22, and 83.23). The 2001 ATA lapsed on January 15, 2007 because of sunset clauses. *See id.,* at 9–10, 20–21. *See also* Canadian DoJ webpage, The Anti-terrorism Act, Parliamentary Review of the Anti-terrorism Act. *http://www.justice.gc. ca/antiter/home-accueil-eng.asp* (discussing proposals for replacement of the 2001 ATA).

**94.** Debbie Johnston, *Lifting the Veil on Corporate Terrorism: The Use of the Criminal Code Terrorism Framework to Hold Multinational Corporations Accountable for Complicity in Human Rights Violations Abroad,* 66 U.T. Fac. L.Rev. 137, 160–63 (2008) (citations omitted). *See also* Canadian Criminal Code §§ 83.18, 83.19, 83.2, 83.21, and 83.22.

**95.** *Id.* at 160 n. 113 (citing Canadian Criminal Code § 83.01).

**96.** Holthuis, *supra* n. 93, at 8 n. 36 (citing Canadian Criminal Code § 83.05).

**97.** Anil Kalhan, *Colonial Continuities: Human Rights, Terrorism, and Security Laws in India,* 20 Colum. J. Asian L. 93, 144–45 (2006).

**98.** The 1985 TADA did not address "terrorist gangs" and "terrorist organizations." *Id.* at 156–57 n. 262. The 1993 TADA amendment criminalized "membership in a 'terrorists gang or a terrorist organi[z]ation, which is involved in terrorist acts' "; however, it did not define the terms terrorists gang or a terrorist organization. *Id.* (quoting Act No. 43 of 1993, § 4 (amending 1987 TADA § 3)).

**99.** 1987 TADA at § 3(1) ("Whoever with intent . . . to strike terror in the people or any section of the people . . . does any act or thing by using [various devices or weapons] . . . or by any other substances . . . to cause, or as is likely to cause, death of, or injuries to, any person or persons or loss of, or damage to, or destruction of, property . . . or detains any person and threatens to kill or injure such person in order to compel the Government or any other person to do or abstain from doing any act, commits a terrorist act.").

**100.** 1987 TADA, § 3(3) ("Whoever conspires or attempts to commit, or advocates, abets, advises or incites or knowingly facilitates the commission of, a terrorist act or any act preparatory to a terrorist act shall be punishable. . . .). *See also* Kalhan, *supra* n. 97, at 144–45. The term, "abet" includes "i. the communication or association with any person or class of persons who is engaged in assisting in any manner terrorists or disruptionists" and "iii. the rendering of any assistance, whether financial or otherwise, [to] the terrorists or disruptionists." 1987 TADA, § 2(a)i and iii.

is anyone "who is a member of a terrorist gang or a terrorist organization." 1987 TADA, § 3(4). TADA lapsed in 1995; however, new cases continue to be initiated "based on allegations arising from the period when TADA was in effect." Kalhan, *supra* n. 97, at 150 (citations omitted). The Prevention of Terrorism Act, No. 15 of 2002 (2002 POTA), "came into force on October 24, 2001," and "remain[ed] in force for three years." *Id.* at 152 n. 245. The 2002 POTA criminalizes:

> (1) commission of a "terrorist act," (2) conspiring, attempting to commit, advocating, abetting, advising or inciting, or knowingly facilitating the commission of a terrorist act or "any act preparatory to a terrorist act," (3) "voluntarily harbor[ing] or conceal[ing], or attempt[ing] to harbor or conceal any person knowing that such person is a terrorist," (4) "possession of any proceeds of terrorism," and (5) knowingly holding any property that has been "derived or obtained from commission of any terrorist act" or that "has been acquired through the terrorist funds."

*Id.* at 155 (citing 2002 POTA § 3). The 2002 POTA broadly defines "terrorist act," duplicating many of the core offenses in the 1987 TADA, and adds organizational or association prohibitions. *Id.* at 155–57 (citations omitted). Subsequent legislation continued many of the important prohibitions contained in the 2002 POTA.[101]

For decades, the Pakistani legal system has punished acts of terrorism. "Under the Suppression of Terrorist Activities (Special Courts) Act, 1975 [ (1975 STA) ], many times subsequently amended, special courts were" established to try suspects for terrorist offenses.[102] An August 1997 Pakistan Law Commission Report noted that in mid–1997 in four provinces "some 18,625 cases were pending under" the 1975 STA. *Id.* Section 6 of the Anti–Terrorism Act, 1997 (1997 ATA) provides:

> Whoever, to strike terror in the people, or any section of the people, ... does any act or thing by using ... [various devices and weapons] in such a manner as to cause, or to be likely to cause, the death of, or injury to, any person or persons, or damage to, or destruction of,

---

**101.** *See* Kalhan, *supra* n. 97, at 153, 158–59 (citing Unlawful Activities (Prevention) Amendment Act, No. 29 of 2004 (enacted Dec. 21, 2004); Unlawful Activities (Prevention) Amendment Ordinance, No. 2 of 2004 (promulgated Sep. 21, 2004) (2004 UAPA Ordnance), Official Website of the Ministry of Law & Justice, Government of India, New Delhi, (India website) *http://lawmin.nic.in/legislative/unlawful.htm*. The Unlawful Activities (Prevention) Act, 1967 (1967 UAPA), was tailored to prohibit cession or secession of part of India. After the 2002 POTA was repealed, on September 21, 2004, the President of India, "promulgated an Ordinance to amend the" 1967 UAPA. (India website, 2004 UAPA Ordnance webpage). The 2004 UAPA Ordnance § 15 defines terrorist act in a manner similar to 1987 TADA at § 3(1) (quoted at n. 99, *supra* ), includes extraterritorial language, and adds, among other prohibitions, attempts "to compel the ... the Government of a foreign country or any other person to do or abstain from doing any act." The 2004

UAPA Ordnance § 18 includes a variety of offenses stating, "Whoever conspires or attempts to commit, or advocates, abets, advises or incites or knowingly facilitates the commission of, a terrorist act or any act preparatory to the commission of a terrorist act, shall be punishable." Section 19 prohibits attempts to harbor or conceal any person known to be a terrorist. Membership in a "terrorist gang or a terrorist organization, which is involved in terrorist act" is prohibited under § 20. Under § 2(1)(*l* ), the term, "terrorist gang" is defined as "any association, other than terrorist organi[z]ation, whether systematic or otherwise, which is concerned with, or involved in, [a] terrorist act." Al Qaeda is included as a scheduled terrorist organization. *Id.* at § 28.

**102.** Amnesty International, *Pakistan Legalizing the impermissible: The new anti-terrorism law*, ASA 33/34/97, 3 n. 3 (1997) (on file with the USCMCR Clerk of Court).

property ..., or threatens with the use of force public servants in order to prevent them from discharging their lawful duties commits a terrorist act.[103]

Various amendments addressed the Pakistani judiciary's procedural concerns about the 1997 ATA, and Pakistani terrorism law and procedures evolved.[104] The Anti–Terrorism (Second Amendment) Ordnance, 1999 (Dec. 2, 1999) (1999 ATA), expanded the offenses cognizable by the anti-terrorism courts to include offenses of abetment, concealment, conspiracy, attempts, and facilitation of offenses.[105] The Anti–Terrorism (Amendment) Ordnance or Act, 2001 (Aug. 15, 2001) (2001 ATA) further enlarged the class of cases under the jurisdiction of the terrorism courts. The 2001 ATA defines "terrorism" to be an offense if:

> a) it involves the doing of anything that causes death; b) it involves grievous violence against a person or grievous bodily injury or harm to a person; c) involves grievous injury to property; d) involves the doing of anything that is likely to cause death or endangers a person's life ...; f) incites hatred and contempt on religious, sectarian or ethnic basis to stir up violence or cause internal disturbance .... [or] i) creates a serious risk to safety of the public ...[106].

The 2001 ATA "stated that any person committing or linked to a terrorist act either in Pakistan or abroad" or who "train[ed] someone in the use of weapons or for terrorism" was subject to punishment.[107] Pakistan also began to apply criminal sanctions against membership in specified organizations involved in terrorism. Kennedy, *supra* n. 103, at 403–04 (citing 2001 ATA § 11–A). Additional amendments changed the investigative procedures and the procedures at the anti-terrorism courts. *Id.* at 408–10 (citations omitted). The Anti–Terrorism (Amendment) Ordnance, 2004 "increased the penalties *for persons assisting terrorists in any manner.*"[108]

## D. Prosecutions for Wrongfully Providing Aid or Support to the Enemy

The offense of aiding the enemy "is almost as old as warfare itself, and ... may be found in the earliest of recorded military codes."[109] On September 20, 1776, the Continental Congress enacted the

---

103. *Id.* at 5 n. 5; Shabana Fayyaz, *Responding to Terrorism: Pakistan's Anti–Terrorism Laws*, 2 Perspectives on Terrorism, Issue 6, 10, 12 (2008) (citing 1997 ATA, PLD 1997 Central Statutes (unreported) 537); Charles H. Kennedy, *The Creation and Development of Pakistan's Anti-terrorism Regime, 1997–2002*, in Religious Radicalism and Security in South Asia, 387, 390 (Satu P. Limaye, Mohan Malik, and Robert G. Wirsing eds., 2004) (quoting 1997 ATA, § 6) (on file with Clerk of Court).

104. James J. Saulino, *Strategic Choices: Four Legal Models for Counterterrorism in Pakistan*, 2 Harv. Nat. Sec. J. 247, 256–60 (2011); Kennedy, *supra* n. 103, at 389–408; Fayyaz, *supra* n. 103, at 13–16, *http://harvardnsj.com/wp-content/uploads/2011/01/Saulino_Final.pdf*.

105. Kennedy, *supra* n. 103, at 398–99 (citing various sections of the 1999 ATA); Fayyaz, *supra* n. 103, at 15 (citing 2001 ATA).

106. Kennedy, *supra* n. 103, at 403 (citation omitted); Fayyaz, *supra* n. 103, at 15 (citing 2001 ATA, § 11–A).

107. Saba Noor, *Evolution of Counter–Terrorism Legislation in Pakistan*, 1 Conflict and Peace Studies 1, 9 (2008) (citing 2001 ATC Sections 11–V and 21–C), *http://www.google.com/search?hl=enbiw=992bih=581q=noor+tion+of+counter-terrorism+legislation+in+pakistanaq=faqi=aql=oq=*.

108. Noor, *supra* n. 107, at 11 (emphasis added).

109. *United States v. Olson*, 7 U.S.C.M.A. 460, 466, 22 CMR 250, 256 (1957) (citing Code of Articles of King Gustavus Adolphus of Sweden, Art. 76 and 77 (1621) and Articles of War of James II, Art. 8 (1688)).

American Articles of War of 1776, including Section XIII, Article 18, which punishes any person who provides relief of "the enemy with money, victuals, or ammunition," or who "knowingly harbor[s] or protect[s] an enemy." 1920 Winthrop, *supra* n. 23, at 967.

The court recognizes as a preliminary matter the occurrence of these events prior to the 1949 Geneva Conventions and 1950 Uniform Code of Military Justice era and look to these cases as historic precedent for the law of war. Comparison of the contents of 19th century military commission law of war charges and specifications with appellant's charges and specifications is one way of determining whether offenses similar to appellant's were already punishable. Some basic information about the contents of military commission charges and specifications before appellant's offenses is helpful in making this assessment.

## 1. Contents of Specifications

Under military law in the 1860s and today, "the *charge* designates the crime, or offence in law, as mutiny; the *specification* alleges or specifies the act, with time, place, and circumstance." [110] Military law requires that each specification "must specify the material facts necessary to constitute the offence." [111] However, "[t]he specification need not possess the technical nicety of an indictment at common law. The most bald statement of facts is sufficient, provided the legal offense itself be distinctly and accurately described; this should be done, if possible, in the words of the Article violated." [112] When an accused was charged with both murder, and murder in violation of the laws of war, the dual charges recognized that a murder can violate *both* civil law and the laws of war and that the murder was not exclusively a civil crime.[113] During the Civil War-era each

---

**110.** *See* S.V. Benet, *A Treatise on Military Law and the Practice of Courts–Martial*, 61 (5th Ed. 1866) (emphasis in original); 2008 MCM, Rule for Courts–Martial 307(c) and Discussion. *See also Digest of Opinions of the Judge Advocate General of the Army* 27, 61–62, 66, 133 (1865).

**111.** William Winthrop, *Military Law*, vol. I, 171–72 and n. 3 (Morrison 1886) (1886 Winthrop) (citations omitted).

**112.** P. Henry Ray, *Instructions for Courts–Martial and Judge Advocates*, at p. 23 (H.Q. Dept. of the Platte, 1890) (citing 7 Op. Atty. Gen., p. 604) (emphasis omitted), *http://www. loc.gov/rr/frd/Military_Law/pdf/manual–1890. pdf*.

**113.** *See* 1886 Winthrop, *supra* n. 111, at vol. 2 at 75–76 (1886); 1920 Winthrop, *supra* n. 23, at 842 (1920) (both stating, "The offence, where a civil crime, is commonly designated in the charge by its legal name, as Murder, Manslaughter, Robbery, Larceny, & c.; where a violation of the laws of war, by simple terms of description—as Being a guerilla, Unauthorized Trading or Intercourse with the enemy, Recruiting for the enemy within the U.S. lines, Violating a parole by a prisoner of

war, & c., or simply Violation of the Laws of War, the specification indicating the species of the violation. Where the offence is both a crime against society and a violation of the laws of war, the charge, in its form, has not [i]nfrequently represented both elements, as "Murder, in violation of the laws of war," "Conspiracy, in violation," & c."); *see also, id.* (The next paragraph in both versions of Winthrop's Treatise describes the difference between a jurisdictional statement and the description of the offense in military commission charge sheets as follows, "The *specification* should properly set forth, not only the details of the act charged, but the circumstances conferring *jurisdiction*—as that a state of war existed, military government was exercised, or martial law prevailed, at the time and place of the offence: the status of the offender should also appear—as that he was an officer or soldier of the enemy's army or otherwise a public enemy, or a prisoner of war, or an inhabitant of a place or district under military government or martial law or person there serving. It is not however essential to aver facts of which the court will take judicial notice.") (emphasis in original and citations omitted). Unlike modern military practice, during the 19th Century, the

specification of a charge was required to be complete and independent of other specifications and stand on its own as a separate criminal offense.[114] They were required to allege the factual basis for the elements of the offense.[115] Each finding of guilty for each specification must be supported by evidence, and the members of the court must vote on each specification.[116] The members may amend the specification by making findings by exceptions and substitutions. *Id.* For example, if the absence of a breach of duty or allegiance is not in the elements and form specifications, the members are not required to assess this element before making their findings, and they are free to find enemy aliens with no such duty guilty of aiding the enemy. *Compare* n. 28, *infra* (listing elements of providing material support for terrorism) *with* 1920 Winthrop, *supra* n. 23, at 1023 (form charge and specification for "Guerilla warfare, in violation of the Laws of War" for "acting inde-

pendently of" lawful belligerents, "did, in combination with sundry other persons similarly acting, engage in unlawful warfare against the inhabitants of the United States.").

## 2. 19th Century Irregular Warfare and Aiding the Enemy

In 1818, during the first Seminole War, General Andrew Jackson and the U.S. Army entered Florida, which at that time was neutral Spanish territory, in pursuit of Indian warriors. David Glazier, *The Laws of War: Past, Present, and Future: Precedents Lost: The Neglected History of the Military Commission,* 46 Va. J. Int'l L. 5, 27 (2005) (citations omitted) Two British citizens, Arbuthnot and Ambrister, were aiding the Indian warriors. *Id.* (citation omitted). Following their capture, a special court,[117] military commission,[118] or court-martial [119] was convened to try the two men. Arbuthnot was found guilty of, "Charge 1st. Exciting

charge did not require citation to the statutory authority for the offense. David Glazier, *The Laws of War: Past, Present, and Future: Precedents Lost: The Neglected History of the Military Commission,* 46 Va. J. Int'l L. 5, 28 (2005) (citing Alexander Macomb, *The Practice of Courts Martial* 26 (1841)); 1920 Winthrop, *supra* n. 23, at 146.

**114.** 1886 Winthrop, *supra* n. 111, vol. 1 at 199 (emphasis in original and citations omitted); *see also* Benet, *supra* n. 110 at 63 ("The settled usage of military courts permits ... trial for several distinct offenses at the same time. In such cases, each distinct offence must be made the burden of a separate charge and its specification, although but one sentence is adjudged for all the offenses tried upon one arraignment.") (emphasis in original omitted).

**115.** 1920 Winthrop, *supra* n. 23, at 133 (internal quotation marks and citations omitted).

**116.** 1886 Winthrop, *supra* n. 111, vol. I at 529–48 (describing the findings process).

**117.** Glazier, *supra* n. 113 at 27 (citation omitted).

**118.** *See* George Davis, *A Treatise on the Military Law of the United States* 308 n. 1 (rev. 3d ed. 1915) (describing limitations of court-martial jurisdiction for prosecuting civilians and indicating the court which tried British Major John Andre' for spying during the War of the Revolution was "in fact a military commission."). Major General Davis was the Judge Advocate General of the Army from May 24, 1901, to Feb. 14, 1911, and a Professor at the U.S. Military Academy. His treatise on military law is cited in *Hamdan,* 548 U.S. at 590, 126 S.Ct. 2749. Another noted author on military law, William Birkhimer, also took the view that the Ambrister and Arbuthnot "special court" was more accurately "a war court such as would now be known as a military commission." William E. Birkhimer, *Military Government and Martial Law,* 3d ed. 196–97 (Franklin Hudson Pub. Co., Kansas City, Mo., 1914). *See also* Louis Fisher, *Military Tribunals and Presidential Power: American Revolution to the War on Terrorism* 11–13 (2005) (referring to the trial of British Major John Andre' as a "Board of Officers.").

**119.** 1920 Winthrop, *supra* n. 23, at 103 states, "In 1818, R.C. Ambrister, a civilian, was convicted by a court-martial convened by General, afterwards President, Jackson, (by whom

and stirring up the Creek Indians to war against the United States ... [and] Charge 2d. [A]iding, abetting, and comforting the enemy, supplying them with the means of war," and he was sentenced to hang. Glazier, *supra* n. 113, at 28 (citations omitted). Ambrister was convicted of, "Charge 1st. Aiding, abetting, and comforting the enemy, supplying them with the means of war, he being a subject of Great Britain, at peace with the United States, and lately an officer in the British colonial marines ..." and, "Charge 2d. Leading and commanding [Indians], in carrying on a war against the United States." *Id.* at 28 (citing Minutes of the Proceedings of a Special Court, H.Q. Div. of the South at 154–55, 164; H.Q. Div. of the South, G.O. (Apr. 29, 1818)). Colonel Winthrop criticized General Jackson for approving a harsher sentence than the tribunal adjudged on reconsideration.[120] Birkhimer, however, considered General Jackson's actions to be lawful in every respect.[121] Winthrop did not criticize the decision to charge Arbuthnot and Ambrister with aiding the enemy. 1920 Winthrop, *supra* n. 23, at 464–65.

The court takes no comfort in the historical context in which these events occurred or the ultimate disposition of these cases. We cite to these events for their historical occurrence as an embryonic effort of the United States to deal with the complexity of fighters in irregular warfare. In contrast, under the 2006 M.C.A., AUECs have significant due process and are not subject solely to the discretion of the executive. *See* n. 171 *infra.*

During the War with Mexico, "guerilla warfare became in fact a systematic mode of prosecuting hostilities sanctioned by the Mexican government." 1920 Winthrop, *supra* n. 23, at 783 n. 51 (citing G.O. 372, H.Q. of Army, 1847). Military commission-type "trials, however, were few; this branch of jurisdiction not then becoming fully developed." *Id.* at 832–33 (internal footnote omitted).

There were 4,271 documented military commission trials during the Civil War and another 1,435 during Reconstruction.[122] A number of commissions tried individuals for being guerillas and for their conduct while a guerilla.[123] The Civil War General

also the finding and sentence were approved,) of aiding the enemy by 'supplying them with the means of war.'" *Id.* (citing *Trial of Arbuthnot and Ambrister* (London 1819); 1 Am. State Papers, Mil. Affairs, pp. 721–34).

120. 1920 Winthrop, *supra* n. 23, at 464–65 (citations omitted). Winthrop emphasized that Arbuthnot's proceeding was a court-martial, and the first sentence "to be shot" was a nullity. The sentence on reconsideration was the only sentence, which General Jackson could not increase. Thus, Arbuthnot's execution was "wholly arbitrary and illegal. For such an order and its execution a military commander would *now* be indictable for murder." *Id.* (citations omitted; emphasis in original).

121. Birkhimer, *supra* n. 118, at 196–97 (citations omitted).

122. Glazier, *supra* n. 113, at 40 (citing Mark E. Neely, Jr., *The Fate of Liberty: Abraham Lincoln and Civil Liberties* 168–73, 176–77 (1991)). *See* 1920 Winthrop, *supra* n. 23, at 832–34, 839–41; *see also Quirin,* 317 U.S. at 31 n. 10, 63 S.Ct. 2.

123. *See* 1920 Winthrop, *supra* n. 23, at 783 (defining the term "guerillas") and 783–84 n. 55 (listing various synonyms for the term guerilla). *See e.g., id.* at 769 n. 19 (describing the cases of Beall and Kennedy as "the leading cases ... of violators of the laws of war as 'prowlers,' (Lieber's Instructions ¶ 84,) or guerillas; the crimes of Beall consisting mostly in seizing and destroying steamers and their cargoes on Lake Erie, and attempting to throw passenger trains off the track in the State of New York, in September and December, 1864; and the principal crime of Kennedy being his taking part in the attempt to burn the City of New York by setting fire to Barnum's Museum and ten hotels on the night of Nov. 25th, 1864." (citing G.O. 14, 24, Dept. of

Orders establishing military commissions were consistent with this position. On December 4, 1861, HQ, Dept. of the Missouri issued General Orders No. 13, ¶¶ II, III, IV, and VII which read:

> II. It is represented there are numerous rebels ... that ... furnish the enemy with arms, provisions, clothing, horses and means of transportation; [such] insurgents are banding together in several of the interior counties for the purpose of assisting the enemy to rob, to maraud and to lay waste the country. All such persons are *by the laws of war* in every civilized country liable to capital punishment....
>
> III. Commanding officers ... will arrest and place in confinement all persons in arms against the lawful authorities of the United States or who give aid, assistance or encouragement to the enemy....
>
> IV. Commissions will be ordered from these headquarters for the trial of persons charged with aiding and assisting the enemy, [and causing] the destruction of bridges, roads, and buildings....
>
> \* \* \*
>
> VII. Persons not commissioned or enlisted in the service of the so-called Confederate States who commit acts of hostility will not be treated as prisoners of war but will be held and punished as criminals. And all persons found guilty of ... pillaging and marauding under whatever authority will either be shot or otherwise less severely punished as is prescribed by the Rules and Articles of

War or authorized by the usages and customs of war in like cases.[124]

In 1862, Major General (Maj. Gen.) Henry Halleck was the General–in–Chief of the Union Army and a leading international law scholar of his time.[125] In General Orders No. 1, HQ, Dept. of the Missouri (Jan. 1, 1862) (G.O. 1),[126] Halleck noted in Pt. II, Rule 5 that charges preferred before a military commission should be " 'violation of the laws of war,' ... in [such] cases we must be governed by the general code of war." G.O. 1, Pt. II, Rule 9 stated:

> [T]he code of war gives certain exemptions to a soldier regularly in the military service of an enemy ... insurgents not militarily organized under the laws of the State, predatory partisans and gue[ ]rilla bands are not entitled to such exemptions; such men are not legitimately in arms and the military name and garb which they have assumed cannot give a military exemption to the crimes which they may commit. They are in a legal sense mere freebooters and banditti....

In an August 6, 1862 letter, Maj. Gen. Halleck asked Lieber to write a pamphlet addressing violent guerilla activity behind the lines. Halleck succinctly described the Union Army's problem:

> The rebel authorities claim the right to send men, in the garb of peaceful citizens, to waylay and attack our troops, to burn bridges and houses, and to destroy property and persons within our lines. They demand that such persons be treated as ordinary belligerents, and that when captured, they have extended

the East (1865); Printed Trials, New York, 1865).

124. H.R. Doc. No. 65, 55th Cong., 3d Sess., *reprinted in The War of the Rebellion: A Compilation of the Official Records of the Union and Confederate Armies*, Ser. II, vol. I, (Civil War, Ser. II, vol. I), pp. 233–36, G.O. 13 (1861) (emphasis added).

125. Glazier, *supra* n. 113, at 41 n. 229 (citing Henry W. Halleck, *International Law* (1861)); James G. Garner, *General Order 100 Revisited*, 27 Mil. L.Rev. 1, 5 n. 13 (1965).

126. Civil War, Ser. II, vol. I, *supra* n. 124, pp. 247, 249.

to them the same rights as other prisoners of war; they also threaten that if such persons be punished as marauders and spies, they will retaliate by executing our prisoners of war in their possession.

Garner, *supra* n. 125, at 17. In August 1862, Lieber responded to Halleck's request with a pamphlet entitled, "Gue[ ]rilla Parties Considered with Reference to the Laws and Usages of War." *Id.* at 17. Dr. Lieber defined a "gue[ ]rilla party" as follows:

> [I]t is universally understood in this country, at the present time, that a gue[ ]rilla party means an irregular band of armed men, carrying on an irregular war, not being able, according to their character as a gue[ ]rilla party, to carry on what the law terms a *regular* war. The irregularity of the gue[ ]rilla party consists in its origin, for it is either self-constituted or constituted by the call of a single individual, . . . and it is irregular as to the permanency of the band, which may be dismissed and called again together at any time.

George B. Davis, *Doctor Francis Lieber's Instructions for the Government of Armies in the Field,* 1 Am. J. of Int. L. 14, 16 (1907) (quoting Francis Lieber, *Miscellaneous Writings* (1881)) (emphasis in original), *http://www.jstor.org/stable/2186282.* *See also* 1920 Winthrop, *supra* n. 23, at 783. Guerillas are known for "intentional destruction for the sake of destruction," and "general and heinous criminality . . . because the organization of the party being but slight and the leader utterly dependent upon the band, little discipline can be enforced." Davis, *supra* at 16. The

concern was that "he that today passes you in the garb and mien of a peaceful citizen, may tomorrow, as a guerilla-man, fire your house or murder you from behind the hedge." *Id.* Lieber concluded, guerilla parties do not enjoy the full benefit of the law of war because after committing a violent act they blend back into the noncombatant population, and because they, "cannot encumber themselves with prisoners of war; they have, therefore, frequently, perhaps generally, killed their prisoners . . . thus introducing a system of barbarity which becomes [more intense] in its demoralization as it spreads and is prolonged." *Id.*

Lieber was the lead author of Army General Orders 100 (1863) (G.O. 100), which was subsequently styled the Lieber Code. *See* Francis Lieber, *Instructions for the Government of Armies of the United States in the Field (Lieber's Instructions)* 2 (1898). It represented one of the first comprehensive lists of the laws of war.[127] On April 24, 1863, President Abraham Lincoln approved G.O. 100, and directed its publication, "for the information of all concerned." *Lieber's Instructions, supra* at 2. We address two categories of individuals described in G.O. 100 as law of war violators.

General Orders 100, § V, includes several articles that address the issue of loyalty, allegiance, or treason. *See e.g., Lieber's Instructions,* at 28–30 (G.O. 100, arts. 88–98). A "war traitor" or "traitor" is "a person in a place or district under martial law who, unauthorized by military commander, gives information of any kind to the enemy, or holds intercourse with him." *Id.* (G.O. 100, art. 90).[128] Numerous Civil

---

**127.** "The Lieber Code established the basis for later international conventions on the laws of war at Brussels in 1874 and at The Hague in 1899 and 1907." Richard D. Rosen, *Targeting Enemy Forces in the War on Terror: Preserving Civilian Immunity,* 42

Vand. J. Transnat'l L. 683, 695 (2009) (citation omitted).

**128.** *See also* Garner, *supra* n. 125, at 14–15 (The term "war treason" has fallen into disuse. Under Articles 64–68 of the Geneva Civilian Convention (IV) of 1949, n. 57 *supra,*

War and Philippine-era military commission specifications alleged violation of a duty of allegiance to the United States, or violation of an oath of allegiance.[129] Those articles and specifications relating to a breach of loyalty or allegiance are not pertinent here because appellant and al Qaeda have no duty to the United States.[130] Military commission trials for aiding the enemy-type offenses were not limited to such offenses.

General Orders 100, § IV addresses "armed enemies not belonging to the hostile Army," who unlawfully engage in violence and are therefore eligible for military commission trial, and it labels two of these categories, "Armed enemies not belonging to the hostile army" and "Armed Prowlers." G.O. 100, Articles 82 and 84. Those two articles provide:

82. Men, or squads of men, who commit hostilities, whether by fighting, or inroads for destruction or plunder, or by raids of any kind, without commission, without being part and portion of the organized hostile army, and without sharing continuously in the war, but who do so with intermitting returns to their homes and avocations, or with the occasional assumption of the semblance of peaceful pursuits, divesting themselves of the character or appearance of soldiers—such men, or squads of men, are not [lawful combatants], and therefore, if captured, are not entitled to the privileges of prisoners of war, but shall be treated summarily as highway robbers or pirates.

84. Armed prowlers by whatever names they may be called, or persons of the enemy's territory who steal within the lines of the hostile army for the purpose of robbing, killing, or of destroying bridges, roads, or canals, or of robbing or destroying the mail, or of cutting the telegraph wires, are not entitled to the privileges of war.

The conduct described in G.O. 100, Articles 82 and 84 was exemplified by guerilla raiders "in Kansas and Missouri who simply slaughtered unarmed soldiers and civilians, including an infamous massacre in Lawrence, Kansas in 1863."[131] "The guerilla

inhabitants of occupied territory do "not owe any duty of allegiance" to the occupying force. *Id.* at 15–16). *See also id.* at 15 (explaining "war treason" in Lieber's Code could occur only in occupied, conquered, or invaded territory. (citing G.O. 100, arts. 90, 92, 95, 98)); *Compare The Rules of Land Warfare,* ¶¶ 202–05, 207, 210–11, 372 (1914) (1914 *Manual* ) *with* Field Manual 27–10, The Law of Land Warfare ¶¶ 72–74, 79–82, 432–446 (1956) (1956 Manual).

129. Allegiance language in a specification is surplus aggravating information, when a violent, guerilla-type offense is alleged. *See e.g.,* G.O. 93, pp. 8–9 (1864) (T. Sanders), G.O. 93, pp. 10–12 (1864) (J. Overstreet). Some charge sheets contain a separate charge and specifications alleging violation of an oath of allegiance. *See e.g.,* G.O. 93, pp. 3–5 (1864) (F. Norvel); G.O. 112(II), pp. 353–57 (1901) (A. Jiloca), n. 144 *infra. See also* Brief for Appellant on Granted Issue at 21–25. *See also infra* pp. 57–64, 70–71.

130. *See* Granted Issues, *supra* n. 7, responsive briefs, and elements of providing material support for terrorism, which does not have such an element. *See* Elements, *supra* pp. 1282–84. It is unnecessary for this Court to determine whether aiding the enemy under Article 104, UCMJ, applies in this case because appellant is not charged with violating Article 104, UCMJ. We look to the law of war for the historical underpinnings of providing material support for terrorism. *See also* n. 128 *supra.*

131. Sean Murphy, *Enemy Combatants After Hamdan v. Rumsfeld: Evolving Geneva Convention Paradigms in the "War on Terrorism": Applying the Core Rules to the Release of Persons Deemed "Unprivileged Combatants,"* 75 Geo. Wash. L.Rev. 1105, 1111–12 (2007) (comparing the transnational group al Qaeda with "Lieber's gue[ ]rilla brigands").

fighting in Missouri produced a form of terrorism that exceeded anything else in the war. Jayhawking Kansas and bush-whacking Missourians took no prisoners, killed in cold blood, plundered and pillaged and burned ... without stint." *Id.* (citation omitted).

The Lieber Code and Attorney General Speed's 1865 Opinion (1865 AG Opinion) state that such offenses committed in connection with membership in a guerila band, or similar informal organization, violate the law of war. *See Opinion of the Constitutional Power of the Military to Try and Execute the Assassins of the President,* 11 Op. Atty. Gen. 297 (1865). Although the motivation for rape, robbery, murder, and theft may be personal gain, other crimes such as burning bridges, and destroying telegraph and railroad lines were clearly designed to aid or provide material support to the enemy and to impede the Union's ability to prosecute the war. Such offenses, if done by an unauthorized guerilla force, are traditional law-of-war violations.

The 1865 AG Opinion concerns the legality of the military commission trial of several individuals who conspired to assassinate President Lincoln. It supports a tradition of prosecution by military commission of offenses similar to aiding or assisting in the President's murder or providing material support for terrorism stating:

> A military tribunal exists under and according to the Constitution in time of war. Congress may prescribe how·all such tribunals are to be constituted, what shall be their jurisdiction, and mode of procedure. Should Congress fail to create such tribunals, then, under the Constitution, they must be constituted according to the laws and usages of civilized warfare. They may take cognizance of such offences as the laws of war permit; they must proceed according to

the customary usages of such tribunals in time of war, and inflict such punishments as are sanctioned by the practice of civilized nations in time of war.

*Id.* at 298. The 1865 AG Opinion continued:

> Congress shall have power "to define and punish ... offences against the law of nations." Many of the offences against the law of nations for which a man may, by the laws of war, lose his life, his liberty, or his property, are not crimes.... *[T]o unite with banditti, jayhawkers, guerillas, or any other unauthorized marauders is a high offence against the laws of war; the offence is complete when the band is organized or joined. The atrocities committed by such a band do not constitute the offence, but make the reasons, and sufficient reasons they are, why such banditti are denounced by the laws of war.* Some of the offences against the laws of war are crimes, and some not.... Murder is a crime ... [and] in committing the murder an offence may also have been committed against the laws of war; for that offence he must answer to the laws of war, and the tribunals legalized by that law.
>
> \* \* \*
>
> If the prisoner be a regular unoffending soldier of the opposing party to the war, he should be treated with all the courtesy and kindness consistent with his safe custody; if he has offended against the laws of war, he should have such trial and be punished as the laws of war require.... A bushwhacker, a jayhawker, a bandit, a war rebel, an assassin, being public enemies, may be tried, ... as offenders against the laws of war.

*Id.* at 312–14 (original emphasis deleted; emphasis added).

Violations of the rules regarding assistance to enemies are traditionally punished under the law of war, including "Infrac-

tions of [the rule forbidding trade or interchange with the enemy], by selling to, buying from or contracting with enemies, furnishing them with supplies, corresponding, mail carrying, passing the lines without authority, & c." 1920 Winthrop, *supra* n. 23, at 777. *Rendering or attempting to render* "*material aid or information to the enemy ... are among the most frequent of the offences triable and punishable by military commission.*" *Id.* (emphasis added).

Colonel Winthrop organized Civil War military commission offenses into three classifications. 1920 Winthrop, *supra* n. 23, at 839. Here, we are exclusively interested in use of military commissions for violations "of the laws and usages of war cognizable by military tribunals only." [132] Domestic crimes and law-of-war offenses were both tried before the same commissions, acting as both martial law or military government tribunals and law-of-war commissions. The following law-of-war offenses were tried by Civil War military commissions:

> breaches of the law of non-intercourse with the enemy, such as running or attempting to run a blockade; unauthorized contracting, trading or dealing with, enemies, or furnishing them with money, arms, provisions, medicines, & c.; conveying to or from them dispatches, letters, or other communications, passing the lines for any purpose without a permit,[133] or coming back after being sent through the lines and ordered

not to return; aiding the enemy by harboring his spies, emissaries, & c., assisting his people or friends to cross the lines into his country, acting as guide to his troops, aiding the escape of his soldiers held as prisoners of war, secretly recruiting for his army, negotiating and circulating his currency or securities-as confederate notes or bonds in the late war, hostile or disloyal acts, or publications or declarations calculated to excite opposition to the federal government or sympathy with the enemy, & c.; engaging in illegal warfare as a guerilla, or by the deliberate burning, or other destruction of boats, trains, bridges, buildings, & c., acting as a spy, taking life or obtaining any advantage by means of treachery; violation of a parole or of an oath of allegiance or amnesty, breach of bond given for loyal [behavior], good conduct, & c.; resistance to the constituted military authority, . . . .

1886 Winthrop, *supra* n. 111, vol. 2, at 71–72 (footnotes omitted). In 1912, Charles Howland, on behalf of the Office of The Judge Advocate, General, described numerous offenses against the law of war, and most involved aiding the enemy in one manner or another. Charles R. Howland, *A Digest of Opinions of the Judge Advocates General of the Army* 1070–71 (1912) (Howland); *see also* Davis at 310 n. 2, *supra* n. 118. Howland's description of law of war military commission offenses is similar to the list in Winthrop's 1886 Treatise.

---

**132.** In *Hamdan*, seven Justices agreed that the focus of inquiry should be on law-of-war offenses tried by military commissions, and not on the other two types of military commissions. *Compare Hamdan*, 548 U.S. at 599–600 n. 21, 608, 126 S.Ct. 2749 (Stevens, Souter, Ginsburg, and Breyer, JJ., concurring) *with id.* at 689–91, 126 S.Ct. 2749 (Thomas, Scalia, and Alito, JJ., dissenting).

**133.** 1886 Winthrop, *supra* n. 111, vol. 2, at 13 ("**Secretly Entering the Lines.** Similar to the

violation of the laws of war committed by the spy is that of officers, soldiers, or agents of the enemy, coming secretly within our lines or into country occupied and held by our forces, for any unauthorized purpose, as, for example, for the purpose of recruiting for their army, obtaining horses or supplies for the same, holding unlawful communication, & c., a class of offenses of which instances were not infrequent in the border States during the late war.")(emphasis in original; footnotes omitted).

Numerous Civil–War era military commission cases resulted in law of war convictions for aiding the enemy, and the following are illustrative examples: [134] giving aid, assistance, presence, advice, counsel, or comfort to a party of armed men or joining a party of armed men, who damaged or destroyed railroad or telegraph property; [135] providing combatants with clothing, horses, ammunition, firearms, tools, or other supplies, or a team to haul supplies, *see e.g.*, I. Breckinridge, I. Giddings, W. Lisk, J. Sallie, and E. Wingfield,

n. 134 *supra*, or attempting to do so, *see e.g.*, J. Trimble, n. 134 *supra;* harboring and maintaining persons in rebellion against the United States; [136] offering a horse, saddle, firearm, or money to another to take up arms against the United States, *see e.g.*, W. Lisk, n. 134 *supra;* or buying for or delivering cattle to the Southern army, *see e.g.*, n. 134 *supra,* S. Bontwell, I. Jones, and J. Montgomery.[137]

Guerilla activity and aiding guerillas violate the law of war and resulted in military

**134.** H.R. Doc. No. 65, 55th Cong., 3d Sess., *reprinted in The War of the Rebellion: A Compilation of the Official Records of the Union and Confederate Armies,* Ser. II, vol. I (Civil War, Ser. II, vol. 1), pp. 265, 374–502 is the source for the following records cited in this paragraph: G.O. 15, p. 473 (1862) (J. Bently); G.O. 9, p. 465 (1862) (S. Bontwell); G.O. 15, p. 473 (1862) (S. Boswell); S.O. 28, pp. 443–45 (1862) (J. Bowles); G.O. 42, p. 448 (1862) (I. Breckinridge); S.O. 28, pp. 427–31 (1862) (W. Combs); S.O. 97, pp. 383–86, 405 (1861) (R. Crowder); G.O. 20, pp. 405–06 (1862) (G. Cunningham); S.O. 97, pp. 378–80, 405 (1861) (W. Forshey); S.O. 97, pp. 389–402 (1861) (T. Foster); G.O. 9, p. 466 (1862) (I. Giddings); G.O. 15, p. 474 (1862) (R. Hawkins); S.O. 81, pp. 284–92 (1861) (W. Hearst); G.O. 15, pp. 472–73 (1862) (T. Henly); S.O. 28, pp. 437–39 (1862) (J. Howard); S.O. 117, pp. 483, 494–502 (1861) (J. Hussey); G.O. 9, p. 466 (1862) (I. Jones); G.O. 20, pp. 405–06 (1862) (J. Jones) (1862); G.O. 20, pp. 405–06 (H. Jones) (1862); G.O. 9, pp. 464–65 (1862) (W. Kirk); S.O. 160, pp. 451–52 (1862) (J. Lane); G.O. 9, pp. 470–71 (1862) (W. Lisk); S.O. 28, pp. 431–37 (1862) (W. Mathews); G.O. 12, p. 471 (1862) (J. McClurg); G.O. 9, pp. 465–66 (1862) (J. Montgomery); G.O. 15, p. 474 (1862) (W. Norris); S.O. 28, pp. 406–21 (1862) (J. Owen); S.O. 97, pp. 381–83, 405 (1861) (J. Patton); G.O. 15, pp. 473–74 (1862) (J. Penn); S.O. 160, pp. 457–64 (1862) (W. Petty); S.O. 97, pp. 386–89, 405 (1861) (G. Pulliam); S.O. 160, pp. 449–50 (1862) (J. Quisenberry); G.O. 15, p. 473 (1862) (S. Rice); G.O. 9, p. 468 (1862) (J. Sallie); S.O. 28, pp. 445–48 (1862) (W. Shearin); G.O. 20, pp. 404–06 (1862) (T. Smith); G.O. 20, pp. 404–06 (1862) (S. Stott); G.O. 12, p. 471 (1862) (J. Stout); G.O. 9, p. 470 (1862) (J. Sublett); S.O. 97, pp. 374–78, 405

(1861) (J. Tompkins); G.O. 9, pp. 468–69 (1862) (J. Trimble); G.O. 15, p. 475 (1862) (J. Williams); G.O. 15, p. 475 (1862) (E. Wingfield); S.O. 28, pp. 439–43 (1862) (F. White). All cited Civil War and Philippine War orders in n. 134 through n. 144 are on file with Clerk of Court.

**135.** *See e.g.*, Civil War, Ser. II, vol. 1, n. 134 *supra,* J. Bowles, I. Breckinridge, W. Combs, R. Crowder, G. Cunningham, W. Forshey, T. Foster, R. Hawkins, J. Howard; W. Hearst, H. Jones, J. Jones, J. Lane, W. Mathews, W. Norris, J. Owen, J. Patton, W. Petty, G. Pulliam, J. Quisenberry, W. Shearin, T. Smith, S. Stott, J. Tompkins, E. Wingfield, and F. White.

**136.** *See e.g.*, Civil War, Ser. II, vol. 1, n. 134 *supra,* I. Breckinridge. Aiding guerillas by feeding or harboring them resulted in military commission convictions for law of war violations. *See e.g.*, G.O. 148, pp. 1–2 (1863) (M. Jackson); G.O. 148, p. 2 (1863) (S. Jackson); and G.O. 86, pp. 1–2 (1864) (M. Davis).

**137.** Providing transportation, such as a horse in the Civil War to guerillas, is similar to driving a vehicle and transporting al Qaeda personnel in its conflict against the United States. *See* H.R. Doc 111–26 (Statement of Steven A. Engel) 109, 121–23, *supra* at n. 39. Engel was assigned to the Department of Justice's Office of Legal Counsel from June 2006 to January 2009, where he worked with Congress to develop the 2006 M.C.A. *Id.* at 37–38. He acknowledged the historical support from the Civil–War era for the existence of the offense of providing material support for terrorism, *id.* at 122 (stating, "During the Civil War, for instance, the United States prosecuted by military commissions 'numerous rebels

commission convictions for offenses such as: unlawfully plundering an oxen, wagon, horse, or other property, *see e.g.*, W. Kirk and S. Bontwell, n. 134 *supra;* forcing a loyal citizen to take an oath of allegiance to the Confederacy, *see e.g.*, W. Kirk, n. 134 *supra;* taking a loyal U.S. citizen prisoner, *see e.g.*, S. Bontwell, n. 134 *supra;* committing various acts of outlawry,[138] and murdering or advising, aiding, and assisting in the murder of a loyal U.S. citizen.[139]

Aid to the enemy, in violation of the law of war, included providing advice, information, one's own person, or other services to assist the enemy. *See e.g.*, n. 134 *supra* (listing cases). Commissions convicted defendants of transgressing the laws of war

by wrongfully taking or inciting, inducing, or procuring others "to take up arms and to commit acts of hostility" against the forces or property of the United States as an insurgent, outlaw, guerilla, bushwhacker or otherwise,[140] for acts of hostility against U.S. forces;[141] and for informing the enemy "where Union men lived and encouraging the enemy" to harm them to drive them from their homes or to coerce "them into the service of the Southern Army," *see e.g.*, I. Jones, n. 134 *supra.*

Civil War military commissions, trying violations of the law of war, were not limited to cases involving accused that resided inside the lines or within occupied states.[142] For example, in May 1865, T.

... that furnish[ed] the enemy with arms, provisions, clothing, horses and means of transportation' for the purpose of engaging in sabotage operations behind Union lines. [*United States v. Hamdan,* Ruling on Motion to Dismiss (Ex Post Facto)] at 4 (quoting H.R. Doc. No. 65, 55th Cong 3d Sess. 234 (1894)).... In view of these historical precedents, the United States is well justified in prosecuting al Qaeda members who do the same in support of the enemy in Afghanistan or elsewhere.").

138. *See e.g.*, Civil War, Ser. II, vol. 1, n. 134 *supra,* J. Montgomery; G.O. 41, pp. 6–7, 21 (1864) (M. Fornshal) and G.O. 86, pp. 4–5 (1864) (J. Williams).

139. *See e.g.*, Civil War, Ser. II, vol. 1, n. 134 *supra,* J. McClurg and J. Stout. In 1862, the trials of at least ten individuals resulted in treason convictions by taking up arms against the United States and usually other law of war offenses; however, the treason charges were disapproved because treason is not an offense triable by military commission. In the cases of T. Benedict, J. Rumans, R. Batterdon, and J. Tuggle, the only charge was treason. G.O. 20, pp. 402–05 (1862), n. 134 *supra* (citing G.O. 1, (1862), Pt. II, Rule 6 [Civil War, Ser. II, vol. 1, p. 248], which provides, "Treason as a distinct offense is defined by the Constitution and must be tried by courts duly constituted by law; but certain acts of a treasonable character such as conveying information to the enemy, acting as

spies, & c., are military offenses triable by military tribunals....").

140. *See e.g.*, Civil War, Ser. II, vol. 1, n. 134 *supra,* J. Bently, M. Boswell, T. Henly, J. Penn, S. Rice, J. Sublett, and J. Williams. They all received the same sentence. *Id.* at pp. 472–74. *See also Hamdan,* 548 U.S. at 694–95 and n. 9, 126 S.Ct. 2749 (Thomas and Scalia, JJ., dissenting) (citing G.O. 51, p. 1 (1866) (J. Wells); G.O. 108, p. 1 (1865) (H. Magruder); G.O. 41, pp. 1–2, 21 (1864) (J. Wilson); G.O. 153, p. 1 (1864) (Kight); G.O. 93, pp. 3–4, (1864) (F. Norvel); G.O. 93, p. 9 (1864) (J. Powell); G.O. 93, pp. 10–11 (1864) (J. Overstreet); *Hamdan,* 548 U.S. at 601, 609–10 n. 37, 126 S.Ct. 2749 (Steven, Souter, Ginsburg, and Breyer, JJ., concurring) (discussing conspiracy commission cases). *See also e.g.*, Civil War, Ser. II, vol. 1, n. 134 *supra,* J. Bowles, J. Montgomery, J. Owen, W. Shearin, F. White, and E. Wingfield; G.O. 41, pp. 13–14, 21 (1864) (W. Roberts); G.O. 41, pp. 14–15, 21 (1864) (H. Sipes); and G.O. 86, pp. 2–4 (1864) (J. Turner).

141. *See e.g.*, G.O. 93, pp. 1–3, 11 (1864) (J. Highley); G.O. 93, pp. 3–6, 11 (1864) (F. Norvel); G.O. 148, pp. 8–9 (1863) (J. Jones); G.O. 148, pp. 7–8 (1863) (T. Meade).

142. *See e.g.*, Military commission charges of W. Mathews, Civil War, Ser. II, vol. 1, n. 134 *supra,* of the Confederate Army, who "secretly and unlawfully entered the lines occupied" by

Hogg and six others were convicted of a single specification and charge of "Violation of the laws and usages of civilized war."[143] The seven men were "commissioned, enrolled, enlisted or engaged" by the Confederate Government, before they went aboard the "U.S. merchant steamer Salvador," which was in the port of Panama, New Granada. *See* n. 143, at 674. They were "in the guise of peaceful passengers," and lacked "any visible mark or insignia indicating their true character as enemies." *Id.* They were secretly armed and intended to capture the Salvador, secure the passengers and crew, and use her for "a cruiser to prey on the commerce of the citizens of the United States." *Id.* After a legal review by the Army Judge Advocate General, their convictions for violations of the laws of war were "approved and confirmed." *Id.* at 679–81, 650–53, 905.

As Attorney General Speed explains at p. 58, *ante*, the offense against the law of war is complete when these individuals joined the guerilla band. Of course, some action is usually required to manifest that they have joined the guerilla band, such as "taking up arms," providing advice on how to destroy trains or telegraphs, or provid-

ing their presence on a raid. *See* p. 58, *supra.* A person can also violate the law of war by providing assistance to a guerilla band, and Civil War military commissions punished numerous offenders for providing a wide array of such assistance. These examples of Civil War-era military commission convictions for providing support or aid to insurgents and guerillas illustrate the long-standing prohibitions against conduct similar to appellant's aid to al Qaeda.

### 3. The Philippine–American War, 1899–1902

General Orders No. 100 (1863), the Lieber Code, continued in force as the practical and effective "rule of conduct to which every officer understands that he must conform" during the Philippine–American War.[144] It provided for punishment of those who engaged in unauthorized hostilities. 57th Cong., 1st Sess., Sen. Doc. No. 205, Part 1 (1902 Sen. Doc.) p. 29 (1902) (quoting Article 82 of the Lieber Code at p. 57, *supra* ).

During the Philippine war, numerous residents of the Philippines were convicted of various violations of the laws and usages of war, such as: constituting themselves as a "band of armed prowlers," and damaging

---

the U.S. military where he advised persons to take up arms and become insurgents. He met with armed bands and advised the destruction of railroad property, "contrary to the laws and customs of war." *See also* G.O. 41, pp. 6–7, 21 (1864) (M. Fornshal); G.O. 41, pp. 15–17, 21 (1864) (G. Ham) (recruiting behind lines for Confederate Army, inciting insurrection, and spying); and G.O. 41, pp. 17–22 (1864) (R. Louden) (conspiracy to destroy steamboats, spying, and other offenses).

143. H.R. Doc. No. 314, 55th Cong., 3d Sess., *reprinted in The War of the Rebellion: A Compilation of the Official Records of the Union and Confederate Armies,* Ser. II, vol. 8 (1899), is the source for the following records cited in this paragraph: G.O. 52, pp. 674–81, 750–53, 905 (1865) (T. Hogg and six others,); G.O. 24, pp. 414–16, 428–29, 850, 852, 857, 859, 880,

891, 937, 941 (1865) (R. Kennedy). *See* n. 123 *supra. See also e.g.,* Civil War Ser. II, vol. 1, n. 134 *supra,* W. Mathews.

144. 57th Cong., 1st Sess., Sen. Doc. No. 205, Part 1 pp. 1–3 (1902) (1902 Sen. Doc.). All cited General Orders (G.O.) in this section refer to military commission trials in the Philippines from 1900 to 1901, and are reprinted in 1902 Sen. Doc. at the pages indicated. Each cited G.O. is the source for the information in the paragraph where the footnote is located, unless stated otherwise: G.O. 174, pp. 213–16 (1901) (Juan Confesor); G.O. 112(I), pp. 351–53 (1901) (Julian Confesor); G.O. 112(II), pp. 353–57, (1901) (A. Jiloca); G.O. 52, pp. 126–27 (1901) (F. Morales); G.O. 147, pp. 79–80 (1900) (D. Noul and 13 others); G.O. 204, pp. 229–30 (1901) (F. Trinidad).

railroad track, a public highway, and telegraph wires, *see e.g.,* D. Noul and 13 others; soliciting or collecting and providing money, food, clothing, information, and other items to the insurgents, *see e.g.,* Julian Confesor; F. Morales; inciting, procuring, aiding, abetting, ordering, and commanding two native policemen to murder a U.S. Army soldier, which they did, *see e.g.,* Julian Confesor; collecting and transmitting money, clothing, bolos, cigarettes, 20 persons (more or less to become members of the bands of outlaws), and other articles to a native outlaw engaged in guerilla warfare against the United States, *see e.g.,* F. Trinidad; and becoming an active member in an organization that assists and supports the insurgent forces, and by contributing and collecting money, food, clothing, and tobacco or other supplies to the organization for the insurgent forces, *see e.g.,* Juan Confesor and A. Jiloca.

Conduct and not residency is the focus of whether a law of war offense involving guerilla activity has been committed.[145] In a memorandum affirming the commission conviction of D. Noul and 13 others, the reviewing authority noted that the permanent residence of the insurrectionists is irrelevant stating, "Under the laws of war, armed prowlers whether they permanently reside within or, residing elsewhere, steal within the lines of an occupying army, and there [damage public property] are not entitled to the privileges of prisoners of war." 1902 Sen. Doc., *supra* n. 144, at 80. Moreover, ". . . all those who order or cause the same to be done *or connive at or secretly aid and assist therein* will take warning that regard for the helpless and

noncombative population . . . whose lives are put in jeopardy by the destruction of [public property] . . . will make unavoidable" the imposition of the most severe penalties upon those who are found guilty. *Id.* (emphasis added).

### 4. World War II Era

The extent of Nazi and Japanese outrages against civilian populations, as exemplified at Auschwitz, Nanking, and the Philippines, compelled the Allies to create a legal structure to prosecute not only those who personally committed atrocities but also those who supported such large scale war crimes.

Seven months after the Japanese attack on Pearl Harbor and the subsequent entry of the United States into the war, President Franklin Roosevelt proclaimed that enemy belligerents who "enter or attempt to enter the United States," and who commit, attempt, or prepare to commit, "hostile or warlike acts, or violations of the law of war, shall be subject to the law of war and to the jurisdiction of military tribunals." *Quirin,* 317 U.S. at 22–23, 63 S.Ct. 2 (quoting Proclamation No. 2561, 7 Fed. Reg. 5101 (July 2, 1942)). On the same day, President Roosevelt, acting as President and Commander in Chief, appointed a military commission and directed it to try four German saboteurs for "offenses against the law of war and the Articles of War." *Quirin,* 317 U.S. at 22, 63 S.Ct. 2.

"On July 3, 1942, the Judge Advocate General's Department of the Army prepared" and provided to the Commission four charges and supporting specifications against the captured saboteurs: violation of the law of war; [146] "relieving or attempt-

---

**145.** Some specifications stated that the territory was occupied by U.S. troops in insurrection against the lawful authority of the United States, without being part or portion of any organized hostile army, *see e.g.,* D. Noul and 13 others; Felix Trinidad.

**146.** Specification 1 "charged that they, 'being enemies of the United States and acting for . . . the German Reich, a belligerent enemy nation, secretly and covertly passed, in civilian dress, contrary to the law of war, through the military and naval lines and defenses of the United States . . . and went behind such

ing to relieve, or corresponding with or giving intelligence to the enemy" in violation of Article 81 of the Articles of War; spying in violation of Article 82; and conspiracy to commit the first three offenses. *Id.* at 23, 63 S.Ct. 2.

The Court denied the saboteurs' request for habeas relief solely on the grounds that Specification 1 of Charge I "alleged an offense which the President is authorized to order tried by military commission." *Id.* at 48, 63 S.Ct. 2. In *Quirin,* the Court discounted the arguments of the defendants that they had not actually committed any damage to the United States and did not invade an area under active military operations stating:

> Nor are petitioners any the less belligerents if, as they argue, they have not actually committed or attempted to commit any act of depredation or entered the theatre or zone of active military operations. The argument leaves out of account the nature of the offense which the Government charges and which the Act of Congress, by incorporating the law of war, punishes. It is that each petitioner, in circumstances which gave him the status of an enemy belligerent,

passed our military and naval lines and defenses or went behind those lines, in civilian dress and with hostile purpose. The offense was complete when with that purpose they entered—or, having so entered, they remained upon—our territory in time of war without uniform or other appropriate means of identification. For that reason, even when committed by a citizen, the offense is distinct from the crime of treason defined in Article III, § 3 of the Constitution, since the absence of uniform essential to one is irrelevant to the other.[147]

Even before the end of the war in Europe was in sight, Stalin, Churchill, and Roosevelt released the Moscow Declaration on November 1, 1943, which addressed the need to hold Nazi war criminals responsible for their crimes.[148] In a series of meetings, the United Nations, as President Roosevelt styled the alliance in that document, worked out specific details on how the Nazis would be tried. On August 8, 1945, after long negotiation, they produced a document known as the London Charter.[149]

Article 9 of the London Charter empowered the tribunal to "declare groups and

---

lines, contrary to the law of war, in civilian dress ... for the purpose of committing ... hostile acts, and, in particular, to destroy certain war industries, war utilities and war materials within the United States.'" *Quirin,* 317 U.S. at Syllabus.

**147.** *Quirin,* 317 U.S. at 38, 63 S.Ct. 2 (citing *Morgan v. Devine,* 237 U.S. 632, 35 S.Ct. 712, 59 L.Ed. 1153 (1915); *Albrecht v. United States,* 273 U.S. 1, 11–12, 47 S.Ct. 250, 71 L.Ed. 505 (1927)).

**148.** Quincy Wright, *The Law of the Nuremberg Trial,* 41 Am. J. Int'l L. 38, 39 (1947). *See also Joint Four–Nation Declaration from the Moscow Conference of October 1943, http://avalon.law.yale.edu/wwii/moscow.asp.*

**149.** *Abdullahi v. Pfizer, Inc.,* 562 F.3d 163, 177 (2d Cir.2009) (stating that the United States, United Kingdom, Soviet Union, and

France "established the International Military Tribunal ('IMT') through entry into the London Agreement of August 8, 1945. M. Cheriff Bassiouni et al., *An Appraisal of Human Experimentation in International Law and Practice: The Need for International Regulation of Human Experimentation,* 72 J.Crim. L. and Criminology 1597, 1640 and n. 220 (1981)) (internal quotation marks omitted). Annexed to the London Agreement was the London Charter, which served as the IMT's constitution. *See* Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis Powers, with annexed Charter of the IMT art. 2, Aug. 8, 1945, 59 Stat. 1544, 82 U.N.T.S. 279, *available at,* 4 *Trials of War Criminals Before the Nuernberg Military Tribunals under Control Council Law No. 10* at X–XIV (1951).

organizations [to be] criminal organizations" and then, under Article 10, to take individuals to trial for membership *alone* in one of those organizations. 1 *Trial of the Major War Criminals Before the International Military Tribunal* 255 (1947). The tribunal addressed the scope of membership liability or organizational guilt, and described the criminal organization's essence as being "bound together and organized for a common purpose." *Id.* at 256. The criminal group must be "formed or used in connection with the commission of crimes denounced by the Charter." Individuals are not subject to criminal liability for membership of the organization if they have "no knowledge of the criminal purposes or acts of the organization," or were compelled to become members, "unless they were personally implicated in the commission of acts declared criminal by Article 6 of the Charter." *Id.* With these restrictions in mind, "[m]embership alone is not enough to come within the scope of these declarations."

The tribunal, in effect, limited liability to two groups within the criminal enterprises: (1) those "who became or remained members of the organizations with knowledge that it was being used for the commission of acts declared criminal" (i.e., war crimes), and (2) those "who were personally implicated as members of the organizations in the commission of such crimes."

Quincy Wright, *The Law of the Nuremberg Trial,* 41 Am. J. Int'l L. 38, 70 (1947) (citing Judgment at 256, 262, 266). Additionally, the tribunal "considered criminal responsibility an individual matter," and gave "the benefit of the doubt to the accused." *Id.* Finally, "no person could be convicted unless as an individual he had conspired in criminal activities or purposes." *Id.* Even with these judicial limitations, it is clear that the concept of organizational guilt employed at Nuremberg is similar to providing material support for terrorism under the M.C.A. *See* M.M.C., Part IV, ¶ 6(25)b, *supra* p. 29 (listing elements for providing material support for terrorism).

Execution of the Moscow Declaration and London Agreement was entrusted to the Allied Control Council (ACC). On December 10, 1945, acting as the Military Government of Occupied Germany, the ACC adopted Control Council Law No. 10.[150] The International Military Tribunal (IMT) "declared criminal the Leadership Corps of the Nazi Party, the Gestapo and S.D.[151] (intelligence agency), which had been treated together by the Prosecution, and the S.S."[152]

The United States conducted 12 trials with multiple defendants in Germany under the authority of Control Council No. 10, which are known as the Nuremberg Military Tribunals (NMT). These were considered international tribunals administering international law.[153] At the NMT,

---

**150.** Telford Taylor, *The Nuremberg War Crimes Trials: An Appraisal,* 23 Proceedings of the Academy of Political Science, 19, 22 (1949).

**151.** The *"Die Geheime Staatspolizei* (Gestapo) and *Der Sicherheitsdienst des Reichsführer SS* (SD)" were police and intelligence agencies for the Nazis. *See International Military Tribunal (Nuremberg), Judgment and Sentences,* 41 Am. J. Int'l L. 172, 256–57, 261–62, 266–67 (1946) (*Judgment and Sentences* ).

**152.** Francis Biddle, *The Nürnberg Trial,* 91 Proceedings of the Am. Philosophical Society

294, 300 (1947). *See also Hamdan,* 548 U.S. at 696, 126 S.Ct. 2749 (Thomas & Scalia, JJ., dissenting) (citations omitted).

**153.** 6 *Trials of War Criminals Before the Nuernberg Military Tribunals under Control Council Law No. 10* at 1188 (1952) (holding in its judgment that the Tribunal conducted by the United States "is an international tribunal established by the International Control Council, the high legislative branch of the four Allied Powers now controlling Germany . . . The Tribunal administers international law.").

177 defendants were tried to verdict, and 142 were convicted. Telford Taylor, *Final Report to the Secretary of the Army on the Nuernberg War Crimes Trials under Control Council No. 10* (Taylor Report) 91 (Aug. 10, 1949). Although the concept of organizational guilt was not used for the hundreds of thousands of people who were potentially liable under the London Charter and the decisions of the IMT, a significant number of businessmen, doctors, and jurists were tried by military tribunals in the American Occupied zone for their membership in these four criminal organizations. Taylor Report, *supra* at 93 (87 defendants were tried for membership offenses, 74 were convicted of a membership charge among other charges, and 10 were convicted solely of a membership charge). *See also* Jonathan A. Bush, *The Prehistory of Corporations and Conspiracy in International Criminal Law: What Nuremberg Really Said,* 109 Colum. L.Rev. 1094 (2009) (discussing charging decisions for membership offenses).

The case of Mathias Graf is an example of a case with a conviction solely of a membership offense. 4 *Trials of War Criminals Before the Nuernberg Military Tribunals under Control Council Law No. 10* at 584–85 (1947). Graf was a defendant tried as part of the *Einsatzgruppen* cases. He was a noncommissioned officer who never commanded a unit. *Id.* at 584. Graf's unit, *Einsatzkommando (Kommando)* 6, participated in executions and "liquidating operations," which constituted crimes against humanity and war crimes. *Id.* at 585. However, he was found not guilty by the NMT of those offenses, because the tribunal found lacked proof that he was present during or participated directly in the executions, and he was not in a position to protest against them. *Id.* The tribunal declined to presume that he had taken part in planning operations. *Id.* The tribunal did find, however, that he was aware of at least some of the illegal acts

committed. *Id.* The tribunal found him guilty of membership in the SD (*Der Sicherheitsdienst*), found the mitigating circumstance that "his membership in the SD was not without compulsion and constraint," and sentenced him to time served. *Id.* at 587.

By way of example, Doctor Helmut Poppendick was Chief Physician of the Main Race and Settlement Office, Chief of the Personnel Office in Grawitz, an active duty army surgeon, a lieutenant colonel in the SS, and a colonel in the Waffen SS. 2 *Trials of War Criminals Before the Nuernberg Military Tribunals under Control Council Law No. 10* at 186, 248–49 (1951). He was acquitted of war crimes and crimes against humanity. *Id.* at 252–53. However, the NMT noted that Poppendick "remained in the SS voluntarily throughout the war, with actual knowledge of the fact that organization was being used for the commission of acts now declared criminal ... He must, therefore, be found guilty." *Id.* at 253. Poppendick was convicted solely of membership in a criminal organization and sentenced to imprisonment for 10 years. *Id.* at 299. The Supreme Court denied writs of habeas corpus and prohibition. *Brandt v. United States,* 333 U.S. 836, 68 S.Ct. 603, 92 L.Ed. 1119 (1948). *See also Hamdan,* 548 U.S. at 696, 126 S.Ct. 2749 (Thomas and Scalia, JJ., dissenting) (citations omitted).

"Konrad Meyer–Hetling was the chief of the planning office within the Staff Main Office." 5 *Trials of War Criminals Before the Nuernberg Military Tribunals under Control Council Law No. 10* at 156 (1950). He was a professor and scientist of agriculture who worked part time developing the "General Plan East" that was a "proposed plan for the reconstruction of the East." *Id.* The NMT found that there was no evidence to support the assertions that Meyer–Hetling's plan was the cause of the

child kidnappings, abortions, reproductive interference and general Germanization of the East, and that his plan did not contain anything incriminating. *Id.* at 156. The NMT found him guilty of count three, membership in a criminal organization, namely, that he was a member of the SS, *id.* at 157, and sentenced him to time served. *Id.* at 165.

In addition to prosecuting membership in a criminal organization as a separate and distinct crime, the NMT also found defendants guilty of war crimes and crimes against humanity for their support of criminal organizations. In the Flick Case, defendants Flick and Steinbrinck were charged in count four with committing "war crimes and crimes against humanity . . . in that they were accessories to, abetted, took a consenting part in, were connected with plans and enterprises involving, and were members of organizations or groups connected with: murders, brutalities, cruelties, tortures, atrocities and other inhumane acts. . . ." 6 *Trials of War Criminals Before the Nuernberg Military Tribunals under Control Council Law No. 10* at 23 (1952). The indictment alleged that the defendants, as members of the group "Friends of Himmler," "worked closely with the SS, met frequently and regularly with its leaders, and furnished aid, advice, and support to the SS, financial and otherwise." *Id.* The Tribunal found that the "gist of count four is that . . . Flick and Steinbrinck with knowledge of the criminal activities of the SS contributed funds and influence to its support." *Id.* at 1216. Flick's monetary contributions began long before the criminal activities of the SS were widely known, and it was not proven that the money he contributed was directly used for criminal activities. *Id.* at 1220. The NMT concluded that Flick and Steinbrinck "played but a small part in the criminal program of the SS." *Id.* at 1222. Still, the Tribunal found that the criminal character of the SS "must have been

known," and that how the money was spent was "immaterial." *Id.* at 1221. The Tribunal found Flick and Steinbrinck guilty of count four, committing war crimes and crimes against humanity by supporting the criminal organization responsible for such acts. *Id.* at 1221–22.

The NMT held that where clear crimes against humanity and war crimes were committed, an "organization which . . . is responsible for such crimes can be nothing else than criminal. One who knowingly by his influence and money contributes to the support thereof must, under settled legal principles, be deemed to be, if not a principal, certainly an accessory to such crimes." *Id.* at 1217. The NMT dismissed the argument that the defendants "could not be liable because there had been no statute nor judgment declaring the SS a criminal organization and incriminating those who were members or in other manner contributed to its support." *Id.* at 1217. The NMT further found that Steinbrinck did not seek admission into the SS; his membership was honorary; he only had two official tasks, neither of which were criminal in nature; he had "no duties, no pay, and only casual connection with SS leaders;" and that his activities did "not connect him with the criminal program of the SS." *Id.* at 1221–22. Nevertheless, the NMT found Steinbrinck guilty of membership in an organization declared criminal. Flick was sentenced to seven years confinement and Steinbrinck was sentenced to five years. *Id.* at 1223.

Similarly, in *Einsatzgruppen*, the NMT tried members of *Einsatz* units for a large number of murders, and noted that:

the elementary principle must be borne in mind that neither under Control Council Law No. 10 nor under any known system of criminal law is guilt for murder confined to the man who pulls the trigger or buries the corpse. In line

with recognized principles common to all civilized legal systems, paragraph 2 of Article II of Control Council Law No. 10 specifies a number of types of connection with crime which are sufficient to establish guilt. Thus, not only are principals guilty but also accessories, those who take a consenting part in the commission of crime or are connected with plans or enterprises involved in its commission, those who order or abet crime, and those who belong to an organization or group engaged in the commission of crime. These provisions embody no harsh or novel principles of criminal responsibility.... Any member who assisted in enabling these [*Einsatz* units whose express mission, well known to all the members, was to carry out a large scale program of murder] to function, knowing what was afoot, is guilty of the crimes committed by the unit.

... The cook in the galley of a pirate ship does not escape the yardarm merely because he himself does not brandish a cutlass. The man who stands at the door of a bank and scans the environs may appear to be the most peaceable of citizens, but if his purpose is to warn his robber confederates inside the bank of the approach of the police, his guilt is clear enough. And if we assume, for the purposes of argument, that the defendants such as Schubert and Graf have succeeded in establishing that their role was an auxiliary one, they are still in no better position than the cook or the robbers' watchman.[154]

## 5. Army 1914 and 1956 Manuals

In 1914, the United States War Department "replaced General Orders No. 100 with an army field manual entitled '*The [Rules] of Land Warfare*' which, updated, is still in force."[155] The purpose of the 1914 Manual was to provide authoritative guidance to military personnel on customary and treaty law applicable to the conduct of warfare on land. 1914 Manual at 3, 11–13. The 1914 Manual ¶¶ 369, 371, and 373 permit prosecution as war criminals of individuals who engage in hostilities without qualifying as lawful combatants or privileged belligerents stating:

369. **Hostilities committed by individuals not of armed forces.**—Persons who take up arms and commit hostilities without having complied with the conditions prescribed for securing the privileges of belligerents, are, when captured by the enemy, liable to punishment for such hostile acts as war criminals.

371. **Highway robbers and pirates of war.**—Men, or squads of men, who commit hostilities, whether by fighting, or by inroads for destruction or plunder, or by raids of any kind, without commission, without being part and portion of the organized hostile army, and without sharing continuously in the war, but who do so with intermitting returns to their homes and avocations, or with the occasional assumption of the semblance of peaceful pursuits, divesting themselves of the character or appearance of soldiers—such men, or squads of men, are not [lawful combatants or privileged belligerents], and, therefore, if captured,

**154.** *Prosecutor v. Tadić*, Judgment, Case No. IT–94–1–A, ¶ 200 (ICTY Appeal Chamber, July 15, 1999) (*Tadić* Appeal Chamber) (quoting The *United States of America v. Otto Ohlenforf et al.*, 4 *Trials of War Criminals Before the Nuernberg Military Tribunals under Control Council Law No. 10* at 372–73 (1951)).

**155.** Gregory P. Noone, *The History and Evolution of the Law of War Prior to World War II*, 47 Naval L.Rev. 176, 200 (2000) (citing Telford Taylor, *The Anatomy of the Nuremberg Trials: A Personal Memoir* 10 (1992); Field Manual FM 27–10, *The Law of Land Warfare*, (1956)).

are not entitled to the privileges of prisoners of war, but shall be treated summarily as highway robbers and pirates. 373. **Armed prowlers.**—Armed prowlers, by whatever names they may be called, or persons of the enemy's territory, who steal within the lines of the hostile army for the purpose of robbing, killing, or of destroying bridges, roads, or canals, or of robbing or destroying the mail, or of cutting the telegraph wires, are not entitled to the privileges of the prisoner of war.

In 1942, the Supreme Court cited the 1914 and 1940 Rules of Land Warfare as the War Department's guidance to the Army on war crimes. *See Quirin*, 317 U.S. at 33–34, 63 S.Ct. 2. In 1956, the U.S. Army updated the 1940 version of the Rules of Land warfare with Field Manual 27–10, *The Law of Land Warfare* (1956 Manual). The 1956 Manual at ¶¶ 502–504 listed grave breaches of the Geneva Conventions and a representative list of other war crimes. At ¶ 499 it defines "the term 'war crime' " to be "the technical expression for a violation of the law of war by any person or persons, military or civilian. Every violation of the law of war is a war crime." Like the 1914 Manual, the 1956 Manual permits prosecution of unlawful combatants or unprivileged belligerents as war criminals stating:

80. **Individuals Not of Armed Forces Who Engage in Hostilities** Persons, such as gue[ ]rillas and partisans, who take up arms and commit hostile acts without having complied with the conditions prescribed by the laws of war for recognition as belligerents (see GPW, art. 4; par. 61 herein), are, when captured by the injured party, not entitled to be treated as prisoners of war and may be tried and sentenced to execution or imprisonment.

81. **Individuals Not of Armed Forces Who Commit Hostile Acts** Persons who, without having complied with the conditions prescribed by the laws of war for recognition as belligerents (see GPW, art. 4; par. 61 herein), commit hostile acts about or behind the lines of the enemy are not to be treated as prisoners of war and may be tried and sentenced to execution or imprisonment. Such acts include, but are not limited to, sabotage, destruction of communications facilities, intentional misleading of troops by guides, liberation of prisoners of war, and other acts not falling within Articles 104 and 106 of the Uniform Code of Military Justice and Article 29 of the Hague Regulations.

The 1956 Manual provides for punishment of those who assist in illegal hostilities stating in ¶ 82 that persons culpable under ¶¶ 80 and 81 "who have attempted, committed, or conspired to commit hostile or belligerent acts are subject to the extreme penalty of death because of the danger inherent in their conduct. Lesser penalties may, however, be imposed."

### E. Ex Post Facto

■ The Constitution's Ex Post Facto Clause was understood by the Founders to be among the most significant rule of law guarantees in the Constitution. In *The Federalist*, Alexander Hamilton stated:

The creation of crimes after the commission of the fact, or in other words, the subjecting of men to punishment for things which, when they were done, were breaches of no law, and the practice of arbitrary imprisonments, have been, in all ages, the favorite and most formidable instruments of tyranny.[156]

---

**156.** Robert G. Natelson, *Statutory Retroactivity: The Founder's View*, 39 Idaho L.Rev. 489, 520 (2003) (quoting Alexander Hamilton, The Federalist No. 84, *The Federalist Papers* 511– 12 (Clinton Rossiter Ed., 1961)); Frederick Quinn, *The Federalist Papers Reader* 174 (Seven Locks Press 1993).

Any law which removes defenses, imposes liability or otherwise makes more severe the punishment for past conduct is prohibited as an *ex post facto* application of the laws. *Collins v. Youngblood,* 497 U.S. 37, 42, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990). Over 200 years ago, Justice Chase described four categories of *ex post facto* laws stating:

> 1st. Every law that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action. 2d. Every law that *aggravates* a *crime,* or makes it *greater* than it was, when committed. 3d. Every law that *changes the punishment,* and inflicts a *greater punishment,* than the law annexed to the crime, when committed. 4th. Every law that alters the *legal* rules of *evidence,* and receives less, or different, testimony, than the law required at the time of the commission of the offence, *in order to convict the offender.* All these, and similar laws, are manifestly unjust and oppressive.[157]

International law recognizes the legal maxim *"nullum crimen sine lege"* as a general principle of justice. 22 *Trial of the Major War Criminals Before the International Military Tribunal* 462 (1948). The perpetrator "must know that he is doing wrong and so far from it being unjust to punish him, it would be unjust if his wrong were allowed to go unpunished." *Id.* at 462. Like the Constitution's Ex Post Facto Clause, the maxim's goal is to

prevent punishment of an individual for acts which he or she "reasonably believed to be lawful at the time of their commission. It strains credibility to contend that the accused would not recognize the criminal nature of the acts alleged in the indictment."[158] Similarly, the Special Court for Sierra Leone ruled:

> "[i]n interpreting the principle *nullum crimen sine lege,* it is critical to determine whether the underlying conduct at the time of its commission was punishable. The emphasis on conduct, rather than on the specific description of the offence in substantive criminal law, is of primary relevance."[159] In other words, it must be "foreseeable and accessible to a possible perpetrator that his concrete conduct was punishable."[160]

▮▮▮ Changes to judicial tribunals, venue, and jurisdiction do not violate the Ex Post Facto Clause of the Constitution. Creation of a new court to assume the jurisdiction of an old court does not implicate *ex post facto* prohibitions so long as the "substantial protections" of "the existing law" are not changed to the prejudice of the accused. *See Duncan v. Missouri,* 152 U.S. 377, 382–83, 14 S.Ct. 570, 38 L.Ed. 485 (1894). Transfer of jurisdiction from one court or tribunal to another does not violate *ex post facto* prohibitions. As the Supreme Court explained:

> Application of a new jurisdictional rule usually takes away no substantive right but simply changes the tribunal that is

**157.** *Collins v. Youngblood,* 497 U.S. 37, 41–42, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990) (quoting *Calder v. Bull,* 3 U.S. 386, 390–91, 3 Dall. 386, 1 L.Ed. 648 (1798) (emphasis in original)). An *ex post facto* law is one which imposes criminal punishment for conduct lawful when committed. *Stogner v. California,* 539 U.S. 607, 609–22, 123 S.Ct. 2446, 156 L.Ed.2d 544 (2003).

**158.** *See Prosecutor v. Delalic,* IT–96–21–A, Judgement, Appeals Chamber, ¶ 179 (Feb. 20, 2001) (citation omitted).

**159.** *Prosecutor v. Hadzihasanović, Alagić and Kubura,* IT–01–47–PT, Trial Chamber, Decision on Joint Challenge to Jurisdiction, ¶ 62 (Nov. 12, 2002).

**160.** *Prosecutor v. Sam Hinga Norman,* SCSL–2004–14–AR72(E), Special Court for Sierra Leone (Appeals Chamber), ¶ 25 (May 31, 2004) (citation omitted).

to hear the case. Present law normally governs in such situations because jurisdictional statutes speak to the power of the court rather than to the rights or obligations of the parties. Statutes merely addressing *which* court shall have jurisdiction to entertain a particular cause of action can fairly be said merely to regulate the secondary conduct of litigation and not the underlying primary conduct of the parties. Such statutes affect only *where* a suit may be brought, not *whether* it may be brought at all.

*Hughes Aircraft Co. v. United States,* 520 U.S. 939, 951, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997) (internal citations and quotation marks omitted; emphasis in original). The Supreme Court has upheld post-offense procedural changes against *ex post facto* challenges "even if application of the new rule operated to a defendant's disadvantage in a particular case." *Landgraf v. USI Film Products,* 511 U.S. 244, 275 n. 28, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (citations omitted).

### F. Conclusion

When the Supreme Court in *Quirin* analyzed whether the military commission had jurisdiction to adjudicate the cases of the Nazi saboteurs, the Court examined the charged offenses, noting the Congress incorporated by reference through the 15th Article of War, "as within the jurisdiction of military commissions, all offenses which are defined as such by the law of war." 317 U.S. at 30, 63 S.Ct. 2 (internal citation omitted). "Congress had the choice of crystallizing ... every offense against the law of war, or of adopting the system of common law applied by military tribunals so far as it should be recognized and deemed applicable by the courts.[161] It chose the latter course." *Id.*

 In the instant case, Congress exercised authority derived from the Constitution to define and punish offenses against the law of nations by codifying an existing law of war violation into a clear and comprehensively defined offense of providing material support to terrorism.[162] The President, through the Secretary of Defense, further defined the procedures for military commissions in the M.M.C. in a manner that is similar to the Manual for Courts-Martial (MCM). Congress's stated purpose for the 2006 M.C.A. was to "codify offenses that have traditionally been triable by military commissions." In this case, we find, in defining and punishing providing material support for terrorism in the 2006 M.C.A., that is precisely

---

**161.** "For two centuries" the Supreme Court has "affirmed that the domestic law of the United States recognizes the law of nations." *Sosa v. Alvarez–Machain,* 542 U.S. 692, 729–30, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004) (citing *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 423, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) ("[I]t is, of course, true that United States courts apply international law as a part of our own in appropriate circumstances"); *The Paquete Habana,* 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900); *The Nereide,* 13 U.S. at 423 (Marshall, C.J.) ("[T]he Court is bound by the law of nations which is a part of the law of the land"); *see also Texas Industries, Inc. v. Radcliff Materials, Inc.,* 451 U.S. 630, 641, 101 S.Ct. 2061, 68 L.Ed.2d 500 (1981)).

**162.** "Where a statute provides the conditions for the exercise of governmental power, its requirements are the result of a deliberative and reflective process engaging both of the political branches," *Hamdan,* 548 U.S. at 637, 126 S.Ct. 2749 (Kennedy, Souter, Ginsburg, and Breyer, JJ., concurring). In the area of national security and foreign affairs, when determining what is required to serve the Government's interest in preventing terrorism, "the considered judgment of Congress and the Executive ... is entitled to significant weight." *Holder v. Humanitarian Law Project,* 561 U.S. ——, 130 S.Ct. 2705, 2728–29, 177 L.Ed.2d 355 (2010).

what Congress has done. Congress did not create a new offense, providing material support for terrorism was an existing law of war offense since at least 1996.

■ For purposes of compliance with the Define and Punish Clause of the Constitution, the standard of review for whether an offense as codified by Congress violates the law of war is not clearly established by applicable precedents. However, we find that the evidence supporting the 2006 M.C.A. offense of providing material support for terrorism as a pre-existing law of war offense far exceeds even the "substantial showing" standard advanced in *Hamdan* that "the Government must make a substantial showing that the crime for which it seeks to try a defendant by military commission is acknowledged to be an offense against the law of war." [163]

When appellant's charged offenses began in 1996, the underlying wrongful conduct of providing material support for terrorism, as now defined under the 2006 M.C.A., was a cognizable offense under the law of war. Crimes equivalent to providing material support for terrorism had been recognized in various United Nations Security Council Resolutions, regional conventions, and the domestic criminal codes, among other authorities. Military commission trials in the 19th and 20th centuries involved violations of the law of war similar to wrongfully providing material support to terrorism. Many of these offenses violated the laws and customs of war because they engaged in an unlawful belligerency, used an illegal means of warfare, or targeted protected persons. Addi-

tionally, the conduct of providing assistance to others with knowledge that those they assist, have, or intend to violate the laws and customs of war has long been tried as a law of war offense.

■ In light of our holding that providing material support for terrorism is a codification of a pre-existing law-of-war violation, we conclude that the Ex Post Facto Clause of the Constitution was not violated by appellant's conviction for providing material support to terrorism under the M.C.A. of 2006.

## VIII. EQUAL PROTECTION

■ The military commission judge ruled that the 2006 M.C.A. properly established jurisdiction over appellant and his offenses, notwithstanding its jurisdictional limitation to aliens. On appeal, appellant disputes the military commission judge's ruling by asserting that he possesses a "fundamental right" to equality in criminal proceedings arising from a constitutional entitlement to identical trial forum and procedural treatment to that enjoyed by U.S. citizens. Appellant preserved this issue by litigating it at trial. He argues that any deviation from such equal treatment violates the Fifth and Fourteenth Amendments and the Supreme Court holding in *Boumediene v. Bush*, 553 U.S. 723, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008), and is only permissible for reasons sufficient to survive a strict scrutiny analysis. We disagree and decline to adopt the level of scrutiny urged by appellant.

Appellant's military commission satisfied the equal protection guarantees of the U.S.

---

**163.** *Hamdan*, 548 U.S. at 602–603, 126 S.Ct. 2749 (stating, "Government must make a substantial showing that the crime for which it seeks to try a defendant by military commission is acknowledged to be an offense against the law of war," and applying the "substantial showing" standard when "neither the elements of the offense nor the range of permis- sible punishments is defined by statute or treaty, the precedent must be plain and unambiguous.") (Stevens, Souter, Ginsburg, and Breyer, JJ., concurring). In our case, Congress has "positively identified" providing material support for terrorism as a war crime. *Id.* at 601–602, 126 S.Ct. 2749.

Constitution and is consistent with the ruling in *Boumediene*.[164] We agree with the military commission judge that the M.C.A.'s restriction to prosecution of AUECs does not constitute a prohibited invidious discrimination against aliens, and appellant does not have a fundamental constitutional right to criminal procedures identical to those of U.S. citizens.[165]

## A. Jurisdiction of Article I Courts

Congress established the M.C.A. in an exercise of its constitutional authority under Article 1, sec. 8, cl. 10 to "define and punish ... offenses against the law of nations." In this regard, the legislature provided the executive an additional forum for the prosecution of such offenses. That such executive discretion is based, in part, on a distinction between U.S. citizens and noncitizens is entirely consistent with the Supreme Court's observation that the Constitution's framers had not "supposed that a nation's obligations to its foes could ever be put on a parity with those to its defenders."[166]

The Supreme Court has recognized that U.S. military commissions and U.S. occupation courts are necessary to address

164. The Court's decision in *Boumediene* was focused on the constitutionality of Section 7 of the 2006 M.C.A., which purported to suspend the writ of habeas corpus for detainees at Guantanamo Bay. The Court distinguished *Eisentrager*, noting that Boumediene had not received a "trial by military commission for violations of the laws of war. The difference [from *Eisentrager*, 339 U.S. at 766, 70 S.Ct. 936] is not trivial." *Boumediene*, 128 S.Ct. at 2260.

165. The military commission judge at p. 6 found:

(1) that the accused has been found to be an alien unlawful enemy combatant by a full, fair, open and adversarial hearing, the determination having been made by a military [commission] judge; (2) that the site of his apprehension and detention "is a factor that weighs against a finding that he has rights under the [Constitution]" *Boumediene* [, 128 S.Ct. 2229, 2260 (2008)]; (3) that there are substantial practical arguments against applying the Equal Protection Clause in Guantanamo Bay; (4) that the alternative remedy Congress has provided is less protective than the accused would receive were Equal Protection to apply, but not significantly so; (5) that there is no necessity for the Equal Protection Clause to apply to prevent injustice in the trial of detainees in Guantanamo, and (6) that application of the Equal Protection component of the Due Process Clause in Guantanamo Bay would be anomalous and impractical. All of the six factors analyzed weigh against application of the Equal Protection component of the Due Process

Clause in Guantanamo Bay. Finally, the Commission notes that in *United States v. Verdugo–Urquidez*, 494 U.S. 259, 269 [110 S.Ct. 1056, 108 L.Ed.2d 222] (1990), the Supreme Court wrote: "[T]his Court's decisions expressly according differing protection to aliens than to citizens also undermine respondent's claim that treating aliens differently under the 14th Amendment violates the Equal Protection component of the 5th Amendment."

166. *Eisentrager*, 339 U.S. at 775, 70 S.Ct. 936. In *Eisentrager*, the Supreme Court emphatically stated the Fifth Amendment did not invest:

enemy aliens in unlawful hostile action against us with immunity from military trial, [putting] them in a more protected position than our own soldiers. American citizens conscripted into the military service are thereby stripped of their Fifth Amendment rights and as members of the military establishment are subject to its discipline, including military trials for offenses against aliens or Americans. Can there be any doubt that our foes would also have been excepted, but for the assumption "any person" would never be read to include those in arms against us? It would be a paradox indeed if what the Amendment denied to Americans it guaranteed to enemies. And, of course, it cannot be claimed that such shelter is due them as a matter of comity for any reciprocal rights conferred by enemy governments on American soldiers.

*Eisentrager*, 339 U.S. at 783, 70 S.Ct. 936 (internal citations omitted).

"many urgent governmental responsibilities related to war. They have been called our common law war courts. They have taken many forms and borne many names. Neither their procedure nor their jurisdiction has been prescribed by statute. It has been adapted in each instance to the need that called it forth." *Madsen v. Kinsella*, 343 U.S. 341, 346–47, 72 S.Ct. 699, 96 L.Ed. 988 (1952) (internal footnotes omitted) (citing *In re Yamashita*, 327 U.S. 1, 18–23, 66 S.Ct. 340, 90 L.Ed. 499 (1946)). In direct contrast, the 2006 M.C.A. is an explicit statutory prescription with a further prescribed jurisdictional ambit of AUECs committing offenses in the context of and associated with armed conflict. *See* n. 48, 49, and 54.

Court-martial jurisdiction, like military commission jurisdiction, is based on Article I of the Constitution. In recent years, Congress has expanded court-martial jurisdiction over more offenses and categories of persons. *See Loving v. United States*, 517 U.S. 748, 752–54, 760–68, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996) (discussing history of the expansion of court-martial jurisdiction and stating "[o]ver the next two centuries, Congress expanded court-martial jurisdiction"); *see also* 10 U.S.C. § 802 (2011) (listing categories of persons subject to court-martial jurisdiction). For example, courts-martial can now try offenses without regard to the offense's service connection.[167] Courts-martial can and do prosecute federal crimes such as "counterfeiting (18 U.S.C. § 471) and various frauds against the Government not covered by Article 132," UCMJ. 2008 MCM, Part IV, ¶ 60c(4)(b). Courts-martial routinely assimilate state criminal codes for offenses occurring on military installations.[168] *See* 10 U.S.C. § 934. Moreover, courts-martial are not necessarily restricted or limited by other constitutional requirements applicable to Article III Courts.[169]

Appellant's theory that trial of a broad array of criminal and law of war offenses is not constitutionally permitted for jurisdictional reasons in Article I courts is without merit. Like courts-martial, there is no compelling reason not to permit properly constituted military commissions to try such offenses.

**B. Due Process**

 We recognize that the life, liberty, and property of persons tried before an American court or tribunal established

167. *Solorio v. United States*, 483 U.S. 435, 450–51, 107 S.Ct. 2924, 97 L.Ed.2d 364 (1987). *Compare Solorio*, 483 U.S. at 442–49, 456–62, 107 S.Ct. 2924 (discussing history of the scope of court-martial jurisdiction) *with O'Callahan v. Parker*, 395 U.S. 258, 268–74, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969) (same).

168. Through the Federal Assimilative Crimes Act, 18 U.S.C. § 13, Congress adopted "state criminal laws for areas of exclusive or concurrent federal jurisdiction," and made them applicable for military personnel who commit offenses against those laws, provided they are not otherwise preempted. *See* 2008 MCM, Part IV, ¶ 60c(4)(c)(ii). *See e.g., United States v. Robbins*, 52 M.J. 159 (C.A.A.F.1999); *United States v. Wright*, 5 M.J. 106 (C.M.A.1978); *United States v. Rowe*, 13 U.S.C.M.A. 302, 32 C.M.R. 302 (1962).

169. *Compare Weiss v. United States*, 510 U.S. 163, 166–68, 181, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994) (holding appointment of military judges need not satisfy requirements of Appointments Clause and did not violate the Constitution's Due Process Clause, and describing system of courts-martial established pursuant to Art. I, § 8, cl. 14) *with Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 59–60, 66, 87, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (holding provisions of the Bankruptcy Reform Act of 1978 unconstitutional because it conferred broad jurisdiction on bankruptcy judges, who lacked lifetime tenure and protection against salary reductions).

under our Constitution are protected by due process.[170] Analyzing the comparative rights and protections afforded by the M.C.A. in comparison to the UCMJ and criminal defendants in domestic federal District Courts, we are satisfied that the equal protection element of the due process clause has been met in this case.[171]

## C. *Boumediene* and Equal Protection under the Fifth Amendment

Appellant cites *Boumediene* in arguing that all of the constitutional due process and equal protections must apply to appellant's military commission. We find appellant's reliance on *Boumediene* is not persuasive. *Boumediene* decided the narrow issue of whether federal courts may entertain habeas petitions from noncitizens detained outside the United States. We decline to adopt appellant's broad application of the *Boumediene* decision.

Our reading of *Boumediene* suggests that, far from an intentionally broad extension of constitutional due process rights to AUECs, the Court intended to address the more fundamental issue of "the Constitution's separation-of-powers structure." *Boumediene*, 128 S.Ct. at 2246; *see also Rasul v. Bush*, 542 U.S. 466, 485–86, 124 S.Ct. 2686, 159 L.Ed.2d 548 (2004) (Kennedy, J., concurring).[172]

---

**170.** *Wong Wing v. United States*, 163 U.S. 228, 238, 16 S.Ct. 977, 41 L.Ed. 140 (1896); *accord Wong Yang Sung v. McGrath*, 339 U.S. 33, 48–53, 70 S.Ct. 445, 94 L.Ed. 616 (1950).

**171.** We note, per the M.C.A., appellant enjoys the following benefits similar to the rights received at courts-martial, in U.S. District Courts, and before international tribunals sponsored by the United Nations. Analyzing the comparative rights and protections afforded by the M.C.A. in comparison to the UCMJ and criminal defendants in U.S. Federal District Courts, there is no question that the essential due process requirement is satisfied. The President and Congress in the M.C.A. provided the following procedural benefits to AUECs:

(1) to be represented by counsel;

(2) to a public trial;

(3) to a panel of officer members, selected after a process of voir dire and challenge;

(4) to have compulsory process for the production of witnesses in his defense;

(5) to limitations on the admissibility of evidence under rules similar to the Military Rules of Evidence;

(6) to raise affirmative defenses such as are common in criminal trials;

(7) to be found guilty only if two thirds of the members present at the time of the balloting find him guilty beyond a reasonable doubt;

(8) to have the assistance of counsel in submitting a petition for clemency to the convening authority and filing an appeal;

(9) to have the findings and sentence reviewed by a convening authority and his or her legal advisor, who in the convening authority's sole discretion can grant clemency (including setting aside the findings of guilty, changing them to findings of guilty to a lesser offense, and reducing or setting aside the sentence) for any reason or for no reason at all; and an automatic appeal to the United States Court of Military Commission Review.

(10) Review by the United States Court of Appeals for the District of Columbia Circuit and the Supreme Court by writ of certiorari. *See* Jennifer Elsea, Cong. Research Serv. (CRS) Report for Congress Order Code R40932, *Comparison of Rights in Military Commission Trials and Trials in Federal Criminal Courts*, 8–24 (Jan. 26, 2010), *http://www.fas.org/sgp/crs/natsec/R40932.pdf*; Jennifer Elsea, CRS Report for Congress Order Code RL31262, *Selected Procedural Safeguards in Federal, Military, and International Courts* 11–34 (Sept. 18, 2006), *http://www.fas.org/sgp/crs/natsec/RL31262.pdf*.

**172.** Justice Kennedy writing for the majority in *Boumediene* noted, "[b]ecause the Constitution's separation-of-powers structure, like the substantive guarantees of the Fifth and Fourteenth Amendments, protects persons as well as citizens, foreign nationals who have the privilege of litigating in our courts can seek to enforce separation-of-powers principles." 128 S.Ct. at 2246 (citations omitted). It does not follow *a fortiori*, that non-citizens have

The *Boumediene* Court held that the Suspension Clause of "Art. I, § 9, cl. 2 of the Constitution [173] has full effect at Guantanamo Bay" and "[p]etitioners, therefore, are entitled to the privilege of habeas corpus to challenge the legality of their detention." *Boumediene*, 128 S.Ct. at 2262. Discussing the Insular Cases,[174] the Supreme Court identified factors [175] relevant to determining whether a Constitutional provision should apply to noncitizens outside of the United States and concluded extension of constitutional protections depends upon "the 'particular circumstances, the practical necessities, and the possible alternatives which Congress had before it' and in·particular, whether judicial enforcement of the provisions

would be 'impracticable and anomalous' " [176]

The *Boumediene* Court recognized that there was no historical precedent that noncitizens located overseas have rights under the U.S. Constitution stating, "It is true that before today the Court has never held that noncitizens detained by our Government in territory over which another country maintains *de jure* sovereignty have any rights under our Constitution." *Boumediene*, 128 S.Ct. at 2262. The Court distinguished *Boumediene* from other habeas cases involving enemy aliens held abroad and those tried by military commissions for war crimes by emphasizing that the proceedings in those cases all had an ad-

guarantees under the Fifth Amendment in a trial by military commission.

**173.** Art. I, § 9, cl. 2 of the Constitution provides, "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."

**174.** The Supreme Court addressed whether the Constitution applied in territories that are not a State, such as the Philippines, Territory of Hawaii, and Puerto Rico, "[i]n a series of decisions later known as the Insular Cases." *Boumediene*, 128 S.Ct. at 2254–55 (citing *Balzac v. Porto Rico*, 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922); *De Lima v. Bidwell*, 182 U.S. 1, 21 S.Ct. 743, 45 L.Ed. 1041 (1901); *Dooley v. United States*, 182 U.S. 222, 21 S.Ct. 762, 45 L.Ed. 1074 (1901); *Armstrong v. United States*, 182 U.S. 243, 21 S.Ct. 827, 45 L.Ed. 1086 (1901); *Downes v. Bidwell*, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901); *Hawaii v. Mankichi*, 190 U.S. 197, 23 S.Ct. 787, 47 L.Ed. 1016 (1903); *Dorr v. United States*, 195 U.S. 138, 24 S.Ct. 808, 49 L.Ed. 128 (1904)). *See also Torres v. Puerto Rico*, 442 U.S. 465, 475–476, 99 S.Ct. 2425, 61 L.Ed.2d 1 (1979) (Brennan, J., concurring in judgment) ("Whatever the validity of the [Insular Cases] in the particular historical context in which they were decided, those cases are clearly not authority for questioning the application of the Fourth Amendment—or any other provision of the Bill of Rights—to the Commonwealth of Puerto Rico in the 1970's.").

**175.** *Boumediene*, 128 S.Ct. at 2259 (stating, "[T]he outlines of a framework for determining the reach of the Suspension Clause are suggested by the factors the Court relied upon in *Eisentrager*. In addition to the practical concerns discussed above, the *Eisentrager* Court found relevant that each petitioner: '(a) is an enemy alien; .(b) has never been or resided in the United States; (c) was captured outside of our territory and there held in military custody as a prisoner of war; (d) was tried and convicted by a Military Commission sitting outside the United States; (e) for offenses against laws of war committed outside the United States; (f) and is at all times imprisoned outside the United States.' ") (citing *Eisentrager*, 339 U.S. at 777, 70 S.Ct. 936).

**176.** *Id.* at 2255 (quoting *Reid v. Covert*, 354 U.S. 1, 74–75, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (Harlan, J., concurring) and citing *United States v. Verdugo–Urquidez*, 494 U.S. 259, 277–278, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990) (Kennedy, J., concurring)). In *Reid v. Covert*, 354 U.S. 1, 5, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957), the Supreme Court held that military trials of two spouses of military personnel were unconstitutional. The *Boumediene* Court noted that the U.S. citizenship of the defendants "was a key factor and was central to the plurality's conclusion that the Fifth and Sixth Amendments apply·to American citizens tried outside the United States." *Boumediene*, 128 S.Ct. at 2256.

versarial structure, which included counsel to defend the accused.[177]

Citing the Insular Cases, the Court explained that the central issue it previously confronted was not whether constitutional protections were universally applicable, but rather "which of its provisions were applicable by way of limitation upon the exercise of executive and legislative power in dealing with new conditions and requirements." *Id.* at 2254–55 (quoting *Balzac v. Porto Rico*, 258 U.S. 298, 312, 42 S.Ct. 343, 66 L.Ed. 627 (1922)). Contrary to appellant's assertion, the Court expressly stated that the doctrine arising from its precedents did not practically extend constitutional protections "always and everywhere." *Id.* at 2255. Instead, the Court noted that it did so "sparingly and where it would be most needed." *Id.* at 2255 (citation omitted). We, therefore, view *Boumediene* and related cases as recognizing a limited right to judicial review of extraterritorial detention of noncitizens.

Most recently, our superior court noted that any argument equating a general right to habeas corpus "with all the accoutrements of ... domestic criminal defendants is highly suspect." *Al–Bihani v. Obama*, 590 F.3d 866, 876 (D.C.Cir.2010). The *Al–Bihani* Court elaborated as follows:

> [I]n the shadow of *Boumediene*, courts are neither bound by the procedural limits created for other detention contexts nor obligated to use them as baselines from which any departures must be justified. Detention of aliens outside the sovereign territory of the United States during wartime is a different and peculiar circumstance, and the appropriate procedures cannot be conceived of as mere extensions of an existing doctrine.

*Id.* at 877. In fact, the *Al–Bihani* opinion appeared to reject an extension of equal protection to noncitizen military detainees, when the court concluded that procedural protections of American citizens or legal residents "are likely greater than the procedures to which non-citizens seized abroad during war are entitled." *Id.* at 877 n. 3.

We agree with the military commission judge's determination in appellant's case that the Supreme Court's opinion in *Boumediene* does not reflect a broad, wholesale expansion of constitutional due process rights to military detainees and, by extension, to AUECs. We also agree with the military commission judge's further determination that, under the circumstances of the case, extending constitutional equal protection guarantees to AUECs tried before military commissions would be "impracticable and anomalous."

 Appellant cites to no precedent comprehensively extending equal protection or other constitutional due process rights to noncitizens tried by military commissions, either inside or outside the United States. Likewise, we find none. We are guided by the Supreme Court's admonition that "any rule of constitutional law that would inhibit the flexibility of the political branches of government to respond to changing world conditions should be adopted only with the greatest caution." *Mathews v. Diaz*, 426 U.S. 67, 81, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976). To read the *Boumediene* opinion to extend Fifth Amendment equal protection rights to AUECs tried before military commissions would be an exceptionally broad and incautious expansion of constitutional rights. We find, therefore, that AUECs are not under all circumstances fundamentally entitled to constitutional equal protection.

---

177. *Boumediene,* at 2271 (citing *Yamashita,* 327 U.S. at 5, 66 S.Ct. 340; *Quirin,* 317 U.S. at 23–24, 63 S.Ct. 2; Exec. Order No. 9185, 7 Fed.Reg. 5103 (1942) (appointing counsel to represent the Nazi saboteurs)).

## D. The 2006 M.C.A. and the Equal Protection Component of the Due Process Clause of the Fifth and Fourteenth Amendments

Assuming *arguendo* that AUECs tried before military commissions may, under some circumstances, possess a constitutional due process right of equal protection, we will now consider appellant's assertion that his equal protection rights were violated.

██ The case before this court today involves a federal statute implicating the Fifth, not Fourteenth, Amendment. While the *analysis* and *approach* of equal protection claims under the Fifth and Fourteenth Amendments are the same, the Supreme Court has recognized that there are special circumstances where federal interests compete with equal protection.[178] In those cases where the Court found competing national interests, they found "special deference to the political branches of the Federal Government [are] appropriate." *Id.* (citing, *e.g., Hampton v. Mow Sun Wong,* 426 U.S. 88, 100, 101–102 n. 21, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976)). The Supreme Court held that:

> The concept of equal justice under the law is served by the Fifth Amendment's guarantee of due process, as well as by the Equal Protection Clause of the Fourteenth Amendment. Although both

Amendments require the *same type of analysis ... the two protections are not always coextensive.* Not only does the language of the two Amendments differ, but more importantly, there may be overriding national interests which justify selective federal legislation that would be unacceptable for an individual State.[179]

In *Holder v. Humanitarian Law Project,* 561 U.S. ——, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010), the Supreme Court considered challenges of 18 U.S.C. § 2339B, which makes it a federal crime to provide "material support or resources to a foreign terrorist organization." Humanitarian Law Project (HLP) argued the statute violated the Fifth Amendment's Due Process Clause because of vagueness, and contravened HLP's First Amendment rights to freedom of speech and association. *Id.* at 130 S.Ct. at 2716–17. The Supreme Court emphasized the importance of not substituting the Court's evaluation of evidence for that of the legislative branch, recognizing that the legislative and executive branch's expertise and authority "do not automatically trump the Court's own obligation to secure the protection that the Constitution grants to individuals. But when it comes to collecting evidence and drawing factual inferences in this area, the lack of competence on the part of the courts is marked," and appropriate "respect for the Government's conclusions" is

---

**178.** *Adarand Constructors v. Pena,* 515 U.S. 200, 217, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) ("[C]ases in which we found special deference to the political branches of the Federal Government to be appropriate ... [do not] detract from this general rule [of analyzing equal protection claims with the same approach]"), citing *Buckley v. Valeo,* 424 U.S. 1, 93, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) ("Equal protection *analysis* in the Fifth Amendment area is the same as that under the Fourteenth Amendment") (emphasis added), and *Weinberger v. Wiesenfeld,* 420 U.S. 636, 638, n. 2, 95 S.Ct. 1225, 43 L.Ed.2d 514

(1975) ("this Court's *approach* to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment."). "We do not understand a few contrary suggestions appearing in cases in which we found special deference to the political branches of the Federal Government to be appropriate." *Id.* at 217–18, 115 S.Ct. 2097 (citation omitted).

**179.** *Hampton,* 426 U.S. at 100, 96 S.Ct. 1895 (emphasis added and internal citations omitted).

warranted. *Id.* at 2727 ("One reason for that respect is that national security and foreign policy concerns arise in connection with efforts to confront evolving threats in an area where information can be difficult to obtain and the impact of certain conduct difficult to assess") (internal quotation marks and citations omitted).[180] The Court emphasized, the "sensitive interests in national security and foreign affairs at stake," *id.* at 2728. The *Holder* Court, *id.* at 2731, concluded:

> The Preamble to the Constitution proclaims that the people of the United States ordained and established that charter of government in part to "provide for the common defence." As Madison explained, "[s]ecurity against foreign danger is . . . an avowed and essential object of the American Union." The Federalist No. 41, p. 269 (J. Cooke ed. 1961). We hold that, in regulating the particular forms of support that plaintiffs seek to provide to foreign terrorist organizations, Congress has pursued that objective consistent with the limitations of the First and Fifth Amendments.

Bounded by the Constitution of the United States, Congress has the power to define and punish offenses against the laws of nations and to promulgate laws related to national defense, war power, establishment of courts and tribunals, and the treatment of aliens. U.S. Const., art. I, § 8. Individual states subject to the Fourteenth Amendment do not share these powers or responsibilities. This is a significant and dispositive distinction.

As our focus in the instant case is on equal protection under the Fifth Amendment, we decline to opine as to what other, if any, specific constitutional due process rights beyond habeas corpus might, under other circumstances, properly be afforded to AUECs.

### E. Legal Test

Appellant argues that discriminatory language of the M.C.A. statute is subject to strict scrutiny because it infringes on his "fundamental rights" to due process. Appellant contends that the alienage distinction was designed to "prevent the disfavored and disenfranchised group from using the political process to protect itself" and that "[l]egislation such as the M.C.A. aimed solely at the politically powerless attracts strict scrutiny." Appellant cites to cases including *Clark v. Jeter*, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988), *Plyler v. Doe*, 457 U.S. 202, 216–17, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), *Douglas v. California*, 372 U.S. 353, 358, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963), and *Griffin v. Illinois*, 351 U.S. 12, 15–17, 76 S.Ct. 585, 100 L.Ed. 891 (1956), to make his point that such a fundamental right as equality in criminal proceedings is subject to strict scrutiny. Appellant's Brief 26–30.

Appellant's cited authority is not persuasive and is readily distinguishable. None of the cases he cites involve competing national interests, all of the cases were tried in Article III courts, all of the cases involved the application of the Fourteenth Amendment, and only one case, *Plyler*, involves an alien party.[181] Nothing in

---

**180.** *See also Holder*, 130 S.Ct. at 2727–28 (noting special deference due political branches of the government when "weighty interests of national security and foreign affairs" are the basis of a statute designed "to prevent imminent harms").

**181.** In *Clark*, the Court applied "intermediate scrutiny" and decided the state's statute

of limitations on filing paternity lawsuits violated the Equal Protection Clause of the Fourteenth Amendment, as the classification burdening illegitimate children, was not "substantially related to an important government objective." 486 U.S. at 461–65, 108 S.Ct. 1910. In *Plyler*, the Court invalidated a state statute denying alien children a free public education as the state had not shown

those precedents suggests. that the Supreme Court intended courts to apply heightened scrutiny in cases involving disparate treatment by the federal government of nonresident alien enemy combatants captured abroad.

■ On the contrary, precedent clearly mandates that deference be given to congressional classifications based on alienage where foreign policy interests are strongly implicated. In *United States v. Lopez-Flores*, 63 F.3d 1468 (9th Cir.1995), appellants challenged their conviction under the Hostage Taking Act, 18 U.S.C. § 1203, claiming that it violated the Equal Protection Clause of the Fifth Amendment by "impermissibly classifying offenders and victims on the basis of alienage." *Id.* at 1470. The court held that Congress's plenary control over immigration legislation and the accompanying low level of judicial review "dictate a similarly low level of review here, where foreign policy interests are strongly implicated." *Id.* at 1474. In fact, the 11th Circuit expressly held that "*congressional* classifications based on alienage are subject to rational basis review." [182]

In additional to congressional authority, the President traditionally has had broad authority in matters relating to enemy aliens. In 1950, the Supreme Court stated:

> that "the denial furthers a substantial state interest." 457 U.S. at 230, 102 S.Ct. 2382. In *Douglas*, the Court stated "where the merits of the one and only appeal an indigent has of right are decided without benefit of counsel, we think an unconstitutional line has been drawn between rich and poor," and held an indigent appellant has a right to appointed counsel on their appeal of right. 372 U.S. at 357, 83 S.Ct. 814. And in *Griffin*, the Court held that the state violated the Fourteenth Amendment's Due Process and Equal Protection Clauses by declining to pay for transcripts for indigent appellants. 351 U.S. at 18–20, 76 S.Ct. 585. In the instant case, appellant has a right to a transcript of

> Executive power over enemy aliens, undelayed and unhampered by litigation, has been deemed, throughout our history, essential to war-time security. This is in keeping with the practices of the most enlightened of nations and has resulted in treatment of alien enemies more considerate than that which has prevailed among any of our enemies and some of our allies. [The Alien and Sedition Act of 1789] was enacted or suffered to continue by men who helped found the Republic and formulate the Bill of Rights, and although it obviously denies enemy aliens the constitutional immunities of citizens, it seems not then to have been supposed that a nation's obligations to its foes could ever be put on a parity with those to its defenders.

*Eisentrager*, 339 U.S. at 774–75, 70 S.Ct. 936. We find, therefore, that the strong foreign policy implications associated with the war on terror, coupled with the recognition of the President's power over enemy aliens in times of war and Congress's power to enact legislation pertaining to aliens and its war powers, dictate the M.C.A.'s alienage distinction be reviewed under the deferential rational basis standard. *See* pages 1265–74, *supra.* (discussing authority of Congress and the Executive in the areas of war powers and foreign affairs).

his trial and to representation by appointed counsel at the trial and appellate levels without regard to his ability to pay. None of the cases appellant cited involved competing national interests.

**182.** *United States v. Ferreira*, 275 F.3d 1020, 1025–26 (11th Cir.2001) (noting that every circuit court of appeals that confronted the equal protection argument in a Hostage Taking Act case applied rational basis review and clarifying the distinction between strict scrutiny that applies to state classifications of aliens and rational basis review applicable to federal classifications of aliens).

## F. Application of Rational Basis Review

 Rational basis analysis requires a two-step inquiry: (1) whether there is a legitimate government purpose identifiable, regardless of actual motives; and (2) whether a rational basis exists to believe that the legislation would further that purpose. *United States v. Ferreira*, 275 F.3d 1020, 1026 (11th Cir.2001) (citing *Joel v. City of Orlando*, 232 F.3d 1353, 1357 (11th Cir.2000)).

Appellant argues that the M.C.A.'s legislative history suggests that Congress intended to create a discriminatory regime of lesser criminal procedures meant to punish aliens. The M.C.A.'s legislative history recognizes that persons tried under the M.C.A. may be captured on the battlefield under conditions where widely-used police investigative procedures cannot be applied. Appellant's assertions that Congress engaged in pernicious discrimination against aliens is not persuasive and wholly irrelevant so long as there is a "conceivably rational basis, [regardless of] whether that basis was actually considered by the legislative body." *Ferreira*, 275 F.3d at 1026 (noting that "the *actual* motives of the enacting governmental body are entirely irrelevant").

The first prong of the inquiry, whether a legitimate government interest exists, is easily satisfied as Congress enacted the M.C.A. to create a forum and a process by which to bring to justice foreign unlawful combatants whose purpose is to terrorize American citizens. There can be no more legitimate purpose of a government than to protect its citizens from its enemies. The second prong of the test, whether there is a rational basis to believe that the legislation will further the legitimate purpose, is met as Congress and the President have rightly determined that the treatment of foreign detainees captured on the battlefield in a foreign land has foreign policy implications, for which they are responsible. The legislation distinguishes between alien unlawful enemy combatants and the rest of the world and has a rational connection to its purpose.

 Reviewing the military commission judge's ruling *de novo*, we agree that the Fifth Amendment's equal protection component is not applicable to AUECs, who are tried at Guantanamo, Cuba, under the M.C.A. Nevertheless, after performing a functional analysis under *Boumediene*, we conclude that Congress established reasonable procedures in the M.C.A. for protecting the rights of AUECs and preserving national security. The M.C.A. provides due process, which is similar to the procedural protections received by defendants in U.S. District Courts, by accused U.S. military personnel at courts-martial, and by accused persons tried before international tribunals under the sponsorship of the United Nations.

Appellant was represented throughout his trial by counsel and received a full and fair trial. He was found not guilty of the majority of the charges. He was sentenced to serve only a few months of confinement after his trial, and has been returned to Yemen. We decline to find that appellant, as an unlawful enemy alien combatant, is entitled to more due process under the Fifth Amendment than he received.

 We find, therefore, that Congress had a rational basis for the disparate treatment of aliens in the M.C.A. and that such disparate treatment does not violate the equal protection component of the Fifth Amendment.

## IX. CONCLUSION

Appellant's assigned errors and legal arguments are without merit. Pursuant to the 2006 M.C.A., these proceedings, the

findings, and appellant's sentence are the product of lawful, Congressionally-created processes, "affording all the judicial guarantees of all civilized peoples." *See supra* n. 8.

The findings and approved sentence are correct in law and fact and no error materially prejudicial to the substantial rights of the Appellant occurred. 2009 M.C.A. §§ 950a(a) and 950f(d). Accordingly, the findings and sentence are affirmed.